UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
HAPPY HOUR DRINKS COMPANY, INC.                    Index No._____

                                      Plaintiff,

-against-                                          **COMPLAINT**  3:24-cv-00047 (TJM/ ML)

CAN MAN, LLC d/b/a Best Bev Co.,
BEST BEV, LLC and
JOHN DOES 1 through 100

                                      Defendants.
-----------------------------------------------------------------x

Plaintiff Happy Hour Drinks Company, Inc. ("Happy Hour" or "Plaintiff") hereby complains against defendant CAN MAN, LLC d/b/a Best Bev Co. ("Can Man" or "Defendant"), BEST BEV, LLC ("Best Bev") and JOHN DOES 1 through 100, inclusive, as follows:

## INTRODUCTION

1.      This action stems from reckless and negligent manufacturing procedures employed by Can Man over the course of multiple production runs that caused Plaintiff to incur millions of dollars in damages.  The damages caused by Can Man's conduct, and by the defective product it delivered, caused Plaintiff to suffer damages at the hands of its distributors, its retailers, and its consumers.  The damages are catastrophic and debilitating to a young start-up company with considerable momentum.

## PARTIES

2.      Plaintiff Happy Hour is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in Los Angeles, California.

1

3. Upon information and belief Defendant Can Man (d/b/a "Best Bev Co.") is, and at all times mentioned herein was, a corporation organized and existing under the laws of the State of Pennsylvania, and does business in Waverly, New York and formerly in Pennsberg, Pennsylvania.

4. Upon information and belief Defendant Best Bev, LLC is, and at all times mentioned herein was, a limited liability company existing under the laws of the U.S. Virgin Islands, and does business in Waverly, New York.

5. Happy Hour is unaware of the true names and capacities of the defendants named herein as DOES 1 through 100, inclusive, whether individual, corporate, associate, or otherwise and therefore sues such defendants by fictitious names. Happy Hour will seek leave of the court to amend the complaint to set forth the true names and capacities of said defendants when the same has been ascertained. Upon information and belief DOES 1 through 100, inclusive, and each of them, are responsible in some manner for the wrongful acts, occurrence, and/or omissions alleged herein and for the damages caused to Happy Hour.

6. Wherever appearing in this Complaint, each and every reference to Defendants, or to any of them, is intended to and shall refer to all Defendants, named and un-named, including all fictitiously named Defendants, unless said reference is otherwise specifically qualified.

**JURISDICTION AND VENUE**

7. Subject matter jurisdiction is proper pursuant to 28 U.S.C. §1332(a)(1), as there is complete diversity of citizenship between Happy Hour and Can Man and the amount in controversy exceeds $75,000.00.

8. Venue is proper in this judicial district under 28 U.S.C. §1391(b)(2), on information and belief that it is a district in which a substantial part of the events or omissions giving rise to Happy Hour's claims occurred, or a district in which a substantial part of property that is the subject of the action is situated.

### FACTUAL ALLEGATIONS

9. Happy Hour is an alcoholic beverage manufacturer with its principal place of business in Los Angeles, California. Happy Hour currently sells "Ready to Drink" tequila seltzer cocktails, which are mixed and placed into cans at Can Man's manufacturing facility.

10. Happy Hour differentiates itself from other "Ready to Drink" cocktails in the alcoholic beverage market, which incorporate malt liquor and sugar into their recipes, by using real tequila, sparkling water, and juice for a different taste. Tequila is thus an essential ingredient in Happy Hour cocktails.

11. From its inception, Happy Hour has engaged with co-packer Can Man to pack its cocktails into cans. As co-packer, Can Man is responsible for receiving Happy Hour's ingredients from vendors, storing them, and batching them into the ready-made cocktails that are sold to consumers. Accordingly, Can Man has significant influence over the process that eventually created a Happy Hour cocktail.

12. As Happy Hour has continued to grow, Can Man has continued to scale up its own production. While Can Man has continued to operate in Pennsylvania, where it maintains a registered office, it also recently established a 130,000-square-foot co-packing facility in Waverly, New York. Can Man has packed over 1 million cans of

Happy Hour cocktails annually, split into orders ("runs") that can total over 240,000 cans per order.

13. In November 2022, while Can Man was still packing cans in Pennsylvania, Happy Hour requested a run of approximately 10,000 cases, or 240,000 cans. However, upon receipt of the cans, Happy Hour discovered that nearly 80 percent of the cases contained cans that were leaking and could not be repaired. At this time, the cans were sitting at Happy Hour's distributors warehouse in California. Republic National Distributing Company ultimately disposed of nearly 8,000 cases of its product due to the faulty packaging process, and billed Happy Hour back for the damages

14. Happy Hour investigated the reason for the faulty packaging process, contacting Ardagh Metal Packaging ("Ardagh"), which supplies the metal beverage cans for Happy Hour's product. Ardagh noted that the leaking product was due to higher copper levels in the tequila and higher dissolved oxygen level.

15. Happy Hour subsequently contacted Can Man to discuss the apparent increase in copper levels in the tequila, and Can Man expressly disclaimed any liability for increased copper levels. Can Man provided Happy Hour with a report stating that copper levels had *decreased* in the new tequila mixture, from 1.94 mg/L to 1.61. Can Man further claimed that no other suppliers had encountered issues with leaking products, and asked Happy Hour to call each of its other ingredient vendors to ask if any of their ingredients had been changed or had noticed any changes in copper levels. However, no other vendors had *ever* used copper in their ingredients.

16. Can Man encouraged Happy Hour to continue working with Can Man due to their longstanding business relationship, promising that it would investigate the source of

4

the leakage while Can Man and Happy Hour maintained their business relationship. Happy Hour never received a report, nor any financial remedy, stemming from the promised investigations by Can Man into the November 2022 run.

17. Happy Hour continued its relationship with Can Man based on Can Man's consistent denial of fault and the parties' longstanding business relationship. Unaware of any underlying issues with Can Man's packaging process, Happy Hour ordered an additional run of 5,000 cases in April of 2023 and 7,000 cases in July 2023. However, the both the April and July runs carried issues of its own.

18. In connection with the April run, cans again began to leak and had to be disposed.

19. In connection with the July run, Happy Hour again received defective product. This time, the Happy Hour cans developed the same tiny holes that later leaked, as with the November 2022 run, while other cans were so misshapen that consumers would not be able to put the cans down on surfaces while drinking.

20. Prior to the November 2022 run, Can Man unilaterally decided to change the tequila in Happy Hour's recipe. Upon information and belief, the new tequila contained significantly higher levels of copper that led to corrosion in the cans.

21. The change in copper levels and the significantly higher oxygen levels caused the cans to corrode, and as a result, the cans developed tiny holes, from which there was significant amounts of product leakage. However, Can Man neglected to test cans while making the switch in its ingredients or check the dissolved oxygen specs when running the cans

22. Can Man intentionally and continually concealed each of these facts from Happy Hour. In fact, Can Man expressly denied all fault in the November 2022 production

run despite knowing that it was their changes that directly caused the products to become defective. Can Man even provided Happy Hour with a test report stating that the new tequila contained *lower* levels of copper than the prior mixture, attempting to expressly refute any concerns over its packaging process, when the opposite was true.

23. Happy Hour was finally able to glean this important fact in October 2023, as Can Man admitted liability for its failure to test the new ingredient mixture. However, Happy Hour had continued to engage Can Man for additional runs in the meantime without receiving any remedy for the defective November 2022 run. Had Happy Hour been aware, following the November 2022 run, that Can Man's decisions directly produced the defective cans before agreeing to continue its relationship with Can Man, Happy Hour would have further pursued claims for compensation and reconsidered its relationship with Can Man.

24. Additionally, in October 2023, Can Man, following an internal investigation, accepted liability for its failure in the July 2023 packaging process, providing Happy Hour with a written complaint, filed by a Can Man worker, stating that Happy Hour's cans were not packed properly due to incorrect tooling on the production line.

25. As a result of Can Man's actions, Happy Hour has been left with a financially significant amount of unusable product from multiple defective runs. Happy Hour has lost a tremendous amount of capital stemming from these defective products, between bill back for damaged product by its distributor, buybacks of damaged products in the market, loss of retailer accounts due to product leaking onto floors and molding on shelves, loss of brand goodwill, and loss of customers. Moreover, Happy Hour is still

learning of further damages stemming from the defective July 2023 run and losing additional capital as a result.

## FIRST CAUSE OF ACTION
### Negligence

26. Plaintiff reaffirms and reincorporates paragraphs 1 through 25 as if fully set forth herein.

27. Can Man was responsible for the manufacturing process for Happy Hour. Happy Hour would send its aluminum cans, ingredients, and packaging materials to Can Man. Can Man procured the tequila and citric acid that was used in the product, among some other ingredients items. Can Man was responsible for batching the ingredients, filling the cans on the production line, making sure the product was run per certain specifications, placing the cans into 4 packs and 8 packs, placing finished cases into pallets, and loading them on trucks to go to Happy Hour's distributors. Additionally, Can Man was responsible for ensuring that its production lines were clean and not littered with items that could cause holes to be poked in Happy Hour cans.

28. Can Man owed Happy Hour a duty to use reasonable care during the manufacturing process since it was in exclusive control of certain procurement, storage, production, and packaging. This duty includes the duty to review specifications for the aluminum cans regarding permissible dissolved oxygen levels, and also the duty to disclose changes in key components. Additionally, Can Man was under a duty to ensure that

its production lines were not littered with items that could cause holes to be poked in Happy Hour Cans.

29. Can Man breached this duty when it failed to review the dissolved oxygen specifications for the aluminum cans and consequently ran the dissolved oxygen levels at much higher level. Additionally, Can Man breached its duty when unilaterally decided to change the tequila to be used in the production run and failed to provide any specification regarding the composition of the new tequila used in the cans. Additionally, Can Man breached its duty when not running product on a clean production line, which caused holes to appear in cans, causing product to leak and damage entire pallets of inventory.

30. Can Man's actions caused damages to Happy Hour. As a result of Can Man's negligence, Happy Hour was injured and suffered considerable damages. Happy Hour's distributors have billed it back for the all the damaged inventory and has been fearful of placing large orders since it is uncertain whether such production issues will persist. Additionally, Happy Hour had to pause productions until it could figure out what the underlying issue cause of the leaking was. Happy Hour's retailers are unwilling to purchase the product for fear it will continue to leak and mold on their shelves. Happy Hour customers have also complained to Happy Hour via social media of wet boxes and empty cans when purchasing in stores. Additionally, Happy Hour sales representatives have been required to repurchase product from stores that are molded or damaged as a result of the defective productions. In sum, Can Mans negligence has caused Happy Hour millions of dollars in damages as it has effected

Happy Hours relationship with its distributors, retailers, and costumers. For an early stage start-up, such wide spread damages can be fatal.

## SECOND CAUSE OF ACTION
### Unjust Enrichment/ Quasi Contract

31. Plaintiff reaffirms and reincorporates paragraphs 1 through 30 as if fully set forth herein.

32. Happy Hour requested Can Man's services for the packing of Happy Hour's product, and Can Man continually provided runs of Happy Hour product.

33. Happy Hour performed services in good faith. Happy Hour received and paid invoices payable to Can Man. Happy Hour paid invoices for Can Man's services, even in defective runs. Happy Hour initially paid Can Man for the November 2022 and July 2023 runs and continued to pay Can Man for additional runs between the two runs at issue.

34. Can Man accepted Happy Hour's orders and accepted Happy Hour's payments.

35. Can Man failed to provide usable product. Can Man and Happy Hour had previously agreed to specifications for its product and all previous runs had conformed to these specifications, so it was understood by both parties that the November 2022 and July 2023 runs would meet these same specifications. Can Man failed to produce a usable product, going well beyond any specifications agreed upon by the parties.

36. Happy Hour, under its contract with Can Man, was entitled to the merchantability of its product under the contract. Can Man did not expressly disclaim and failed to reserve any exclusions to the implied warranty of merchantability under UCC 2-314.

37. As a direct and proximate result of Can Man's breach, Happy Hour has suffered damages in an amount to be determined at trial. This damage includes, but is not limited to, a the reasonable value of expenses stemming from consumer product returns, loss of retail accounts, loss of brand goodwill, and failure to fulfill its obligations to other distributors.

## THIRD CAUSE OF ACTION
### Fraudulent Misrepresentation

38. Plaintiff reaffirms and reincorporates paragraphs 1 through 37 as if fully set forth herein.

39. In February and March of 2023, Andrew Zimmerman and Anthony Ciocci of Can Man expressly disavowed any liability related to increased copper levels in Happy Hour's product due to changes in the tequila.

40. Defendant Can Man and DOES 1-100 falsely represented that Can Man was not responsible for the faulty production of cans in the November 2022 run. In fact, Can Man instructed Happy Hour to contact each of its ingredient vendors and ask them whether their products had changed their copper composition, when no other ingredient vendor utilized copper to create its product, knowing that Can Man was at fault from the start.

41. Defendants' representations were, in fact, false. Instead, the true facts include, *inter alia*, that Can Man had indeed changed its own product mix to incorporate more copper into its production process, that the change in copper levels along with increased (and out of spec) dissolved oxygen levels, increased the corrosiveness of the

product, and led to a significant increase in the production of defective cans as a result.

42. When Defendants made these representations, they knew them to be false and made these representations with the intention to deceive and defraud Happy Hour and to induce Happy Hour to act in reliance on the representations in the manner herein alleged, or with the expectation that Happy Hour would so act. Defendant also made these representations to avoid liability (which it knew to be substantial) and to continue a working relationship with Happy Hour despite its indisputable negligence.

43. Happy Hour, at the time these representations were made by Defendants, was ignorant of the falsity of those representations and believed them to be true.

44. The true facts concerning Defendants' representations were not reasonably observable by Happy Hour upon inspection.

45. Based on and in justifiable reliance on Defendants' representations, Happy Hour continued its relationship with Can Man with the expectation that Can Man would investigate the source of the leakage, forgoing compensation for Can Man's mistakes. Had Happy Hour known the true facts, it would have sought financial compensation from Can Man's insurance based on Can Man's failure to produce the proper product, and discontinued its relationship with Can Man.

46. As a direct and proximate result of the fraudulent conduct of Defendants as herein alleged, Happy Hour has suffered damages in an amount to be determined at trial.

47. This damage includes, but is not limited to, expenses stemming from consumer product returns, loss of retail accounts, loss of brand goodwill, and failure to fulfill its obligations to other distributors.

## FOURTH CAUSE OF ACTION
### Fraudulent Concealment and/or Fraud in the Inducement

48. Plaintiff reaffirms and reincorporates paragraphs 1 through 47 as if fully set forth herein.

49. On Friday October 20, 2023 at approximately 7 A.M. Pacific Standard Time, principals at Happy Hour discovered for the first time that the leaking in connection with the November 2023 run was caused by increased copper levels in its product. During a zoom call to discuss issues with the July 2023 production, Jesse King of Can Man asked John Pitts of Can Man whether Happy Hour was one of the clients that suffered damages due to increased copper levels. This was the first time the principals from Happy Hour heard members of Can Man acknowledge anything related to the increased copper levels causing damage to the product.

50. In the wake of the November 2022 run, Can Man expressly denied all liability for its faulty product and promised Happy Hour it would investigate its processes.

51. Happy Hour continued to engage Can Man for further business and ultimately chose not to seek financial compensation for the faulty product based on Can Man's reassurances and promises to investigate.

52. Upon information and belief, Can Man was aware that it had changed the tequila in Happy Hour's recipe and failed to test the effects of the change on Happy Hour's cans. Can Man was aware that this change caused the cans to develop holes and leak Happy Hour product despite expressly claiming otherwise.

53. Can Man failed to inform Happy Hour their changes were the primary reason for defective product production, and upon information and belief, continued to represent that it was not responsible for the product leakage in the November 2022 run.

54. Can Man has conducted several runs of Happy Hour product – and other alcoholic beverages – in the past and, upon information and belief, was aware or should have been aware, that the change in tequila needed to be tested and that untested changes could result in damage to the product. The change in ingredients without subsequent testing was a material alteration to the terms of the contract between the parties, and Can Man knew or should have known that its denial of the product issue would induce Happy Hour to avoid seeking financial compensation for the failed November 2022 run.

55. Happy Hour was injured due to Can Man's concealment of a material change in their agreement. Upon information and belief, Can Man knew Happy Hour would continue to engage it for future business if it continued to deny any fault for its defective packing process.

56. As a result of Can Man's omissions, Happy Hour was prevented from seeking financial redress for the failed November 2022 run and continued to pay for the damages suffered under the November run out of its own pockets, nearly bankrupting Happy Hour in the process. Additionally, Happy Hour was induced to continue engaging with Can Man, leading to the failed July 2023 run that further deepened Happy Hour's financial struggles.

57. As a direct and proximate result of the intentional and willful fraudulent conduct of Defendants as herein alleged, Happy Hour has suffered damages in an amount to be determined at trial.

58. This damage includes, but is not limited to, expenses stemming from consumer product returns, loss of retail accounts, loss of brand goodwill, and failure to fulfill its obligations to other distributors.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Happy Hour Drinks Company demands Judgment against Defendant Can Man, LLC, as follows:

On the First Cause of Action, for damages, including, but not limited to, the expenses stemming from consumer product returns, loss of retail accounts, loss of brand goodwill, and failure to fulfill its obligations to other distributors, which is in excess of the minimum jurisdictional limits of this Court and consequential damages, such as lost profits under UCC 2-714 and 715, in an amount to be determined at trial.

On the Second Cause of Action, for damages, including, but not limited to, the expenses stemming from consumer product returns, loss of retail accounts, loss of brand goodwill, and failure to fulfill its obligations to other distributors, which is in excess of the minimum jurisdictional limits of this Court and consequential damages, such as lost profits under UCC 2-714 and 715, in an amount to be determined at trial.

On the Third Cause of Action, for damages, including, but not limited to, the expenses stemming from consumer product returns, loss of retail accounts, loss of brand goodwill, and failure to fulfill its obligations to other distributors, which is in

excess of the minimum jurisdictional limits of this Court and consequential damages, such as lost profits under UCC 2-714 and 715, and punitive damages, in an amount to be determined at trial.

On the Fourth Cause of Action, for damages, including, but not limited to, the expenses stemming from consumer product returns, loss of retail accounts, loss of brand goodwill, and failure to fulfill its obligations to other distributors, which is in excess of the minimum jurisdictional limits of this Court and consequential damages, such as lost profits under UCC 2-714 and 715, and punitive damages, in an amount to be determined at trial.

As and for all such causes of action, such other and further relief as the Court deems just and proper.

Dated: Nanuet, New York
       January 4, 2024

*[signature]*
JOSEPH A. CHURGIN (6854)
Savad Churgin
*Attorneys for Plaintiff*
55 Old Turnpike Road, Suite 209
Nanuet, New York 10954
(845) 624-3820
j.churgin@savadchurgin.com