**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

HAPPY HOUR DRINKS COMPANY, INC.,

Plaintiff,

-against-

CAN MAN, LLC d/b/a Best Bev Co.;
BEST BEV, LLC and
JOHN DOES 1 through 100,

Defendants.

**DECLARATION OF RYAN USZENSKI IN OPPOSITION TO PLAINTIFF'S MOTION TO AMEND**

Case No. 3:24-cv-00047 (ECC/ML)

I, Ryan Uszenski, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, the following:

1. I am the managing member of Can Man, LLC, one of the two named defendants in the above-captioned action. It is my understanding that the plaintiff, Happy Hour Drinks Company, Inc. ("Happy Hour"), is seeking leave of Court to add me, individually, as a defendant in this action.

2. I am a resident of the United States Virgin Islands.

3. In May of 2021, I formed defendant Can Man, LLC ("Can Man") as a Pennsylvania limited liability company. A copy of Can Man's Operating Agreement is annexed hereto as Exhibit "A."

4. To the best of my knowledge, at all times since its formation, with the assistance of counsel and accountants, Can Man has been operated in accordance with the applicable terms of its Operating Agreement, changes in its quity structure, and the laws of the Commonwealth of Pennsylvania.

5. I formed Can Man in May 2021 for the purpose of engaging in low-end spirit sales and beverage co-packing. In furtherance of those purposes, Can Man rented premises at 2512 Quakertown Road in Pennsburg, Pennsylvania. A copy of Can Man's lease for these premises is attached at Exhibit "B."

6. Happy Hour has suggested that Can Man paid rent "to an entity at [Shawn] Sheehan's address in St. Thomas." This is simply not true. Can Man paid (and still pays) rent to the owner of the building at 2512 Quakertown Road: MH II Pennsburg, LLC, which has an address of 300 Conshohocken State Road, Suite 100, West Conshohocken Pennsylvania 19428-3803. Specifically, as per the terms of the lease, Can Man executed an "Authorization Agreement for Direct Deposits (ACH Debits)" and its rent is paid via ACH (i.e., wire payments) to the landlord.

7. I have no interest in MH II Pennsburg, LLC and I have not profited or benefited from Can Man's rent payments to that entity.

8. Happy Hour has also suggested that Shawn Sheehan is a member of Can Man and that Mr. Sheehan "held a 90% profit-and-loss interest in Can Man." This is, likewise, not true.

9. Rather, shortly after its formation, on or about October 1, 2021, Can Man financed its operations by executing a Convertible Note with the Shawn P Sheehan Revocable Trust (the "Trust"). Per the terms of the Convertible Note, in lieu of repayment, a portion of Can Man's debt under that note was converted to equity in Can Man. As a result of this election, the Trust—not Mr. Sheehan individually—acquired a 9.99% equity interest in Can Man, and my ownership interest in Can Man was reduced to 90.1%.

10. Happy Hour claims that I "totally" controlled Can Man. Of course, as the managing member of Can Man I am charged with primary responsibility for Can Man. This would be true of any managing member of any member-managed LLC. However, the claim that my role as managing member supports the conclusion that Can Man is simply my "alter ego" is not accurate.

11. In furtherance of its business operations, Can Man hired managers and employees who were responsible for the day-to-day operations of the business. Can Man rented equipment, including canning equipment, sought out customers, entered into co-packing relationships with beverage companies, purchased ingredients, paid vendors, and operated at all times as a functioning manufacturing and co-packing business. The company was not simply a "front" for my own personal activities.

12. I dispute Happy Hour's unsubstantiated allegation that Can Man was inadequately capitalized. Can Man was not a sham "shell" company that was formed or operated for the purpose of defrauding third parties. Can Man performed co-packing services to many customers. Can Man used the gross income it received to pay its employees, pay its vendors, pay its landlord, and pay taxes. There has been no dissolution, liquidation, or assignment for the benefit of creditors of Can Man continues to this day to exist as an independent entity under Pennsylvania law.

13. Ultimately, and unfortunately, Can Man's business model failed. Among other things, the property that Can Man leased from MH II Pennsburg, LLC proved ill-suited for its co-packing activities. In addition, many of the co-packing customers that engaged Can Man were—like Happy Hour—start-up beverage companies operating in a very competitive industry which ceased doing business, resulting in unpaid substantial accounts receivable at Can Man. Can Man lost money each year it was in existence and, as is often the case with new businesses, did not survive.

14. Following the termination of its co-packing business, Can Man did not "transition" or otherwise continue its business operations via Best Bev, LLC. Specifically:

a. Can Man did not transfer its co-packing equipment to Best Bev, LLC. Can Man leased and did not own its co-packing equipment. To my knowledge, Best Bev, LLC did not purchase or lease the same equipment used at Can Man.

b. Can Man never conducted any business at Best Bev, LLC's Waverly, New York facility, and Can Man has no interest in Best Bev, LLC, its business operations, its company-owned co-packing equipment, or otherwise.

c. Can Man's employees did not "transition" to Best Bev, LLC. Rather, certain employees left Can Man during or after the termination of its operations and were hired by Best Bev, LLC; others were not offered or chose not to seek or accept employment with Best Bev, LLC. As I noted during my deposition, Can Man employed as many as 60 employees. While I estimated that "a dozen" of these employees ended up at Best Bev, LLC, I am now aware that the number was closer to five or six.

d. Best Bev, LLC did not acquire any customers ***from*** Can Man; Can Man received no compensation from Best Bev, LLC for any customers which opted to take their business to Best Bev, LLC after Can Man discontinued its operations.

15. The only transaction between Can Man and Best Bev, LLC of which I am aware was the arms'-length sale of certain left-over inventory, most of which Can Man was obligated to either sell or dispose of pursuant to TTB (the Alcohol and Tobacco Tax and Trade Bureau) requirements. Can Man and Best Bev, LLC negotiated a sales price of $262,123.45 for these materials.

16. Can Man was not used as a vehicle to benefit its members to the detriment of the third parties with whom it did business. I never received any compensation, distributions or profits from Can Man, and I did not use Can Man as my "alter ego."

17. I most certainly did not "siphon off" funds from Can Man to myself and I never intermingled Can Man's funds with my own. Can Man maintained its own bank accounts, employed its own accountants, and filed its own tax returns.

18. I did not personally engage in any of the alleged actions that Happy Hour claims caused it harm. I was not involved in the production runs that form the basis of Happy Hour's claims in this litigation, and never made any representations to Happy Hour or its principals.

19. Happy Hour repeatedly suggests that it is or was a "creditor" of Can Man and that Can Man was under some obligation to "reserve" funds for Happy Hour's benefit. Happy Hour is not a creditor of Can Man. At present, Can Man

does not owe Happy Hour anything. At best, Happy Hour is a claimant in this litigation.

20. Can Man had and has any number of secured creditors, including the Trust, whose claims are superior to Happy Hour's contingent claims.

21. Notwithstanding the foregoing, Can Man reported Happy Hour's claims to its insurance carrier, which thereafter sought a declaratory judgment that said claims were not covered by Can Man's policy. Can Man ultimately settled its dispute with its carrier for a cash payment, and engaged in two mediations as well as bilateral settlement discussions with Happy Hour that did not result in a settlement.

22. As a result of the foregoing, Can Man's available funds to defend this action are being depleted and it would be prejudiced by this eleventh hour effort to expand the scope of this litigation. While I understand that Happy Hour has represented that it will not need any additional discovery if its motion is granted, I am advised and believe that these "alter ego" claims will require significant additional proceedings.

23. Finally, I would be personally prejudiced by Happy Hour's proposed amendment. Among other things, I anticipate that I would have to (a) retain separate counsel to defend myself in a litigation thousands of miles from my home, (b) retain experts to contest Happy Hour's allegations regarding inadequate

capitalization and compliance with "corporate formalities," (c) engage in further discovery regarding these allegations, and (d) ultimately move to dismiss these "alter ego" claims.

Dated: April 23, 2026
St. Thomas
U.S Virgin Islands

Ryan Uszenski