# EXHIBIT "B"

LEASE

between

**MH II PENNSBURG LLC**, as Landlord

and

**CAN MAN LLC**, as Tenant

2512 Quakertown Road
Pennsburg, Pennsylvania

July 13, 2021

## TABLE OF CONTENTS

_Toc320697895


| | | |
|---|---|---|
| **ARTICLE 1** | **GRANT** | 3 |
| **ARTICLE 2** | **TERM** | 4 |
| **ARTICLE 3** | **COMPLETION AND OCCUPANCY OF THE PREMISES** | 5 |
| **ARTICLE 4** | **RENT AND SECURITY** | 5 |
| **ARTICLE 5** | **ADDITIONAL RENT FOR ESCALATIONS IN REAL ESTATE TAXES AND OPERATING EXPENSES** | 7 |
| **ARTICLE 6** | **SERVICES AND UTILITIES** | 12 |
| **ARTICLE 7** | **CONDUCT OF BUSINESS BY TENANT** | 15 |
| **ARTICLE 8** | **ALTERATIONS, IMPROVEMENTS AND SIGNAGE** | 18 |
| **ARTICLE 9** | **INSURANCE** | 20 |
| **ARTICLE 10** | **CASUALTY** | 23 |
| **ARTICLE 11** | **CONDEMNATION** | 25 |
| **ARTICLE 12** | **ASSIGNMENT AND SUBLETTING** | 26 |
| **ARTICLE 13** | **DEFAULTS AND REMEDIES** | 28 |
| **ARTICLE 14** | **SUBORDINATION; ATTORNMENT AND RIGHTS OF MORTGAGE HOLDERS** | 35 |
| **ARTICLE 15** | **NOTICES** | 37 |
| **ARTICLE 16** | **MISCELLANEOUS** | 38 |

# LEASE

This Lease is made and entered into as of July 13, 2021, by and between **MH II Pennsburg LLC**, a Pennsylvania limited liability company, with its principal place of business at 300 Conshohocken State Road, Suite 200, West Conshohocken, PA 19428 (the "**Landlord**") and **Can Man LLC**, a Pennsylvania limited liability company with a business address at 1619 New London Road, Landenberg, PA 19350 (the "**Tenant**").

## ARTICLE 1 GRANT

1.1 **Premises**. Landlord, for and in consideration of the rents herein reserved and of the covenants and agreements herein contained on the part of Tenant to be performed, hereby leases to Tenant and Tenant agrees to lease from Landlord on the terms and subject to the conditions hereinafter set forth, certain space shown on Exhibit A attached hereto and made a part hereof, containing 50,000 rentable square feet in area (the "**Premises**"), situated in the building located at 2512 Quakertown Road, Pennsburg, Pennsylvania (the "**Building**"). The Premises, Building, the "**Building Common Areas**" (defined below) and the land upon which the same are located (the "**Land**"), together with all other improvements thereon and thereunder are collectively referred to as the "**Property**."

1.2 **Common Areas**.

1.2.1 The "**Common Areas**" shall consist of elements located in the Building and the Property, including, but not limited to, the hallways, lobbies, stairways, elevators, pedestrian sidewalks, landscaped areas, loading areas, roadways, parking areas, rights of way, walking and jogging paths, if any, and Building amenities, if any.

1.2.2 Use of Common Areas. Landlord hereby grants to Tenant during the term of this Lease, a license to use, in common with the others entitled to such use, those Common Areas (as they may from time to time exist) designated by Landlord from time to time for the general, non-exclusive use and convenience of Building tenants and others, subject to such rights, powers and privileges as are reserved to Landlord in this Lease. As used in this Lease, the term "**Building Common Areas**" shall mean those Common Areas described in Subsection 1.2.1 above, that are designated for Tenant's exclusive use hereunder.

1.3 **Parking**. During the term of this Lease, Tenant shall be entitled to use the parking facilities at the Property in common with other Building tenants, but such right shall be limited to the reasonable use of unreserved parking spaces in common with other tenants on a first-come, first-served basis. Tenant agrees not to overburden the parking facilities and agrees to cooperate with Landlord and other tenants in the use of parking facilities. Landlord may reasonably designate parking facilities at the Property for the handicapped, visitors to the

Building and for use by other tenants. Landlord may install signage or implement a pass or sticker system to control parking use. To the extent applicable to Tenant's use of the parking spaces, the provisions of this Lease shall apply, including rules and regulations of general applicability from time to time promulgated by Landlord in writing upon thirty (30) days written notice.

## ARTICLE 2 TERM

2.1 **Lease Term**.

2.1.1 Commencement Date; Term. The Premises are leased for a term (the "**Initial Term**") which shall commence on July 1, 2021 (the "**Commencement Date**") and shall end on June 30, 2026 (the "**Expiration Date**"), unless sooner terminated as herein provided. Landlord hereby grants, and Tenant accepts, pre-Commencement Date possession as of June 15, 2021 (the "**Possession Date**"). Such occupancy shall be subject to the terms and conditions of this Lease, including, but not limited to, prorated rent and other charges. Notwithstanding the foregoing, the commencement date for distillery operations (subject to Section 7.1 below) shall begin upon the approval of Tenant's application for a distillery permit by the Pennsylvania Liquor Control Board; provided, however, that neither the Commencement Date nor any of Tenant's obligations hereunder shall be conditioned upon such approval nor on the commencement of such operations..

2.1.2 Lease Year Defined. The first "**Lease Year**" shall begin on the Commencement Date and shall end on the last day of the twelfth (12th) full calendar month following the Commencement Date. Each Lease Year thereafter shall consist of twelve (12) consecutive calendar months following the end of the immediately preceding Lease Year.

2.2 **Holding Over**. In the event that Tenant retains occupancy of the Premises, or any part thereof, after the Expiration Date, Tenant's occupancy of the Premises shall be a tenancy at will on a month-to-month basis terminable at any time by Landlord in accordance with the Pennsylvania Landlord and Tenant Act. Tenant's occupancy during any holdover period shall otherwise be subject to the provisions of this Lease (unless clearly inapplicable), except that Tenant shall pay Landlord rent for such time as Tenant remains in possession of the Premises at a monthly rate equal to the higher of (a) one hundred fifty percent (150%) of the Annual Base Rent payable during the last month of the Lease Term, or (b) one hundred twenty-five percent (125%) of the then market-rate for the Premises, plus all Additional Rent and other sums due under this Lease. In addition, Tenant shall pay Landlord for all damages sustained by reason of Tenant's retention of possession of the Premises after the end of the Term. Any provision in this Lease to the contrary notwithstanding, any holdover by Tenant shall constitute an Event of Default on the part of Tenant under this Lease entitling Landlord to exercise, without obligation to provide Tenant any notice or cure period, all of the remedies available to Landlord in the event of an Event of Default by Tenant. The provisions hereof do not limit or restrict Landlord's rights or remedies under this Lease in the event of any holding over by Tenant.

## ARTICLE 3 COMPLETION AND OCCUPANCY OF THE PREMISES

3.1 **Delivery of the Premises**. Landlord represents and warrants that, as of the Possession Date, the Building Structure and Building Systems (as each term is defined in Section 8.3.1 below) are in good working order and condition. Tenant acknowledges that it has been in occupancy of the Premises as of the Possession Date pursuant to that certain License Agreement by and between Tenant, as Licensee, and Landlord, as Licensor, dated as of June 15, 2021 and, subject to the foregoing representation, accepts the same in its as-is condition on and as of the Commencement Date. Landlord shall have no obligation to make any improvement or alteration to the Premises, except that Landlord, at its sole cost and expense, shall upgrade the lighting throughout the Premises to LED and shall repave, seal coat and stripe the parking lot.

3.2 **Tenant's Systems**. Tenant, at its sole expense, shall design, install, construct and maintain Tenant's data, telephone, audio-visual, internet and video systems ("**Tenant's Communications Systems**") and Tenant's furniture systems (collectively, the "**Tenant's Systems**") within the Premises and the related wiring within the Building necessary for the operation thereof. Landlord will permit Tenant and its agents, architects, engineers, space planners, contractors, subcontractors, suppliers and materialmen ("**Tenant's Agents and Consultants**") to have access to the Premises and the Building (at the sole risk of such parties and without liability to Landlord) for such purposes subject to the terms and conditions of this Lease. The design, plans and specifications for the wiring, cabling and equipment for Tenant's Communication System, and its locations and connections from within the Premises to the Building risers, conduits and systems shall be subject to Landlord's prior review and approval. Tenant shall provide Landlord with reasonable prior written notice of any construction work relating to Tenant's Systems that involves any Building systems, and all such work shall be coordinated with Landlord and subject to Landlord supervision.

## ARTICLE 4 RENT AND SECURITY

4.1 **Annual Base Rent**.

4.1.1 Schedule of Monthly Rent Payments. Beginning with the Commencement Date and continuing throughout the Term, Tenant shall pay to, or as directed by, Landlord an annual rental (the "**Annual Base Rent**") as set forth below which shall be payable in consecutive monthly installments on or before the first day of each calendar month in advance in the monthly amount set forth below:

| **Period** | **Annual Base Rent per** [redacted] | **Annual Base Rent** | **Monthly Base Rent** |
|---|---|---|---|
| 7/1/21 - 6/30/22 | [redacted] | | |
| 7/1/22 - 6/30/23 | [redacted] | | |
| 7/1/23 - 6/30/24 | [redacted] | | |
| 7/1/24 - 6/30/25 | [redacted] | | |
| 7/1/25 - 6/30/26 | [redacted] | | |

4.1.2 Manner of Payment. All payments of Rent (hereinafter defined) shall be made without demand, deduction, counterclaim, set off, discount or

abatement in lawful money of the United States of America. If the Commencement Date should occur on a day other than the first day of a calendar month, or the Expiration Date should occur on a day other than the last day of a calendar month, then the monthly installment of Annual Base Rent for such fractional month shall be prorated upon a daily basis based upon a thirty (30)-day month. Notwithstanding anything to the contrary contained herein, Tenant shall cause payment of the first installment of rent to be paid to Landlord to be concurrent with the execution of this Lease.

4.2 **Additional Rent**. In addition to the Annual Base Rent, Tenant shall pay to Landlord all charges and other amounts as and when required under this Lease including, without limitation, any sums due pursuant to the provisions of Article 5 hereof, and the same shall constitute additional rent hereunder (herein called "**Additional Rent**"). All such amounts and charges shall be payable to Landlord in accordance with Section 4.3 hereof. Landlord shall have the same remedies for a default in the payment of Additional Rent as for a default in the payment of Annual Base Rent. The term "**Rent**" as used in this Lease shall mean the Annual Base Rent and the Additional Rent.

4.3 **Place of Payment**. Concurrent with its execution hereof, Tenant shall complete and deliver to Landlord the Authorization Agreement for Direct Deposits (ACH Debits) form attached hereto as Exhibit C to be used for payment of Annual Base Rent, Additional Rent and other recurring monthly amounts payable hereunder. All other sums payable to Landlord under this Lease shall be paid to Landlord at 300 Conshohocken State Road, Suite 180, West Conshohocken, PA 19428, or at such other place as Landlord shall designate in writing to Tenant from time to time.

4.4 **Terms of Payment**. Tenant shall pay to Landlord all Annual Base Rent as provided in Section 4.1 above and Tenant shall pay all Additional Rent payable under Article 5 and Article 6 on the terms provided therein. Except as provided in the immediately preceding sentence and as may otherwise be expressly provided by the terms of this Lease, Tenant shall pay to Landlord, within ten (10) days after delivery by Landlord to Tenant of bills or statements therefor: (a) sums equal to all expenditures made and monetary obligations incurred by Landlord in accordance with the terms of this Lease for Tenant's account; and (b) all other sums of money accruing from Tenant to Landlord in accordance with the terms of this Lease.

4.5 **Late Charges**. If Tenant shall fail to pay any Rent within ten (10) days after the date same is due and payable or if any check received by Landlord from Tenant shall be dishonored, Tenant agrees that Landlord's actual damages resulting therefrom are difficult to fix or ascertain. As a result, Tenant shall pay to Landlord (a) an administrative fee equal to five percent (5%) per month on the amount due, and (b) interest on the amount due from its due date until paid at the lesser of eighteen percent (18%) per annum or the maximum legal rate that Landlord may charge Tenant. Such charges shall be paid to Landlord together with such unpaid amounts as an administrative fee to compensate Landlord for administrative expenses and its cost of funds.

4.6 **Security Deposit**. By execution of this Lease, Landlord acknowledges receipt of Tenant's security deposit in the amount of [redacted] (the "**Security Deposit**") for the faithful

performance of all terms, covenants and conditions of this Lease. Tenant agrees that Landlord may, without waiving any of Landlord's other rights and remedies under this Lease upon the occurrence of any of the uncured Events of Default described in Article 13 hereof, apply the Security Deposit (a) to remedy any failure by Tenant to repair or maintain the Premises or to perform any other terms, covenants or conditions contained herein, or (b) to compensate Landlord for damages incurred, or to reimburse Landlord as provided herein, in connection with any such Event of Default. If Landlord uses any portion of the Security Deposit to cure any uncured Event of Default by Tenant hereunder, Tenant shall replenish the Security Deposit to the original amount within ten (10) days following written notice from Landlord in the manner directed by Landlord in such notice. If Tenant fails to restore the full amount of the Security Deposit within such ten (10)-day period, then the amount of such deficiency shall be subject to the charges described in Section 4.5 hereof. Landlord shall not be required to keep the Security Deposit separate from its general funds, and Tenant shall not be entitled to interest on any such deposit. If Tenant performs all of Tenant's obligations hereunder during the Term, Landlord will, within thirty (30) days after the expiration or earlier termination of the Lease, return the Security Deposit and any accrued interest, or so much as has not been applied by Landlord, to Tenant or the last permitted assignee of Tenant's interest hereunder at the expiration of the Term.

4.7 **Guaranty**. The Tenant's obligations under this Lease shall be unconditionally guaranteed by Shawn Sheehan ("**Guarantor**"). Simultaneously with the Tenant's execution and delivery of this Lease, Guarantor shall execute and deliver a guaranty agreement in form and substance satisfactory to Landlord. It shall be an Event of Default under this Lease if any of the events enumerated in Sections 13.1.4 or 13.1.5 of this Lease shall happen to Guarantor.

4.8 **Independence of Covenants**. Landlord's and Tenant's covenants herein are independent and, without limiting the generality of the foregoing, Tenant acknowledges that its covenant to pay Annual Base Rent and Additional Rent hereunder is independent of Landlord's obligations hereunder, and that in the event that Tenant shall have a claim against Landlord, Tenant shall not have the right to deduct the amount allegedly owed to Tenant from any Base Rent or Additional Rent due hereunder, it being understood that Tenant's sole remedy for recovering upon such claim shall be to bring an independent legal action against Landlord.

## ARTICLE 5 ADDITIONAL RENT FOR ESCALATIONS IN REAL ESTATE TAXES AND OPERATING EXPENSES

5.1 **Definitions**. Tenant agrees to pay as Additional Rent, an amount calculated as hereinafter set forth. For purposes of this Article 5, the following definitions shall apply:

"**Tax Year**": Each calendar year occurring during the Term.

"**Taxes**": All taxes, assessments and charges of every kind and nature levied, assessed or imposed at any time by any governmental authority upon or against the Property or any improvements, fixtures and equipment of Landlord used in the operation thereof whether such taxes and assessments are general or special, ordinary or extraordinary, foreseen or unforeseen in respect of each Tax Year falling wholly or partially within the Term. Taxes shall include, without limitation, all general real property taxes and general and special assessments, charges, fees or assessments for all governmental services or purported benefits to the Property,

service payments in lieu of taxes, all business privilege taxes, and any tax, fee or excise on the act of entering into this Lease or any other lease of space in the Building, or on the use or occupancy of the Building or any part thereof, or on the rent payable under any lease or in connection with the business of renting space under any lease or in connection with the business of renting space in the Building, that are now or hereafter levied or assessed against Landlord by the United States of America, the Commonwealth of Pennsylvania, or any political subdivision, public corporation, district or other political or public entity, including legal fees, experts' and other witnesses' fees, costs and disbursements incurred in connection with proceedings to contest, determine or reduce Taxes. Taxes shall also include any other tax, fee or other excise, however described, that may be levied or assessed as a substitute for, or as an addition to, in whole or in part, any other Taxes (including, without limitation, any municipal income tax) and any license fees, tax measured or imposed upon rents, or other tax or charge upon Landlord's business of leasing the Building, whether or not now customary or in the contemplation of the parties on the date of this Lease. Taxes shall not include: (a) franchise, transfer, gift, excise, capital stock, estate, succession and inheritance taxes, and federal and state income taxes measured by the net income of Landlord from all sources, unless due to a change in the method of taxation such tax is levied or assessed against Landlord as a substitute for, or as an addition to, in whole or in part, any other Tax that would constitute a Tax; or (b) penalties or interest for late payment of Taxes.

"**Expense Year**": The first and full calendar year during the Term and each calendar year thereafter.

"**Operating Expenses**": The commercially reasonable costs and expenses (and taxes, if any, thereon) paid or incurred on behalf of Landlord (whether directly or through independent contractors) in connection with the ownership, management, operation, maintenance and repair of the Building and Common Areas (including any sales or other taxes thereon) during the Term, including, without limitation:

(a) supplies, materials and equipment purchased or rented, total wage and salary costs paid to, and all contract payments made on account of, all persons to the extent engaged in the management, operation, maintenance, security, cleaning and repair of the Property, including property management fees not to exceed 4% of gross receipts, necessary to implement such services at or below the level of building manager (including the amount of any taxes, social security taxes, unemployment insurance contributions, union benefits) and any on-site employees of Landlord's property management agent;

(b) the maintenance, replacement, and repair of the Building Structure (except to the extent related to the structural integrity thereof) or building systems, including heating, ventilating, air conditioning, plumbing, electrical, mechanical, sewer, fire detection, sprinkler, life safety and security systems, telecommunications facilities, elevators and escalators, exterior windows and doors, tenant directories, emergency generator, and other equipment used in common by, or for the benefit of, occupants of the Building including such repairs and replacements as may be necessary to maintain the same in proper working

order and in compliance with all applicable laws and industry performance standards;

(c) charges of contractors for services and facilities otherwise includable in Operating Expenses, including, as applicable, security, trash removal, cleaning, janitorial, window washing, snow and ice removal, exterior and interior landscaping, the maintenance and repair of the parking facilities, roadways and light poles;

(d) the cost of utility services for the Property, including, without limitation, water, sanitary sewer, electricity, gas, fuel oil, steam, chilled water; but excluding electricity supplied to the Premises and billed to Tenant pursuant to Section 5.4 and electricity used by other tenants of the Building within their leased space and billed directly to such tenants;

(e) the premiums for fire, extended coverage, loss of rents, boiler, machinery, sprinkler, public liability, property damage, earthquake, flood, and other insurance relative to the Property and the operation and maintenance thereof and unreimbursed costs incurred by Landlord that are subject to an insurance deductible;

(f) intentionally omitted;

(g) the cost of capital items incurred with respect to the ownership, operation, maintenance and repair of the Property for repairs, alterations, installations, improvements and additions amortized over the useful life of the capital items as determined in the reasonable judgment of Landlord's accountant in accordance with generally accepted accounting principles, but in any event not to exceed five (5) years, together with interest at the greater of twelve percent (12%) per annum or Landlord's borrowing rate for such capital items on the unamortized balance of the cost of the capital item and the installation thereof;

(h) office costs of administration; legal and accounting fees and other expenses of maintaining and auditing Property accounting records and preparing Landlord's Statements; and

(i) fees for management services whether rendered by Landlord (or affiliate) or a third party property manager in an amount not to exceed the rate of five percent (5%) of Rents charged to Building tenants.

Operating Expenses shall not include: (1) utility expenses that are separately metered for any individual tenant in the Building; (2) any expense for which Landlord is reimbursed by a specific tenant by reason of a special agreement or requirement of the occupancy of the Building by such tenant; (3) expenses for services provided by Landlord for the exclusive benefit of a given tenant or tenants for which Landlord is directly reimbursed by such tenant or tenants; (4) all costs, fees and disbursements relating to activities for the solicitation, negotiation and execution of leases for space in the Building (including but not limited to advertising costs, leasing commissions and attorneys' fees therefor); (5) the costs of alterations to, or the decorating

or the redecorating of, space in the Building leased to other tenants; (6) except as stated in subparagraph (h) of the definition of Operating Expenses, the costs associated with the operation of the business of the ownership or entity which constitutes "Landlord", including costs of selling, syndicating, financing or mortgaging any of Landlord's interest in the Property; (7) rentals payable under any ground or underlying lease, if any; (8) depreciation, interest and principal payments on mortgages and other debt costs, if any; (9) repairs or other work required due to fire or other casualty to the extent of insurance proceeds actually received by Landlord; (10) costs to correct any defects in the original construction of the Building; (11) capital expenses for items that are not included in the definition of "Operating Expenses;" (12) payments to affiliates of Landlord (excluding property management fees) but only to the extent that they exceed market charges and (13) the cost of capital replacements to the Building Structure or Building Systems incurred within the first Lease Year of the Term. Operating Expenses for each Expense Year shall be equitably adjusted to the amount such Operating Expenses would have been if ninety-five percent (95%) of the rentable area in the Building had been occupied during such Expense Year if there is less than ninety-five percent (95%) occupancy in such Expense Year. Only those component expenses that are affected by variation in occupancy levels shall be "grossed-up."

"**Tenant's Share**": Tenant's Share shall be a fraction, the numerator of which shall be the rentable area of the Premises and the denominator of which shall be the rentable area of the Building. On the Commencement Date the Tenant's Share is forty-eight and 79/100 percent (48.79%). The Tenant's Share shall be recalculated from time to time in the event that there shall be a change in the rentable area of either the Premises or the Building.

"**Landlord's Statement**": An instrument containing a computation of any Additional Rent due pursuant to the provisions of this Article 5.

5.2 **Payment of Taxes**. Tenant shall pay, as Additional Rent, Tenant's Share of all Taxes payable in respect of any Tax Year falling wholly or partially within the Term (which payment shall be adjusted by proration with respect to any partial Tax Year). Within fifteen (15) days after the receipt of the issuance by the applicable governmental authority of the bill for Taxes, Landlord shall submit to Tenant a copy of such bill, together with Landlord's Statement and Tenant shall pay the Additional Rent set forth on such Landlord's Statement (less the amount of estimated payments paid by Tenant on account thereof) as set forth herein. If an early payment discount on the Taxes is available, Tenant's Share shall be calculated on such basis whether or not Landlord takes advantage of the early payment discount, so long as Tenant's payment of Tenant's Share of its Taxes is made in a timely manner. Landlord, at its option, may require Tenant to make monthly payments on account of Tenant's Share of Taxes for any Tax Year. The monthly payments shall be one twelfth (1/12th) of the amount of Tenant's Share of Taxes and shall be payable on or before the first day of each month during the Term, in advance, in an amount estimated by Landlord and billed by Landlord to Tenant; provided, that, Landlord shall have the right initially to determine such monthly estimates and to revise such estimates from time to time.

5.3 **Payment of Operating Expenses**. Tenant shall pay to Landlord, as Additional Rent, Tenant's Share of all Operating Expenses in respect of each Expense Year. Tenant shall pay a sum equal to one twelfth (1/12) of the amount of Tenant's Share of Operating Expenses for

each Expense Year on or before the first day of each month of such Expense Year, in advance, in an amount estimated by Landlord and billed by Landlord to Tenant; provided, that, Landlord shall have the right initially to determine such monthly estimates and to revise such estimates from time to time. After the expiration of each Expense Year, Landlord shall prepare and furnish Tenant with Landlord's Statement showing the actual Operating Expenses incurred during such Expense Year. Within thirty (30) days after receipt of Landlord's Statement for any Expense Year setting forth Tenant's Share of any Operating Expenses attributable to such Expense Year, Tenant shall pay Tenant's Share of such Operating Expenses (less the amount of estimated payments paid by Tenant on account thereof) to Landlord as Additional Rent.

5.4 **Payment of Electric Expense**. Tenant shall pay for the full cost (the "**Electric Expense**") of the electric energy consumed within the Premises for convenience outlets, lighting fixtures, any supplemental HVAC equipment or other equipment exclusively serving the Premises as reasonably determined by Landlord from time to time based upon the measurement of such use by a submeter in the Premises. During the Term, Tenant's rate of payment shall increase from time to time based upon the increases in rate charged by the utility company to the Landlord; and Landlord shall have the right to issue supplemental billing to Tenant from time to time for its Electric Expense to account for such increases. The Electric Expense payable in respect of the Premises shall constitute Additional Rent under this Lease (but shall not be included as an Operating Expense), and shall be due and payable monthly in arrears on the first day of each calendar month during the Term.

5.5 **Landlord's Statements**.

5.5.1 Landlord's Statements and Tenant's Inspection Rights. Landlord will timely deliver Landlord's Statements to Tenant during the Term. Landlord's delay or failure to timely render Landlord's Statement with respect to any Expense Year or any Tax Year beyond the date, if any, specified herein shall not prejudice Landlord's right to render a Landlord's Statement with respect to that or any subsequent Expense Year or subsequent Tax Year. The obligations of Landlord and Tenant under the provisions of this Article with respect to any Additional Rent incurred during the Term shall survive the expiration or any sooner termination of the Term; provided that such obligations are noticed timely to Tenant in accordance with this Lease. If Landlord fails to give Tenant a statement of projected Operating Expenses prior to the commencement of any Expense Year, Tenant shall continue to pay Operating Expenses in accordance with the previous statement, until Tenant receives a new statement from Landlord.

5.5.2 During the sixty (60)-day period after receipt of any Landlord's Statement (the "**Review Period**"), Tenant may, at its sole cost and expense, inspect and audit Landlord's records relevant to the cost and expense items reflected in such Landlord's Statement at a reasonable time mutually agreeable to Landlord and Tenant during Landlord's usual business hours. Each Landlord's Statement shall be conclusive and binding upon Tenant unless within sixty (60) days after receipt of such Landlord's Statement Tenant shall notify Landlord that it disputes the correctness of Landlord's Statement, specifying the

respects in which Landlord's Statement is claimed to be incorrect. All inspections and audits of Landlord's books and records and any arbitration shall be subject to a confidentiality agreement reasonably acceptable to Landlord.

5.6 **Adjustments**. If the actual amount of Tenant's Share of Operating Expenses for any Expense Year or Tenant's Share of Taxes for any Tax Year exceeds the estimated amount thereof paid by Tenant for such Expense Year or Tax Year, then Tenant shall pay to Landlord the difference between the estimated amount paid by Tenant and the actual amount of such Additional Rent payable by Tenant. This Additional Rent payment shall be due and payable within thirty (30) days following the timely delivery of Landlord's Statement. If the total amount of estimated payments made by Tenant in respect of Tenant's Share of Operating Expenses for such Expense Year or Tenant's Share of Taxes for any Tax Year shall exceed the actual amount of such Additional Rent payable by Tenant, then such excess amount shall be credited against the monthly installments of Additional Rent due and payable from Tenant to Landlord hereunder until such amount shall have been refunded in full to Tenant. Any excess payments made by Tenant during the Term that have not been so applied and are outstanding at the end of the Term shall be paid to Tenant within fifteen (15) days following delivery of Landlord's Statement for the final Expense Year and final Tax Year, as applicable. Even though the Term has expired and Tenant has vacated the Premises, when final determination is made of Tenant's Share of Operating Expenses or Taxes for the year in which this Lease terminates, Tenant shall pay any increase due over the estimated Operating Expenses or Taxes paid within fifteen (15) days after Landlord's delivery of Landlord's Statement therefor.

5.7 **Triple Net Lease**. All Rent payable under this Lease shall be absolutely net to the Landlord so that this Lease shall yield net to Landlord, the specified Base Rent in each specified period during the Term, and except as otherwise expressly provided in this Lease, each and every item of Taxes and Operating Expenses, the payment of which Landlord is, shall, or may become liable for by reason of its estate or interest in the Premises or of any rights or interest of Landlord in or under this Lease or by reason or in any manner connected with or arising from the ownership, leasing, operation, management, maintenance, repair, rebuilding, remodeling, renovation, use or occupancy of the Premises, shall be borne by Tenant, except as and only to the extent otherwise specifically provided in this Lease.

## ARTICLE 6 SERVICES AND UTILITIES

6.1 **Services**. Landlord shall provide the following services to the Building and Premises (subject to Tenant's reimbursement and payment obligations therefore in accordance with the operation of Article 5 hereof):

(a) Hot and cold running water for cleaning, landscaping, grounds maintenance, fire protection, drinking, lavatory and toilet purposes drawn through fixtures installed by Landlord or by Tenant with Landlord's written consent. If Tenant's water use increases beyond customary office user levels, Landlord shall have the right to install a water meter or submeter at Tenant's expense (if the same has not previously been installed) and to charge Tenant as Additional Rent for its water consumption in the Premises in accordance with readings from such meter.

(b) Electric current (but specifically excluding electric current surge protection) from providers selected by Landlord, in amounts required for normal lighting by building standard lighting overhead fixtures and for Tenant's normal business operations, including without limitation, personal computers, copiers, facsimiles and other ordinary business equipment, subject, however, to Landlord's approval of Tenant's final electrical plan for the Premises.

(c) Maintenance of the Common Areas so that they are clean and free from accumulations of snow, debris, rubbish and garbage.

(d) Access by Tenant to the Premises and use of designated elevator service (if applicable) twenty-four (24) hours per day, seven (7) days per week, fifty-two (52) weeks per year, subject to Landlord's Rules and Regulations.

Landlord shall have the right to select the utility providers and Tenant shall pay all actual costs associated with obtaining the utility service as provided in Article 5 hereof. Landlord agrees to furnish or cause to be furnished to the Premises the utilities and services described herein, subject to the conditions and in accordance with the standards set forth herein. Landlord's failure to furnish any of such utilities or services when such failure is caused by accidents, the making of repairs, alterations or improvements, labor difficulties, difficulty in obtaining adequate supply of fuel, electricity, steam, water or other service or supplies from the sources from which they are usually obtained for the Building, or governmental constraints, Tenant Delay or any other cause beyond Landlord's reasonable control, shall not result in any liability to Landlord. Tenant shall not be entitled to any abatement or reduction of rent by reason of such failure, no eviction of Tenant shall result from such failure and Tenant shall not be relieved from the performance of any covenant or agreement in this Lease. In the event of any failure, stoppage or interruption thereof, Landlord shall diligently attempt to resume service promptly.

6.2 **Additional Services**. Provided that they do not unreasonably interfere with Tenant's use, Landlord shall impose reasonable charges and may establish reasonable rules and regulations for the following: (a) the use of any heating, air conditioning, ventilation, electric current or other utility services or equipment by Tenant after normal business hours ("**Overtime HVAC**"); (b) the unreasonable use or consumption of any other building services, supplies or utilities after normal business hours and any unanticipated, additional costs incurred by Landlord to operate the Building after normal business hours as a result thereof; (c) unusual janitorial services required because of any non building standard improvements in the Premises, the carelessness of Tenant, the the operation of Tenant's business after normal business hours; and (d) the removal of any refuse and rubbish from the Premises. The expense charged by Landlord to Tenant for any Overtime HVAC shall be based on Landlord's actual out-of-pocket cost attributable to Tenant for such utility services as charged to Landlord by the utility companies providing such services. This amount shall constitute Additional Rent and shall be payable in accordance with Section 4.4.

6.3 **Excessive Current**.

6.3.1 Prohibited Activities. Tenant shall comply with the conditions of occupancy and connected electrical load reasonably established by Landlord for

the Building and Tenant shall not use utilities or other services in excess of the services described above in Section 6.1 or in a manner which exceeds or interferes with any Building systems or service equipment or Landlord's ability to provide services to other tenants in the Building. Tenant covenants that at no time shall the use of electrical energy in the Premises exceed the capacity of the existing feeders or wiring installations then serving the Premises. Tenant shall not, without prior consent of Landlord in each instance, make or perform, or permit the making or performing of, any alteration to wiring installations or other electrical facilities in or serving the Premises or any additions to the electrical fixtures, machines, equipment or other appliances in the Premises which utilize electrical energy.

6.3.2 Landlord's Right to Survey Usage. Landlord may survey Tenant's use of services from time to time. Tenant shall pay Landlord all direct and attributable costs arising out of any excess or non-standard manner of use, including the cost of all repairs and alterations to the Building's mechanical and electrical systems (including the installation of meters) and the cost of additional electricity made available to Tenant, if any. Such costs shall constitute Additional Rent and Tenant shall pay such costs pursuant to Section 4.4.

6.4 **Maintenance of Common Areas**. The manner in which the Building Common Areas are maintained and operated and the expenditures therefor shall be at the reasonable and sole discretion of Landlord and in accordance with the standards of comparable buildings in the Montgomery County, PA submarket (the "**Submarket**"). Landlord reserves the right from time to time to (a) make changes in the shape, size, location and appearance of the land and improvements which constitute the Common Areas, provided that Landlord shall not materially impair the Tenant's ability to operate its business, except temporary impairments required by said changes; (b) make such improvements, alterations and repairs to the Common Areas as may be required by governmental authorities or by utility companies servicing the Building; (c) construct, maintain, remove, replace and operate lighting and other facilities on all said areas and improvements; (d) grant exclusive parking rights to Building tenants; and (e) add or remove improvements and facilities to or from the Common Areas. The use of the Building Common Areas shall be subject to such reasonable regulations and changes therein as Landlord shall make from time to time, including (but not by way of limitation) the right to close from time to time, if necessary, all or any portion of the Common Areas to such extent as may be legally sufficient, in the opinion of Landlord's counsel, to prevent a dedication thereof or the accrual of rights of any person or of the public therein; provided, however, Landlord shall do so at such times and in such manner as shall minimize any disruption to Tenant to the extent reasonably possible.

6.5 **Access to Premises**.

6.5.1 Landlord's Right of Entry. Landlord shall have the right to enter the Premises without abatement of Rent at all reasonable times upon twenty-four (24) hours prior notice to Tenant (except in emergencies when no advance notice shall be required), (a) to supply any service to be provided by Landlord to Tenant hereunder, (b) to show the Premises to Landlord's Mortgagee and to

prospective purchasers, mortgagees and tenants; provided that Landlord shall not be permitted to show the Premises to prospective Tenants until twelve (12) months prior to the Expiration Date, (c) to inspect, alter, improve or repair the Premises and any portion of the Building, and (d) to introduce conduits, risers, pipes and ducts to and through the Premises. In conducting any such activities, Landlord shall use reasonable efforts not to disrupt the conduct of Tenant's business operations.

6.5.2 Tenant's Keys. For each of the purposes stated above in this Section 6.5, Landlord shall at all times have and retain a key with which to unlock all of the doors in, upon and about the Premises, excluding Tenant's vaults and safes, or special security areas, and Landlord shall have the right to use any and all means that Landlord may deem necessary or proper to open said doors in an emergency, in order to obtain entry to any portion of the Premises.

## ARTICLE 7 CONDUCT OF BUSINESS BY TENANT

7.1 **Permitted Use**. The Premises shall be used and occupied for the distilling, production, canning, and warehousing of distilled spirits in accordance with all Applicable Laws, as well as general office purposes only; provided, however, that in no event shall the Premises be used at any time for the distilling, production, canning, or warehousing of any products containing Schedule 1 controlled substances as defined in the United States Controlled Substances Act of 1970. Tenant shall not use or occupy, or permit the use or occupancy of, the Premises or any part thereof for any use other than the sole use specifically set forth above or in any illegal manner, or in any manner that, in Landlord's judgment, would adversely affect or interfere with any services required to be furnished by Landlord to Tenant or to any other tenant or occupant of the Building, or with the proper and economical rendition of any such service, or with the use and enjoyment of any part of the Building by any other tenant or occupant. Tenant agrees that it will not exceed the maximum floor bearing capacity for the Premises.

7.2 **Tenant's Personal Property**. Tenant shall be responsible for any ad valorem taxes on its personal property (whether owned or leased) and on the value of its leasehold improvements in the Premises (which are in excess of building standard improvements), and if the taxing authorities do not separately assess Tenant's leasehold improvements, Landlord may make a reasonable allocation of the impositions to such improvements and charge Tenant for the same as Additional Rent. Landlord does not waive any statutory liens and/or any rights of distress with respect to Tenant's personal property and trade fixtures. This Lease shall be deemed to grant a contractual lien to Landlord with respect to Tenant's personal property or trade fixtures.

7.3 **Compliance with Laws**.

7.3.1 Tenant's Compliance Obligations. Tenant, at Tenant's expense, shall at all times comply with all laws, ordinances, rules, regulations and orders of all governmental authorities ("**Laws**") in effect from time to time during the Term including, without limitation, the Americans with Disabilities Act ("**ADA**"), including, without limitation, all applicable federal, state and

municipal building, zoning, fire, health, safety and environmental laws (collectively, "**Applicable Laws**") that shall impose any duty on Tenant with respect to the Premises or the use, occupancy or operation thereof. Notwithstanding the foregoing, Landlord represents and warrants that, as of the Possession Date, Landlord has not received any written notice which remains uncured from any governmental authority with respect to any violation of any Applicable Laws. Tenant will obtain and maintain in full force and effect any and all licenses and permits necessary for its use. Tenant shall make any Alterations in or to the Premises required after the Possession Date in order to comply with any changes to the foregoing, which are necessitated or occasioned, in whole or in part by the use or occupancy or manner of use, occupancy or operation of the Premises by Tenant or any Tenant Parties.

7.3.2 Landlord's Compliance Obligations. Landlord shall comply with all Applicable Laws in effect from time to time during the Term that shall impose any duty on Landlord with respect to the Building Common Areas, excluding any matters that are Tenant's responsibility under this Lease or the responsibility of other tenants of the Building. Notwithstanding anything to the contrary contained herein, Tenant shall be responsible for legal compliance, including the requirements of the ADA, with respect to (a) any and all requirements on account of Tenant's use of, or operations in, the Premises arising after the Possession Date, and (b) all Alterations designed or constructed by Tenant or its contractors or agents.

7.4 **Rules and Regulations**. Tenant shall observe and comply with the rules and regulations attached to this Lease as Exhibit E, and all reasonable modifications thereof and additions thereto from time to time put into effect by Landlord in writing and with thirty (30) days written notice to Tenant (the "**Rules and Regulations**"). Tenant shall not use or permit the use of the Premises in any manner that will create waste or a nuisance, or which shall tend to unreasonably disturb other tenants of the Building.

7.5 **No Liens**. Tenant shall keep the Premises and Property free from any liens or encumbrances arising out of any work performed, material furnished, obligations incurred or other acts or omissions by or for Tenant or any person or entity claiming through or under Tenant. Any claim to, or lien upon, the Premises or the Building arising from any act or omission of Tenant shall accrue only against the leasehold estate of Tenant and shall be subject and subordinate to the paramount title and rights of Landlord in and to the Premises and the Property. If any mechanics' or other lien shall be filed against the Premises or the Property purporting to be for labor or material furnished or to be furnished at the request of the Tenant, then Tenant shall at its expense cause such lien to be discharged of record by payment, bond or otherwise, and provide evidence of such discharge within ten (10) days after the filing thereof.

7.6 **Hazardous Substances**.

7.6.1 Prohibition on Use; Remediation. Tenant shall not generate, store (except items customary for its distilling and production use and cleaning supplies maintained in small quantities and in a manner consistent with

reasonable commercial production and warehousing practices if stored, used and disposed of, in accordance with all Applicable Laws and the fire protection requirements of any Building insurers), dispose of or release, or cause or permit the presence, storage, use, disposal or release of, any "**Hazardous Substances**" (as defined below), in, above, on or under the Premises or the Property. Tenant shall promptly remove, clean up and remediate, in accordance with all Applicable Laws, any Hazardous Substance on the Premises that result from the action or inaction of Tenant, or any Tenant Parties; provided, however, Landlord reserves the right to notify Tenant that Landlord will conduct or otherwise cause the remediation and, in such case, Landlord or its agent shall have the sole right to remediate such condition on Tenant's behalf and Tenant shall reimburse Landlord for all costs and expenses upon written demand by Landlord.

7.6.2 Hazardous Substances. As used in this Lease, the term "**Hazardous Substances**" shall mean any material or substance that, whether by its nature or use, is now or hereafter defined as a hazardous waste, hazardous substance, hazardous material, hazardous chemical substance or mixture, residual waste, pollutant or contaminant under the Comprehensive Environmental response Compensation and Liability Act, as amended (42 U.S.C. §9601 et seq.), Hazardous Materials Transportation Act, as amended (49 U.S.C. §1801 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. §6901 et seq.), Toxic Substances Contract Act, as amended (15 U.S.C. §2601 et seq.), the Pennsylvania Solid Waste Management Act (35 P.S. §6018.101 et seq.), or which is now or hereafter regulated under any Applicable Laws, or which is or contains petroleum, gasoline, diesel fuel or another petroleum hydrocarbon product or material, or which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous.

7.7 **Signs**. Landlord (using "building standard materials") will place an identification sign at the interior entrance to the Premises which is consistent with applicable Building standards promulgated by Landlord from time to time. Tenant shall not place or erect any signs, monuments or other structures in or on the Building or Property. Tenant shall not place any signage on the exterior of the Premises nor on the inside of the Premises which are visible from the exterior of the Premises. Tenant shall pay for all costs to change signage as a result of a change in the name of the business occupying the Premises.

7.8 **Right to Relocate**. Landlord reserves the right to relocate the Premises within the Building. If Landlord exercises this right, it agrees to substitute for the Premises comparable space subject to the following conditions: (a) Landlord shall have given Tenant sixty (60) days written notice (the "**Relocation Notice**") of the relocation identifying the location and dimensions of the new space to be made subject to this Lease (the "**Substitute Premises**") together with a plan of such Substitute Premises; (b) the Substitute Premises shall be substantially similar in area to the Premises initially leased to Tenant hereunder and shall be delivered with improvements of a similar standard and quantity as exists at the Premises at the time of relocation (including any approved Alterations constructed by Tenant); and (c) Landlord

shall pay all of Tenant's reasonable costs and expenses incurred as a result of the relocation, including documented moving expenses in connection with the relocation and the cost of re-wiring and re-installing telephone machinery and equipment. Tenant agrees to cooperate with Landlord so as to facilitate the prompt completion by Landlord of its obligations under this Section and the prompt surrender by Tenant of the Premises. Tenant shall vacate and surrender the Premises and shall occupy the Substitute Premises promptly (and, in any event, not later than thirty (30) days) after the work has been substantially completed in the Substitute Premises. Landlord and Tenant agree to execute a lease amendment within fifteen (15) days following delivery of the Relocation Notice to confirm the leasing of the Substitute Premises, and any corresponding changes relative to the Substitute Premises.

## ARTICLE 8 ALTERATIONS, IMPROVEMENTS AND SIGNAGE

8.1 **Landlord's Obligations**. Landlord will maintain in good repair, reasonable wear and use, (except in case of any casualty and condemnation which shall be governed by Article 10 and Article 11, respectively) all structural components of the Building and Building Common Areas, including, without limitation, the roof structure, foundation, exterior and load bearing walls, the structural floor slabs. Landlord, at its sole cost and expense, shall perform the repairs to the roof system described on Exhibit B attached hereto. So long as Tenant complies with its obligations set forth in Section 8.2 below with respect to regularly scheduled preventative maintenance and service contracts and Tenant presents Landlord with applicable service records for the same, Landlord shall replace, as and when reasonably necessary, the Building Systems (defined below in Subsection 8.3.1) serving the Building. The cost of this maintenance and repair shall be included in Operating Expenses and shall be subject to reimbursement under Article 5 hereof to the extent provided therein. Maintenance and repair expenses caused by Tenant's willful misconduct or negligent acts or omissions shall be paid directly to Landlord by Tenant in accordance with Section 4.4, and shall not constitute an Operating Expense.

8.2 **Tenant's Obligations**. Tenant shall take good care of the Premises, and at Tenant's cost and expense, shall make all repairs and replacements necessary to preserve the Premises in good working order and in a clean, safe and sanitary condition, and will suffer no waste. Tenant shall maintain, at its own expense, in good order, condition and repair to Landlord's reasonable satisfaction, all HVAC systems, plumbing facilities and electrical fixtures and devices (including replacement of all lamps, starters and ballasts) serving the Premises, which shall include, without limitation, entering into, at Tenant's expense, a regularly scheduled preventative maintenance and service contract with a maintenance contractor approved in writing by Landlord (which approval shall not be unreasonably withheld) for servicing all hot water, heating and air conditioning systems and equipment in the Premises. Tenant shall repair, at its cost, all deteriorations or damages to the Property and the Common Areas occasioned by its negligent acts or omissions or willful misconduct. If Tenant does not make any such repairs within twenty (20) days following notice from Landlord, Landlord may, but need not, make such repairs, and Tenant shall pay the cost thereof as provided in Section 8.7 hereof.

8.3 **Tenant's Alterations**.

8.3.1 Landlord's Consent to Alterations. Tenant shall not make or permit any improvements, installations, alterations or additions ("**Alterations**")

in or to the Premises, the Building or the Property that involve or affect the structural portions of the Premises or the Building (the "**Building Structure**") or any of the Building's HVAC, mechanical, electrical, telecommunications, cabling, plumbing or other systems or equipment (the "**Building Systems**") or the interior walls or corridors within the Premises. Tenant may make Alterations to the Premises that do not involve or affect the Building Structure or the Building Systems, subject to Landlord's prior written consent in Landlord's discretion which shall not be unreasonably withheld, conditioned, or delayed. Landlord's prior written consent shall not be required for minor decorations in the Premises for which Tenant provides advance notice to Landlord and which do not exceed $10,000.00 in the aggregate on an annual basis.

8.3.2 Construction Standards. All Alterations made by or on behalf of Tenant shall be made and performed: (a) by contractors or mechanics approved by Landlord, who shall carry liability insurance of a type and in such amounts as Landlord shall reasonably require, naming Landlord, Tenant and Landlord's Mortgagee as additional insureds, (b) in a good and workmanlike manner, (c) so that same shall be at least equal in quality, value, and utility to the original work or installation and shall be in conformity with Landlord's building standard specifications in effect at such time, (d) in accordance with all Applicable Laws, and (e) pursuant to plans, drawings and specifications ("**Tenant's Plans**") which have been reviewed and approved by Landlord prior to the commencement of the repairs or replacements and approved by, and filed with, all applicable governmental authorities (the "**Construction Standards**").

8.4 **Tenant's Property**. All trade fixtures, furnishings, equipment and personal property placed in the Premises by Tenant and all computer, telecommunications or other cabling and wiring installed in the Premises or elsewhere in the Building by or for the benefit of Tenant (collectively, the "**Tenant's Property**") shall be removed by Tenant at the expiration of the Term. Tenant shall, at its cost and expense, repair any damage to the Premises or the Building caused by such removal. Any of Tenant's Property not removed from the Premises prior to the Expiration Date shall, at Landlord's option, become the property of Landlord. Landlord may remove such Tenant's Property, and Tenant shall pay to Landlord, Landlord's cost of removal and of any repairs in connection therewith in accordance with Section 4.4 hereof.

8.5 **Ownership and Removal**. All additions, fixtures and improvements attached to or installed in or upon the Premises by Tenant or by Landlord shall be Landlord's property and shall remain upon the Premises at the termination of this Lease without compensation or allowance or credit to Tenant. Landlord may require at the Expiration Date, or the sooner date of termination of this Lease, that Tenant, at Tenant's expense, remove any of Tenant's Property or Alterations which have been attached to or installed in the Premises, and if Tenant fails to do so, then Landlord may remove the same and, Tenant shall pay to Landlord the reasonable out-of-pocket costs of such removal and of any repairs for any damage to the Premises or Building in connection therewith.

8.6 **Surrender**. Upon the expiration or sooner termination of the Term, Tenant will quietly and peacefully surrender to Landlord the Premises in as good condition as when Tenant took possession, ordinary wear and tear and damage by fire or other casualty excepted, and otherwise as is required in Article 8. In addition, at such time Tenant shall remove all Hazardous Substances stored, or disposed of, or generated by Tenant in its use or operation of the Premises and all equipment and materials contaminated or affected by such Hazardous Substances in conformity with the Hazardous Substance laws.

8.7 **Tenant's Failure to Maintain**. If Landlord gives Tenant written notice of the necessity of any repairs or replacements required to be made under Section 8.2 and Tenant fails to commence diligently to cure the same within twenty (20) days thereafter (except that no notice will be required in case of any emergency repair or replacement necessary to prevent substantial damage or deterioration), Landlord, at its option and in addition to any other remedies, may proceed to make such repairs or replacements and the expenses incurred by Landlord in connection therewith plus ten percent (10%) thereof for Landlord's supervision, shall be due and payable from Tenant in accordance with Section 4.4 hereof, as Additional Rent; provided, that, Landlord's making any such repairs or replacements shall not be deemed a waiver of Tenant's default in failing to make the same.

## ARTICLE 9 INSURANCE

9.1 **Tenant's Insurance**. Tenant, at its own expense, shall provide and keep in force with companies which are rated A/XV or better by A.M Best Company and licensed in the Commonwealth of Pennsylvania: (a) Commercial General Liability including premises – operations, independent contractors, products/completed operations, personal injury, broad form property damage, contractual liability in an amount not less than $1,000,000 per occurrence / $2,000,000 General Aggregate limit; (b) Special Form property insurance, including fire and extended coverage, in amounts necessary to provide replacement cost coverage for tenant's property, machinery, electronic data and any alterations/tenant's improvements and betterments in which the Tenant has an insurable interest. The property policy shall include, without limitation, the perils of vandalism and malicious mischief and sprinkler leakage coverage. The property insurance policy shall include business income and extra expense coverage in an amount equal to the greater of (A) two times the Annual Base Rent and estimated Additional Rent then in effect during any Lease Year and (B) the sum of the tenant's net income and Continuing Expenses for a period of twelve (12) months. "**Continuing Expenses**" means business operating expenses, such as rent, taxes, licenses, payroll, insurance and interest expenses. At any time the Tenant has commenced construction of any leasehold improvements or any alterations, and at any time any other construction activities are underway at the Premises, the Tenant shall keep in force an "all risk" or "special form", completed value/non-reporting form Builder's Risk insurance policy for the full replacement cost value of the improvements or alterations; (c) plate glass insurance for the Premises, if applicable; (d) Workers Compensation insurance with statutory limits as required by applicable law and employers' liability insurance with limits of at least $500,000/$500,000/$500,000; (e) Auto Liability for any vehicles owned, maintained, or operated by the tenant and its employees with a combined single limit of at least $1,000,000; (f ) Umbrella Liability or Excess Liability insurance with limits of at least $2,000,000 Per Occurrence and Aggregate, which shall provide limits in excess of the General Liability, Auto Liability and Employers' Liability policies; and (g) any other insurance

reasonably required by the Landlord. At Landlord's request, the amounts and kinds of insurance coverages described herein may be reasonably increased or expanded to reflect amounts and coverages then typically being carried for similar business operations in institutionally owned or financed properties.

**Landlord's Insurance**. Landlord agrees at all times during the Lease Term to purchase and keep in force: (a) A "Special Form" Property Insurance policy with a limit of insurance in an amount equal to the full replacement cost value of the building; and (b) Commercial general liability insurance insuring the Landlord's interest in the property. The General Liability policy, together with any umbrella liability policy, shall provide a limit of at least $5,000,000 per occurrence/ $5,000,000 General Aggregate.

9.2 **Delivery of Policies**. Each such insurance policy shall: (a) be provided in form, substance and amounts (where not above stated) satisfactory to Landlord and to Landlord's Mortgagee (b) Specifically include the liability assumed hereunder by Tenant; (c) shall provide that it is primary insurance, and not excess over or contributory with any other valid, existing and applicable insurance in force for or on behalf of Landlord; and (d) to the extent commercially available, provide that Landlord shall receive thirty (30) days' written notice from the insurer prior to any cancellation or change of coverage. If a notice of cancellation endorsement is not available, Tenant shall be responsible for notifying the Landlord 30 days in advance of policy cancellation (10 days' notice of cancellation for non-payment of premium). Each of the policies required by Section 9.1 shall provide a waiver of subrogation in favor of the Landlord and Landlord's managing agent. Tenant shall deliver policies of such insurance or certificates thereof to Landlord on or before the Commencement Date, and thereafter at least thirty (30) days before the expiration dates of expiring policies. All such insurance certificates shall provide that Landlord, its mortgagees, any ground lessors and Landlord's managing agent shall each be named as an additional insured. In the event Tenant shall fail to procure such insurance, or to deliver such policies or certificates, Landlord may, at its option, procure same for the account of Tenant, and the cost thereof shall be paid to Landlord as Additional Rent within five (5) days after delivery to Tenant of bills therefor. Tenant's compliance with the provisions of this Article 9 shall in no way limit Tenant's liability under any of the other provisions of this Lease.

9.3 **Increased Insurance Risk**. Tenant shall not do or permit anything to be done, or keep or permit anything to be kept in the Premises, which would: (a) be in violation of any Applicable Laws, (b) invalidate or be in conflict with the provision of any fire or other insurance policies covering the Building or any property located therein, (c) result in a refusal by fire insurance companies of good standing to insure the Building or any such property in amounts required by Landlord's Mortgagee (as hereinafter defined) or reasonably satisfactory to Landlord, (d) subject Landlord to any liability or responsibility for injury to any person or property by reason of any business operation being conducted in the Premises, or (e) cause any increase in the fire insurance rates applicable to the Property or property located therein at the beginning of the Term or at any time thereafter. In the event that any use of the Premises by Tenant increases such cost of insurance, Landlord shall give Tenant written notice of such increase and a reasonable opportunity to cure its use to prevent such increase; provided, however, if Tenant fails to do so, Tenant shall pay such increased cost to Landlord in accordance with Section 4.4 hereof.

Acceptance of such payment shall not be construed as a consent by Landlord to Tenant's such use, or limit Landlord's remedies under this Lease.

9.4 **Indemnity**.

9.4.1 Except to the extend due to the gross negligence or willful misconduct of Landlord, Tenant shall defend, indemnify and hold harmless Landlord, all employees, officers, directors, partners, members and shareholders of Landlord, Mortgagees of the Property and any other party having an interest therein from and against any and all liabilities, losses, damages, costs, expenses (including reasonable out-of-pocket attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature (collectively, "Losses") asserted by or on behalf of any third party arising from or with respect to (a) any injury to or death of any person or damage to or loss of property in, on or about the Premises or connected with the use, condition or occupancy of any thereof, (b) any breach or violation by Tenant of any of the terms, conditions or provisions of this Lease, (c) any act, omission, fault, misconduct, negligence or violation of applicable laws and regulations by Tenant or any Tenant Parties, (d) any Hazardous Substances or other pollutants brought, generated, stored, used, installed, disposed of, spilled, released, emitted or discharged on, in or from the Premises or the Property, or allowed, permitted or suffered to be brought, generated, stored, used, installed, disposed of, spilled, released, emitted or discharged thereon, therein or therefrom, by Tenant or any Tenant Parties, in violation of Section 7.6 or otherwise, (e) any construction or other work by Tenant on or about the Premises pursuant to Article 8 or otherwise.

9.4.2 Except to the extent due to the gross negligence or willful misconduct of Tenant, Landlord shall defend, indemnify and hold harmless Tenant, all employees, officers, directors, partners, members and shareholders of Tenant, and any other party having an interest under Tenant against any and all Losses asserted by or on behalf of any third party to the extent incurred in connection with or arising from: (i) any injury or damage caused by any grossly negligent or willful acts of Landlord; or (ii) any work done, or any condition created in or about the Premises during any period of time when Landlord is performing any work or services at the Premises; (iii) the use or manner of use of the Premises or the management of the Common Areas by Landlord, or (iv) a default by Landlord under this Lease.

The terms of this Section 9.4 shall survive the expiration or sooner termination of this Lease.

9.5 **Tenant's Use and Occupancy**. Tenant's use and occupancy of the Premises and the Property and use by all Tenant Parties, and all Tenant's and said parties' furnishings, fixtures, equipment, improvements, materials, supplies, inventory, effects and property of every kind, nature and description which, during the continuance of this Lease or any occupancy of the Premises by Tenant or anyone claiming under Tenant, may be in, on or about the Premises, shall

be at Tenant's and said parties' sole risk and hazard. Except to the extent due to Landlord's gross negligence or willful misconduct, Landlord shall not be liable to Tenant or any other party for injury to or death of any person or damage to or destruction of any property in, on or about the Premises, nor for any interruption in Tenant's use of the Premises or the conduct of its business therein, nor for any other losses, damages, costs, expenses or liabilities whatsoever, including without limitation where caused by fire, water, explosion, collapse, the leakage or bursting of water, steam, or other pipes, any environmental or other condition in, on, or about the Premises, or any other event, occurrence, condition or cause. It is Tenant's responsibility to maintain insurance against any such loss or casualty.

9.6 **Waiver of Subrogation Rights**.

9.6.1 Mutual Waiver. Landlord and Tenant hereby agree and hereby waive any and all rights of recovery against each other for loss or damage occurring to the Premises or the Property or any of Landlord's or Tenant's Property contained therein regardless of the cause of such loss or damage to the extent that the loss or damage is covered by the injured party's insurance or the insurance the injured party is required to carry under this Lease, whichever is greater (without regard to any deductible provision in any policy). This waiver does not apply to claims caused by a party's willful misconduct. This waiver also applies to each party's directors, officers, employees, shareholders, and agents.

9.6.2 Insurance Policy Coverage. Each party will assure that its insurance permits waiver of liability and contains a waiver of subrogation. Each party shall secure an appropriate clause in, or an endorsement to, each insurance policy obtained by or required to be obtained by Landlord or Tenant, as the case may be, under this Lease, pursuant to which the insurance company: (a) waives any right of subrogation against Landlord or Tenant as the same may be applicable, or (b) permits Landlord or Tenant, prior to any loss to agree to waive any claim it might have against the other without invalidating the coverage under the insurance policy. If, at any time, the insurance carrier of either party refuses to write (and no other insurance carrier licensed in Pennsylvania will write) insurance policies which consent to or permit such release of liability, then such party shall notify the other party and upon the giving of such notice, this Section shall be void and of no effect.

## ARTICLE 10 CASUALTY

10.1 **Damage or Destruction**.

10.1.1 Landlord's Repair Obligation. Tenant shall give prompt notice to Landlord of any damage by fire or other casualty (a "**Casualty**") to the Premises or any portion thereof. During the thirty (30)-day period following the occurrence of a Casualty (the "**Notice Period**"), Landlord will notify Tenant of Landlord's estimate of the period of time required to complete the restoration work. In the event that substantially all of the Premises shall be destroyed by

fire or other insured Casualty and if in the judgment of the Landlord the damage or destruction may be repaired within two hundred seventy (270) days with available insurance proceeds, then the Landlord shall so notify the Tenant and shall repair such damage or destruction as provided in Section 10.4 hereof with reasonable diligence, subject to the limitations, if any, of Applicable Laws. If in the judgment of the Landlord the Premises cannot be repaired within two hundred seventy (270) days after the elapse of the Notice Period with available insurance proceeds, then either party shall have the right to terminate the term of this Lease by giving written notice of such termination to the other party within the period of thirty (30) to forty-five (45) days after the occurrence of the Casualty. If the reconstruction period estimated by Landlord is more than two hundred seventy (270) days and neither party terminates this Lease on account thereof, Landlord shall repair such damage or destruction as provided in Section 10.4 hereof, subject to the limitations, if any, of Applicable Laws to be the period so estimated by Landlord.

10.1.2 Failure to Complete Repairs; Rights of Termination. If Landlord is obligated, or elects to repair the damage to the Premises and fails to substantially complete the repairs within the period of time required or permitted by this Section 10.1 (as the same may be reasonably extended due to any delay caused by Force Majeure) (the "**Reconstruction Period**") then, the time for completion of repairs shall be extended by the period of such Force Majeure Delay. Tenant shall have the right to terminate this Lease by delivery of written notice to Landlord not later than ten (10) days following the end of the Reconstruction Period. As used in the Lease, the term "**Force Majeure**" shall mean casualty, acts of God, pandemics, epidemics, or the elements, inability to obtain materials or services, labor disputes or strikes, delays by governmental departments in issuing permits, governmental regulations or controls, civil commotion, war or similar events.

10.2 **Abatement of Rent**. Annual Base Rent and Additional Rent shall not be abated or suspended if, following any Casualty, Tenant shall continue to have access to fifty percent (50%) or more of the Premises and the Premises are not rendered unfit for use and occupancy. If Tenant shall not have sufficient access to the sufficient percentage of the Premises in accordance with this Section or any portion of the Premises shall be otherwise rendered unfit for use and occupancy by the Tenant for the purposes set forth in Section 7.1 by reason of such Casualty, then Rent shall be equitably suspended or abated relative to the portion of the Premises that cannot be used by Tenant for any of its business operations, effective as of the date of the Casualty until Landlord has (a) substantially completed the repair of the Premises and the means of access thereto, and (b) has delivered notice thereof to Tenant.

10.3 **Events of Termination**. Notwithstanding any provisions of this Article 10 to the contrary, if, prior to or during the Term the Building shall be so damaged by Casualty that, in Landlord's reasonable estimate, the cost to repair the damage will be more than twenty-five percent (25%) of the replacement value of the Building immediately prior to the occurrence of

the Casualty (whether or not the Premises shall have been damaged or rendered untenantable), then, in any of such events, Landlord, may give to Tenant, within ninety (90) days after such Casualty, a thirty (30) days' notice of the termination of this Lease and, in the event such notice is given, this Lease and the term shall terminate upon the expiration of such thirty (30) days with the same effect as if such date were the Expiration Date.

10.4 **Scope of Landlord's Repairs**. In the event Landlord elects or shall be obligated to repair or restore any damage or destruction to the Premises pursuant to this Article 10, Landlord shall not be obligated to restore or replace Tenant's Property or Tenant's Alterations. No damages, compensation or claim shall be payable by the Landlord to Tenant, or any other person, by reason of inconvenience, loss of business or annoyance arising from any damage or destruction, or any repair thereof, as is referred to in this Article 10.

## ARTICLE 11 CONDEMNATION

11.1 **Entire Condemnation**. In the event that the whole of the Premises shall be taken under the power of eminent domain or by any proceeding for taking for public or quasi-public use (a "**Condemnation**"), this Lease and the term and estate hereby granted shall automatically terminate as of the earlier of the date of the vesting of title or the date of dispossession of Tenant as a result of such taking.

11.2 **Partial Condemnation**.

11.2.1 Effect of Partial Condemnation. In the event that only a part of the Premises shall be taken by Condemnation and the remaining Premises are suitable for Tenant's permitted use without material interference with Tenant's business operations and Tenant shall have reasonable, convenient access to and from the Premises, the Term shall expire as to that portion of the Premises condemned effective as of the date of the vesting of title in the condemning authority, and this Lease shall continue in full force and effect as to the part of the Premises not so taken. In the event of a partial Condemnation of the Premises which results in substantially all of the Premises being taken, Tenant shall have the right to terminate this Lease if Landlord cannot relocate Tenant to comparable space elsewhere in the Building following the effective date of the Condemnation.

11.2.2 Landlord's Option to Terminate. In the event that a part of the Property shall be subject to Condemnation (whether or not the Premises are affected), Landlord may, at its option, terminate this Lease as of the date of such vesting of title, by notifying Tenant in writing of such termination within ninety (90) days following the date on which Landlord shall have received notice of the vesting of title in the condemning authority if in Landlord's reasonable opinion: (a) a substantial alteration or reconstruction of the Property (or any portion thereof) shall be necessary or appropriate, or (b) the portion of the Property so condemned has the effect of rendering the remainder of the Property uneconomic to maintain.

11.2.3 Landlord's Repair Obligations. In the event that this Lease is not terminated in accordance with Subsection 11.2.2 hereof, Landlord shall, upon receipt of the award in condemnation, make all necessary repairs or alterations to the Building in which the Premises are located so as to constitute the remaining Premises a complete architectural unit to the extent feasible and permitted by applicable law, but Landlord shall not be required to spend for such work an amount in excess of the amount received by Landlord as damages for the part of the Premises so taken. "Amount received by Landlord" shall mean that part of the award in condemnation which is free and clear to Landlord of any collection by Mortgagees and after payment of all costs involved in collection, including but not limited to attorney's fees. Tenant, at its own cost and expense shall, restore all exterior signs, trade fixtures, equipment, furniture, furnishings and other installations of personalty of Tenant which are not taken to as near its former condition as the circumstances will permit. In the event of a partial taking, all provisions of this Lease shall remain in full force and effect.11.3

11.3 **Temporary Taking**. If there is a taking of the Premises for temporary use arising out of a temporary emergency or other temporary situation, this Lease shall continue in full force and effect, and Tenant shall continue to comply with Tenant's obligations under this Lease, except to the extent compliance shall be rendered impossible or impracticable by reason of the taking, and Tenant shall be entitled to the award for its leasehold interest.

11.4 **Condemnation Awards**. Except as provided in the preceding Section 11.3, Landlord shall be entitled to the entire award in any condemnation proceeding or other proceeding for taking for public or quasi public use, including, without limitation, any award made for the value of the leasehold estate created by this Lease. No award for any partial or entire taking shall be apportioned, and Tenant hereby assigns to Landlord any award that may be made in such condemnation or other taking, together with any and all rights of Tenant now or hereafter arising in or to same or any part thereof; provided, however, that nothing contained herein shall be deemed to give Landlord any interest in or to require Tenant to assign to Landlord any award made to Tenant specifically for its relocation expenses or the taking of Tenant's Property provided that such award does not diminish or reduce the amount of the award payable to Landlord.

11.5 **Proration**. In the event of a partial condemnation or other taking that does not result in a termination of this Lease as to the entire Premises, then the Annual Base Rent and Tenant's Share shall be adjusted in proportion to that portion of the Premises taken by such condemnation or other taking.

## ARTICLE 12 ASSIGNMENT AND SUBLETTING

12.1 **Assignment and Subletting**. Tenant shall not, without the prior written consent of the Landlord, which consent, subject to Section 12.2 below, shall not be unreasonably withheld, assign, mortgage, encumber or otherwise transfer this Lease or any interest herein directly or indirectly, by operation of law or otherwise, or sublet the Premises or any part thereof, or permit the use or occupancy of the Premises by any party other than Tenant (any such action,

a "**Transfer**"). If at any time or from time to time during the Term, when no uncured Event of Default has occurred and is continuing, Tenant desires to effect a Transfer, Tenant shall deliver to Landlord written notice ("**Transfer Notice**") setting forth the terms of the proposed Transfer and the identity of the proposed assignee, sublessee or other transferee (each a "**Transferee**"). Tenant shall also deliver to Landlord with the Transfer Notice an acceptable assumption agreement for Tenant's obligations under this Lease (in the case where the Transfer is a proposed assignment of this Lease) together with all relevant information requested by Landlord concerning the proposed Transferee to assist Landlord in making an informed judgment regarding the financial responsibility, creditworthiness, reputation, and business experience of the Transferee. The provisions of this Section 12.1 shall apply to a Transfer (by one or more Transfers) of a controlling portion of or interest in the stock or partnership or membership interests or other evidences of equity interests of Tenant as if such Transfer were an assignment of this Lease; provided that if equity interests in Tenant at any time are or become traded on a public stock exchange, the transfer of equity interests in Tenant on a public stock exchange shall not be deemed an assignment within the meaning of this Section 12.1.

12.2 **Landlord's Options**. Landlord shall have the option, exercisable by written notice delivered to Tenant within forty-five (45) days after Landlord's receipt of a Transfer Notice accompanied by the other information described in Section 12.1, to: (a) permit Tenant to Transfer the Premises; or (b) disapprove the Tenant's Transfer of the Premises and to continue the Lease in full force and effect as to the entire Premises; or (c) terminate the Lease as to the portion of the Premises affected by the Transfer as of the date set forth in Landlord's notice of exercise of such option, which date shall not be less than thirty (30) days nor more than ninety (90) days following the giving of such notice. If Landlord approves of the proposed Transfer pursuant to Section 12.1 above, Tenant may enter into the proposed Transfer with such proposed Transferee subject to the following conditions: (i) the Transfer shall be on the same terms set forth in the Transfer Notice; (ii) no Transfer shall be valid and no Transferee shall take possession of the Premises until an executed counterpart of the assignment, sublease or other instrument effecting the Transfer (in the form approved by Landlord) has been delivered to Landlord pursuant to which the Transferee shall expressly assume all of Tenant's obligations under this Lease; and (iii) Tenant shall provide Landlord with a written ratification agreement from each guarantor of this Lease in form and substance satisfactory to Landlord.

If Landlord exercises its option to terminate this Lease (or in the case of a partial sublet to release Tenant with respect to a portion of the Premises), Tenant shall surrender possession of such Premises on the date set forth in Landlord's notice, and thereafter neither Landlord nor Tenant shall have any further liability with respect thereto. If this Lease shall be terminated as to a portion of the Premises only, Rent and Tenant's parking allocation shall be readjusted proportionately according to the ratio that the number of square feet and the portion of the space surrendered compares to the floor area of Tenant's Premises during the Term of the proposed sublet.

12.3 **Additional Conditions**. Tenant shall not offer to make, or enter into negotiations with respect to any Transfer to: (a) any tenant of the Building or any entity owned by, or under the common control of a tenant in the Building unless there is no competing space then available for leases therein; or (b) any bona fide prospective tenant with whom Landlord is then negotiating with respect to other space in the Building; or (c) any party which would be of such

type, character, or condition as to be inappropriate as a tenant for the Building. It shall not be unreasonable for Landlord to disapprove any proposed assignment, sublet or transfer to any of the foregoing entities or to an entity that does not have at least equal financial strength to Tenant's as of the date of this Lease. Tenant agrees not to list or advertise the Premises for assignment or sublease, whether through a broker, agent or representative, or otherwise at a rental rate which is less than Landlord's current rate in the Building for new tenants. Landlord shall not be deemed to unreasonably withhold its consent to any proposed assignment or sublease if such Transfer, in Landlord's reasonable determination, is at a full-service rate which is less than Landlord's current rate in the Building for new tenants, and would compete with similar space either being offered or anticipated to be offered by Landlord in the Building.

12.4 **No Release**. Landlord's consent to a Transfer shall not release Tenant of Tenant's obligations under this Lease and this Lease and all of the obligations of Tenant under this Lease shall continue in full force and effect as the obligations of a principal (and not as the obligations of a guarantor or surety). From and after any Transfer, the Lease obligations of the Transferee and of the original Tenant named in this Lease shall be joint and several. No acceptance of Rent by Landlord from or recognition in any way of the occupancy of the Premises by a Transferee shall be deemed a consent to such Transfer, or a release of Tenant from direct and primary liability for the further performance of Tenant's covenants hereunder. The consent by Landlord to a particular Transfer shall not relieve Tenant from the requirement of obtaining the consent of Landlord to any further Transfer. Each violation of any of the covenants, agreements, terms or conditions of this Lease, whether by act or omission, by any of Tenant's permitted Transferees, shall constitute a violation thereof by Tenant. In the event of default by any Transferee of Tenant or any successor of Tenant in the performance of any of the terms hereof, Landlord may proceed directly against Tenant without the necessity of exhausting remedies against such Transferee or successor.

12.5 **Transfer Profit**. Tenant shall pay to Landlord, as Additional Rent, an amount (the "**Transfer Profit**") equal to any rent and other economic consideration received by Tenant as a result of any Transfer which exceeds, in the aggregate the total of the remaining rent which Tenant is obligated to pay Landlord under this Lease (prorated to reflect obligations allocable to any portion of the Premises subleased). Tenant shall pay such Transfer Profit to Landlord on a monthly basis within fifteen (15) days after receipt thereof, without affecting or reducing any other obligations of Tenant hereunder. Each such payment shall be sent with a detailed statement. Landlord shall have the right to audit Tenant's books and records to verify the accuracy of the detailed statement.

12.6 **Effect on Personal Rights of Tenant.** If a Transfer shall occur, the rights and options of Tenant set forth in Articles 17, 18 and 19 shall be extinguished and will not be transferred to the assignee or subtenant, all such rights being personal to the Tenant named herein.

## ARTICLE 13 DEFAULTS AND REMEDIES

13.1 **Events of Default**. The occurrence of any one or more of the following events shall constitute an event of default (each an "**Event of Default**") hereunder:

13.1.1 Nonpayment of Annual Base Rent or Additional Rent. Failure by Tenant to pay any installment of Annual Base Rent, Additional Rent or any other amount, deposit, reimbursement or sum due and payable hereunder, within ten (10) days after Landlord has delivered written notice to Tenant that the same is due; however, an Event of Default shall occur hereunder without any obligation of Landlord to give notice if Tenant fails to pay Rent when due and, during the twelve (12) month interval preceding such failure, Landlord has given Tenant notice of failure to pay Rent on one (1) or more occasions.

13.1.2 Certain Obligations. Failure by Tenant to perform, observe or comply with any non-monetary obligation contained in Section 4.6 ("**Security Deposit**"), Section 7.5 ("**No Liens**") and Article 12 ("**Assignment and Subletting**").

13.1.3 Other Obligations. Failure by Tenant to perform any non-monetary obligation, agreement or covenant under this Lease other than those matters specified in Subsection 13.1.2, and such failure continues for thirty (30) days after written notice by Landlord to Tenant of such failure; provided, however, that if the nature of Tenant's obligation is such that more than thirty (30) days are required for performance, then Tenant shall not be in default if Tenant commences performance within such thirty (30)-day period and thereafter diligently and continuously prosecutes the same to completion within sixty (60) days following the date of Landlord's written notice with respect to such failure.

13.1.4 Assignment; Receivership; Attachment. (a) The making by Tenant of any arrangement or assignment for the benefit of creditors; (b) the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days; or (iii) the attachment, execution, or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days.

13.1.5 Bankruptcy. The admission by Tenant or Tenant's guarantor (if any) in writing of its inability to pay its debts as they become due, the filing by Tenant or Tenant's guarantor (if any) of a petition in bankruptcy seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, the filing by Tenant or Tenant's guarantor (if any) of an answer admitting or failing timely to contest a material allegation of a petition filed against Tenant or Tenant's guarantor (if any) in any such proceeding or, if within forty-five (45) days after the commencement of any proceeding against Tenant or Tenant's guarantor (if any) seeking any involuntary reorganization, or arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation by any of Tenant's creditors or such guarantor's creditors, such proceeding shall not have been dismissed.

13.1.6 Abandonment. Abandonment of the Premises by Tenant for a continuous period in excess of thirty (30) days.

13.2 **Remedies**. If an Event of Default occurs and is not cured within the applicable cure period, if any, Landlord shall have the following rights and remedies, in addition to any and all other rights or remedies available to Landlord in law or equity:

13.2.1 Notice to Quit. Landlord shall have the right to deliver written notice to Tenant to quit possession and occupancy of the Premises and to declare the Lease terminated. Upon Landlord's termination of this Lease, Tenant shall quit and peaceably surrender the Premises, and all portions thereof, to Landlord, and Landlord shall have the right to receive all rental and other income of and from the same.

13.2.2 Right of Re-Entry. Landlord shall have the right, with or without terminating this Lease, to re-enter the Premises and take possession thereof by summary proceeding, eviction, ejectment or otherwise and may dispossess all other persons and property from the Premises. Tenant's property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant. No re-entry or taking possession of the Premises by Landlord pursuant to this Subsection 13.2.2 shall be construed as an election to terminate this Lease unless a written notice of such intention is given to Tenant or unless the termination thereof is decreed by a court of competent jurisdiction. Tenant thereby waives all statutory rights, including without limitation the right to a notice to quit, notice before exercise of any prejudgment remedy, and any rights of redemption, all to the extent such rights may be lawfully waived.

13.2.3 Recovery of Rent and Damages. Landlord shall have the right to recover from Tenant all loss of Rent and other payments that Landlord may incur by reason of termination of the Lease, including, without limitation: (a) all Rent and other sums due and payable by Tenant as of the date of termination; (b) all Rent that would otherwise be payable for the remainder of the Term in accordance with the terms of this Lease; (c) all of Landlord's then unamortized costs of special inducements provided to Tenant (including without limitation rent concessions, tenant construction allowances, rent waivers, above building standard leasehold improvements, and the like); (d) the costs of collecting amounts due from Tenant under the Lease and the costs of recovering possession of the Premises (including attorneys fees and litigation costs); (e) the costs of curing Tenant's defaults existing at or prior to the date of termination; (f) all **"Reletting Expenses"** (as defined below); and (g) all Landlord's other reasonable expenditures arising from the termination. Tenant shall reimburse Landlord for all such items, and the same shall be due and payable immediately from time to time upon notice from Landlord that an expense has been incurred, without regard to whether the expense was incurred before or after the termination.

13.2.4 Acceleration of Future Rentals. Following termination of this Lease, Landlord, at its election, may demand to be indemnified for its loss of Rent (with respect to the period following such termination) by a lump sum payment representing the then present value of the amount of Rent that would have been paid in accordance with this Lease for the remainder of the Term minus the then present value of the aggregate fair market rent and additional charges payable for the Premises for the remainder of the Term (if less than the Rent payable hereunder) estimated as of the date of termination, and taking into account Landlord's reasonable projections of vacancy and time required to re-lease the Premises. Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, on demand, such amount as final damages for Tenant's default with respect to the Rents payable for the remainder of the Term as described above. In the computation of present value, a discount at the then market discount rate as reasonably determined by Landlord shall be employed.

13.2.5 Rents Due After Re-Entry by Landlord. If Landlord re-enters or otherwise takes possession of the Premises without terminating this Lease (but terminating only Tenant's right of possession in the Premises), then the Lease and Tenant's liabilities and obligations thereunder shall survive such action. In the event of any such termination of Tenant's right of possession, whether or not the Premises, or any portion thereof, shall have been relet, Tenant shall pay the Landlord a sum equal to the Rent and any other charges required to be paid by Tenant up to the time of such termination of such right of possession and thereafter Tenant, until the end of the Term, shall be liable to Landlord for and shall pay to Landlord: (a) the equivalent of the amount of the Rent payable under this Lease, less (b) the net proceeds of any reletting effected pursuant to the provisions hereof after deducting all of Landlord's Reletting Expenses. Tenant shall pay such amounts in accordance with the terms of this Subsection 13.2.5 as set forth in a written statement thereof from Landlord to Tenant (the **"Deficiency"**) to Landlord in monthly installments on the days on which the Annual Base Rent is payable under this Lease, and Landlord shall be entitled to recover from Tenant each monthly installment of the Deficiency as the same shall arise. Tenant shall also pay to Landlord upon demand the costs incurred by Landlord in curing Tenant's defaults existing at or prior to the date of such termination, the cost of recovering possession of the Premises and the Reletting Expenses. Tenant agrees that Landlord may file suit to recover any sums that become due under the terms of this Section from time to time, and all reasonable costs and expenses of Landlord, including attorneys' fees and costs incurred in connection with such suits shall be payable by Tenant on demand.

13.2.6 Certain Terms Defined. For purposes of this Subsection 13.2.6, **"Reletting Alterations"** shall mean all repairs, changes, improvements, alterations or additions made by Landlord in or to the Premises to the extent deemed reasonably necessary by Landlord to prepare the Premises for the re-leasing following an Event of Default; and **"Reletting Expenses"** shall mean the reasonable expenses paid or incurred by Landlord in connection with any re-leasing of the Premises following an Event of Default, including, without

limitation, marketing expenses, brokerage commissions, attorneys' fees, the costs of Reletting Alterations, tenant allowances and other economic concessions provided to the new tenant.

13.3 **Landlord's Right to Cure Defaults**. If the Tenant shall default in the observance or performance of any condition or covenant on Tenant's part to be observed or performed under or by virtue of any of the provisions of this Lease, and such default continues beyond any applicable notice and cure period or Landlord reasonably determines that an emergency exists, the Landlord, without being under any obligation to do so and without thereby waiving such default, may remedy such default for the account and at the expense of the Tenant. If the Landlord makes any expenditures or incurs any obligations for the payment of money in connection therewith, including but not limited to reasonable attorney's fees in instituting, prosecuting or defending any action or proceeding, such sums paid or obligation incurred and costs, shall be paid upon demand to the Landlord by the Tenant as Additional Rent pursuant to Section 4.4 hereof and if not so paid with interest from its due date until paid at the lesser of eighteen percent (18%) per annum or the maximum legal rate that Landlord may charge Tenant.

13.4 **Disposition of Tenant's Property**. In addition to Landlord's rights under Section 8.4 hereof, Landlord shall have the right to handle, remove, discard or store in a commercial warehouse or otherwise, at Tenant's sole risk and expense, any of Tenant's Property that is not removed by Tenant at the end of the Term. Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. Tenant shall pay to Landlord, upon demand, any and all expenses incurred in such removal and all storage charges for such property so long as the same shall be in Landlord's possession or under Landlord's control.

13.5 **Reletting**. In connection with any reletting of the Premises following an Event of Default, Landlord shall be entitled to grant such rental and economic concessions and other incentives as may be customary for similar space in the Submarket. Subject to applicable law, Landlord shall not be required to accept any tenant offered by Tenant or observe any instruction given by Tenant about such reletting or do any act or exercise any care or diligence with respect to such reletting or to the mitigation of damages.

13.6 **No Accord and Satisfaction**. Landlord may collect and receive any rent due from Tenant, and the payment thereof shall not constitute a waiver of or affect any notice or demand given, suit instituted or judgment obtained by Landlord, or be held to waive, affect, change, modify or alter the rights or remedies that Landlord has against Tenant in equity, at law, or by virtue of this Lease. No receipt or acceptance by Landlord from Tenant of less than the monthly rent herein stipulated shall be deemed to be other than a partial payment on account for any due and unpaid stipulated rent; no endorsement or statement on any check or any letter or other writing accompanying any check or payment of rent to Landlord shall be deemed an accord and satisfaction, and Landlord may accept and negotiate such check or payment without prejudice to Landlord's rights to (a) recover the remaining balance of such unpaid rent, or (b) pursue any other remedy provided in this Lease.

13.7 **Claims in Bankruptcy**. Nothing herein shall limit or prejudice the right of Landlord to prove and obtain in proceeding for bankruptcy, insolvency, arrangement or reorganization by reason of the termination of this Lease, an amount equal to the maximum

allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, the damages are to be proved, whether or not the amount is greater, equal to or less than the amount of the loss or damage that Landlord has suffered. Without limiting any of the provisions of this Article 13, if pursuant to the Bankruptcy Code, as the same may be amended, Tenant is permitted to assign this Lease in disregard of the restrictions contained in Article 12, Tenant agrees that adequate assurance of future performance by the assignee permitted under the Bankruptcy Code shall mean the deposit of cash security with Landlord in any amount equal to all Rent payable under this Lease for the calendar year preceding the year in which such assignment is intended to become effective, which deposit shall be held by Landlord, without interest, for the balance of the term as security for the full and faithful performance of all of the obligations under this Lease on the part of Tenant yet to be performed. If Tenant receives or is to receive any valuable consideration for such an assignment of this Lease, such consideration, after deducting therefrom (a) the brokerage commissions, if any, and other expenses reasonably designated by the assignee as paid for the purchase of Tenant's property in the Premises, shall be and become the sole exclusive property of Landlord and shall be paid over to Landlord directly by such assignee. In addition, adequate assurance shall mean that any such assignee of this Lease shall have a net worth indicating said assignee's reasonable ability to pay the Rent, and abide by the terms of this Lease for the remaining portion thereof applying commercially reasonable standards.

13.8 **Arbitration**. Intentionally omitted.

13.9 Waiver of Trial By Jury. **TO THE EXTENT PERMITTED BY APPLICABLE LAW, LANDLORD AND TENANT HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, OR TENANT'S USE OR OCCUPANCY OF THE PREMISES, OR ANY SUMMARY PROCESS, EVICTION OR OTHER STATUTORY REMEDY WITH RESPECT THERETO. EACH PARTY HAS BEEN REPRESENTED BY, AND HAS RECEIVED THE ADVICE OF, LEGAL COUNSEL WITH RESPECT TO THIS WAIVER.**

13.10 **Confessions of Judgment**.

13.10.1 **IN ADDITION TO THE RIGHTS AND REMEDIES PROVIDED ABOVE IN THIS SECTION 13, IF AN UNCURED EVENT OF DEFAULT OCCURS RELATING TO TENANT'S NON-PAYMENT OF THE RENT OR OTHER SUMS DUE HEREUNDER, TENANT HEREBY AUTHORIZES ANY ATTORNEY OF ANY COURT OF RECORD OF THE COMMONWEALTH OF PENNSYLVANIA TO APPEAR FOR TENANT AND TO CONFESS JUDGMENT AGAINST TENANT, AND IN FAVOR OF LANDLORD, FOR ALL RENT AND OTHER SUMS DUE HEREUNDER PLUS COSTS AND AN ATTORNEY'S COLLECTION COMMISSION EQUAL TO THE GREATER OF 5% OF ALL RENT AND OTHER SUMS OR $1,000, FOR WHICH THIS LEASE OR A TRUE AND CORRECT COPY HEREOF SHALL BE GOOD AND SUFFICIENT WARRANT. TENANT UNDERSTANDS THAT THE FOREGOING**

**PERMITS LANDLORD TO ENTER A JUDGMENT AGAINST TENANT WITHOUT PRIOR NOTICE OR HEARING. ONCE SUCH A JUDGMENT HAS BEEN ENTERED AGAINST TENANT, ONE OR MORE WRITS OF EXECUTION OR WRITS OF GARNISHMENT MAY BE ISSUED THEREON WITHOUT FURTHER NOTICE TO TENANT AND WITHOUT A HEARING, AND, PURSUANT TO SUCH WRITS, LANDLORD MAY CAUSE THE SHERIFF OF THE COUNTY IN WHICH ANY PROPERTY OF TENANT IS LOCATED TO SEIZE TENANT'S PROPERTY BY LEVY OR ATTACHMENT. IF THE JUDGMENT AGAINST TENANT REMAINS UNPAID AFTER SUCH LEVY OR ATTACHMENT, LANDLORD CAN CAUSE SUCH PROPERTY TO BE SOLD BY THE SHERIFF EXECUTING THE WRITS, OR, IF SUCH PROPERTY CONSISTS OF A DEBT OWED TO TENANT BY ANOTHER ENTITY, LANDLORD CAN CAUSE SUCH DEBT TO BE PAID DIRECTLY TO LANDLORD IN AN AMOUNT UP TO BUT NOT TO EXCEED THE AMOUNT OF THE JUDGMENT OBTAINED BY LANDLORD AGAINST TENANT, PLUS THE COSTS OF THE EXECUTION. SUCH AUTHORITY SHALL NOT BE EXHAUSTED BY ONE EXERCISE THEREOF, BUT JUDGMENT MAY BE CONFESSED AS AFORESAID FROM TIME TO TIME AS OFTEN AS ANY OF THE RENT AND OTHER SUMS SHALL FALL DUE OR BE IN ARREARS, AND SUCH POWERS MAY BE EXERCISED AS WELL AFTER THE EXPIRATION OF THE INITIAL TERM OF THIS LEASE AND DURING ANY EXTENDED OR RENEWAL TERM OF THIS LEASE AND AFTER THE EXPIRATION OF ANY EXTENDED OR RENEWAL TERM OF THIS LEASE.**

13.10.2 **WHEN THIS LEASE AND THE TERM OR ANY EXTENSION THEREOF SHALL HAVE BEEN TERMINATED ON ACCOUNT OF ANY UNCURED DEFAULT BY TENANT, OR WHEN THE TERM OR ANY EXTENSION THEREOF SHALL HAVE EXPIRED, TENANT HEREBY AUTHORIZES ANY ATTORNEY OF ANY COURT OF RECORD OF THE COMMONWEALTH OF PENNSYLVANIA TO APPEAR FOR TENANT AND FOR ANYONE CLAIMING BY, THROUGH OR UNDER TENANT AND TO CONFESS JUDGMENT AGAINST ALL SUCH PARTIES, AND IN FAVOR OF LANDLORD, IN EJECTMENT AND FOR THE RECOVERY OF POSSESSION OF THE PREMISES, FOR WHICH THIS LEASE OR A TRUE AND CORRECT COPY HEREOF SHALL BE GOOD AND SUFFICIENT WARRANT. AFTER THE ENTRY OF ANY SUCH JUDGMENT A WRIT OF POSSESSION MAY BE ISSUED THEREON WITHOUT FURTHER NOTICE TO TENANT AND WITHOUT A HEARING. IF FOR ANY REASON AFTER SUCH ACTION SHALL HAVE BEEN COMMENCED IT SHALL BE DETERMINED AND POSSESSION OF THE PREMISES REMAIN IN OR BE RESTORED TO TENANT, LANDLORD SHALL HAVE THE RIGHT FOR THE SAME DEFAULT AND UPON ANY SUBSEQUENT DEFAULT(S) OR UPON THE TERMINATION OF THIS LEASE OR TENANT'S RIGHT OF POSSESSION AS HEREIN SET FORTH, TO AGAIN CONFESS JUDGMENT AS HEREIN PROVIDED, FOR WHICH THIS LEASE OR A TRUE AND CORRECT COPY HEREOF SHALL BE GOOD AND SUFFICIENT WARRANT.**

13.10.3 **THE WARRANTS TO CONFESS JUDGMENT SET FORTH ABOVE SHALL CONTINUE IN FULL FORCE AND EFFECT AND BE UNAFFECTED BY AMENDMENTS TO THIS LEASE OR OTHER AGREEMENTS BETWEEN**

**LANDLORD AND TENANT EVEN IF ANY SUCH AMENDMENTS OR OTHER AGREEMENTS INCREASE TENANT'S OBLIGATIONS OR EXPAND THE SIZE OF THE PREMISES.**

13.10.4 **TENANT EXPRESSLY AND ABSOLUTELY KNOWINGLY WAIVES AND RELEASES (i) ANY RIGHT, INCLUDING, WITHOUT LIMITATION, UNDER ANY APPLICABLE STATUTE, WHICH TENANT MAY HAVE TO RECEIVE A NOTICE TO QUIT PRIOR TO LANDLORD COMMENCING AN ACTION FOR REPOSSESSION OF THE PREMISES, AND (ii) ANY RIGHT WHICH TENANT MAY HAVE TO NOTICE AND TO HEARING PRIOR TO A LEVY UPON OR ATTACHMENT OF TENANT'S PROPERTY OR THEREAFTER, AND (iii) ANY PROCEDURAL ERRORS IN CONNECTION WITH THE ENTRY OF ANY SUCH JUDGMENT OR IN THE ISSUANCE OF ANY ONE OR MORE WRITS OF POSSESSION OR EXECUTION OR GARNISHMENT THEREON. TENANT EXPRESSLY WAIVES THE RIGHT TO ANY NOTICE TO REMOVE AS MAY BE SPECIFIED IN THE LANDLORD AND TENANT ACT OF PENNSYLVANIA, ACT OF APRIL 6, 1951, AS AMENDED, OR ANY SIMILAR OR SUCCESSOR PROVISION OF LAW.**

## ARTICLE 14 SUBORDINATION; ATTORNMENT AND RIGHTS OF MORTGAGE HOLDERS

14.1 **Subordination**. This Lease and all of Tenant's rights hereunder are, and shall be, subject and subordinate at all times to any mortgages (each, a "**Mortgage**") which may now exist or hereafter affect the Property, or any portion thereof, in any amount, and to all renewals, modifications, consolidations, replacements, and extensions of such Mortgages. This Section shall be self-operative and no further subordination shall be required. In confirmation of such subordination, Tenant shall promptly execute, acknowledge and deliver any instrument that Landlord or the holder of any Mortgage or its assigns or successors in interest (each such holder, a "**Mortgagee**") may reasonably request to evidence such subordination. Landlord's inability to obtain a non-disturbance agreement shall not affect Tenant's subordination agreement herein.

14.2 **Attornment by Tenant**. In the event that any such first Mortgage is foreclosed or a conveyance in lieu of foreclosure is made for any reason, Tenant shall, at the option of the Mortgagee or the grantee or purchaser in foreclosure, notwithstanding any subordination of any such lien to this Lease, attorn to and become the Tenant of the successor in interest to Landlord at the option of such successor in interest. Tenant covenants and agrees to execute and deliver, within ten (10) days following delivery of request by Landlord, Mortgagee, or by Landlord's successor in interest and in the form requested by Landlord, Mortgagee, or by Landlord's successor in interest, any additional documents evidencing the priority or subordination of this Lease with respect to the lien of any such first Mortgage, which additional documents shall be satisfactory to Landlord, Mortgagee, and Landlord's successors in interest.

14.3 **Limitation of Mortgagees' Liability**. Notwithstanding any other provision of this Lease to the contrary, no holder of any such Mortgage shall be obligated to perform or liable in damages for failure to perform any of Landlord's obligations under this Lease unless and until such holder shall foreclose such mortgage or otherwise acquire title to the Property, and then shall only be liable for Landlord's obligations arising or accruing after such foreclosure or acquisition of title. No such holder shall ever be obligated to perform or be liable in damages for any of Landlord's obligations arising or accruing before such foreclosure or acquisition of title. Such holder's obligations and liabilities shall in any event be subject to, and such holder shall have the benefit of, Section 16.15 hereof. Tenant shall never pay the Annual Base Rent, Additional Rent or any other charge more than ten (10) days prior to the due date thereof, and any payments made by Tenant in violation of this provision shall be a nullity as to such holder, and Tenant shall remain liable to such holder therefor. Tenant agrees on request of Landlord to execute and deliver from time to time any agreement which may be necessary to implement the provisions of this Section 14.3.

14.4 **Estoppel Certificates**. Tenant and Guarantor shall from time to time, upon written request by Landlord or any Mortgagee of Landlord, execute, acknowledge and deliver to Landlord or such Mortgagee, within fifteen (15) days after receipt of such request, a statement in writing certifying to the extent true, without limitation: (i) the Commencement Date and Expiration Date of this Lease; (ii) that this Lease is unmodified and in full force and effect (or if there have been modifications, identifying such modifications and certifying that the Lease, as modified, is in full force and effect); (iii) the date upon which Tenant began paying Rent and the dates to which Rent and any other charges have been paid; (iv) whether to the knowledge of Tenant Landlord is in default under any provision of this Lease (and if Landlord is in default, specifying each such default) and whether events or conditions are known to Tenant which, with the passage of time or notice or both, would constitute a default on the part of Landlord hereunder; (v) that the Premises have been completed in accordance with the terms hereof and Tenant is in occupancy and paying Rent on a current basis with no rental offsets, abatements or claims; (vi) that there has been no prepayment of Rent other than that provided for in this Lease; (vii) that there are no actions, whether voluntary or involuntary, pending against Tenant or the Guarantor under the bankruptcy laws of the United States or any State thereof; (viii) such other matters as may be required by Landlord or any Lender (ix) the address to which notices to Tenant shall be sent; and (x) the amount of Tenant's security deposit, if any; it being understood that any such statement so delivered may be relied upon by any party in connection with any lease, mortgage, sale or other transfer of all or any part of the Property. Tenant's failure to deliver such statement within such time shall be deemed to have unconditionally assented to and affirmed any and all provisions set forth in the estoppel certificate as same may have been prepared by the Landlord. Notwithstanding the presumptions of this Article, Tenant shall not be relieved of its obligation to deliver said statement. Tenant also hereby irrevocably appoints Landlord as Tenant's attorney-in-fact and in Tenant's name, place and stead to execute (at Landlord's sole option) any and all documents described in this Section 14.4 if Tenant fails to do so within the specified time period.

14.5 **Quiet Enjoyment**. Upon Tenant paying the Annual Base Rent and Additional Rent and performing all of Tenant's obligations under this Lease, Tenant may peacefully and quietly enjoy the Premises during the Term as against all persons or entities lawfully claiming by

or through Landlord; subject, however, to the provisions of this Lease and to the rights of Landlord's Mortgagee.

14.6 **Mortgagee Approval**. Landlord and Tenant hereby agree that this Lease is subject to the review and approval of Landlord's Mortgagee in accordance with the terms of the mortgage loan documents executed by Landlord in connection with its financing of the Property. Landlord shall submit this Lease to its Mortgagee promptly upon Tenant's execution and delivery of this Lease to Landlord, and Landlord shall promptly advise Tenant of its Mortgagee's decision.

## ARTICLE 15 NOTICES

15.1 **Manner of Notice**.

15.1.1 Notices; Addresses. All notices, demands and other communications ("**notices**") permitted or required to be given under this Lease shall be in writing and sent by personal service, telecopy transmission (if a copy thereof is also sent on the same day by a nationally recognized overnight courier service), certified mail (postage prepaid) return receipt requested or by a nationally recognized overnight courier service to the following addresses or to such other address as either Landlord or Tenant may designate as its new address for such purpose by notice given to the other in accordance with the provisions of this **Section 15.1**:

If to Tenant:

Can Man LLC
6501 Red Hook Plaza
Suite 201
St. Thomas, VI 00802
Attn: Ryan Uszenski

With copies to:

Can Man LLC
1619 New London Road
Landenberg, PA 19350
Attn: Carey Drangula

If to Landlord:

MH II Pennsburg LLC
300 Conshohocken State Road
Suite 200
West Conshohocken, PA 19428
Attn: Director of Asset Management

With copies to:

MH II Pennsburg LLC
300 Conshohocken State Road
Suite 200
West Conshohocken, PA 19428

Attention: General Counsel

15.1.2 Delivery. Notices shall be deemed to have been given (a) when hand delivered (provided that delivery shall be evidenced by a receipt executed by or on behalf of the addressee if delivered by personal service) if personal service is used, (b) on the date of transmission if sent before 4:00 p.m. (Philadelphia time) on a business day when telecopy transmission is used, (c) the sooner of the date of receipt or the date that is three (3) days after the date of mailing thereof if sent by postage pre-paid registered or certified mail, return receipt requested, and (d) one (1) day after being sent by Federal Express or other reputable overnight courier service (with delivery evidenced by written receipt) if overnight courier service is used.

## ARTICLE 16 MISCELLANEOUS

16.1 **Brokers**. Landlord and Tenant warrant to each other that they have had no dealings with any broker, agent or finder in connection with this Lease except representatives of Landlord. Both parties hereto agree to protect, indemnify and hold harmless the other from and against any and all expenses with respect to any compensation, commissions and charges claimed by any other broker, agent or finder not identified above with respect to this Lease or the negotiation thereof that is made by reason of any action or agreement by such party.

16.2 **Building Name**. The Building and the Property may be known by such name as Landlord, in its sole discretion, may elect, and Landlord shall have the right from time to time to change such designation or name without Tenant's consent upon prior written notice to Tenant.

16.3 **Authority**. If Tenant signs as a corporation, limited liability company, or a partnership, or other business entity each person executing this Lease on behalf of Tenant hereby covenants and warrants that Tenant is a duly authorized and existing entity, that Tenant is duly qualified to do business in Pennsylvania, that Tenant has full right and authority to enter into this Lease, and that each person signing on behalf of Tenant is duly authorized to do so and that no other signatures are necessary. Upon Landlord's request, Tenant shall provide Landlord with evidence reasonably satisfactory to Landlord confirming the foregoing covenants and warranties.

16.4 **Interpretation**. The words "Landlord" and "Tenant" as used herein shall include the plural as well as the singular. The words used in neuter gender include the masculine and feminine. If there is more than one Tenant, the obligations under this Lease imposed on Tenant shall be joint and several. The captions preceding the articles of this Lease have been inserted solely as a matter of convenience and such captions in no way define or limit the scope or intent of any provision of this Lease. This Lease may be executed in several counterparts and by each party on a separate counterpart, each of which, when so executed and delivered, shall be an original and all of which together shall constitute one instrument.

16.5 **Modifications**. Neither this Lease nor any term or provision hereof may be changed, waived, discharged or terminated orally, and no breach thereof shall be waived, altered or modified, except by a written instrument signed by the party against which the enforcement of the change, waiver, discharge or termination is sought. Any right to change, waive, discharge,

alter or modify, or terminate this Lease shall be subject to the prior express written consent of Landlord's Mortgagee.

16.6 **Severability**. If any provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and enforceable to the full extent permitted by law.

16.7 **Entire Agreement**. Landlord's employees, representatives and agents have no authority to make or agree to make a lease or any other agreement or undertaking in connection herewith. The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises, and this document shall be effective and binding only upon the execution and delivery hereof by both Landlord and Tenant. This Lease, including the Exhibits hereto, which are made part of this Lease, contain the entire agreement of the parties and all prior negotiations and agreements are merged herein. Neither Landlord nor Landlord's agents have made any representations or warranties with respect to the Premises, the Building or this Lease except as expressly set forth herein, and no rights, easements or licenses are or shall be acquired by Tenant by implication or otherwise unless expressly set forth herein.

16.8 **No Merger**. There shall be no merger of this Lease or of the leasehold estate hereby created with the fee estate in the Premises or any part thereof by reason of the fact that the same person may acquire or hold, directly or indirectly, this Lease or the leasehold estate hereby created or any interest in this Lease or in such leasehold estate as well as the fee estate in the leasehold Premises or any interest in such fee estate.

16.9 **Easements**. Landlord reserves the right, from time to time, to grant easements and rights, make dedications, agree to restrictions and record maps affecting the Property as such party may deem necessary or desirable, so long as such easements, rights, dedications, restrictions, and maps do not unreasonably interfere with the use of the Premises by Tenant; and this Lease shall be subordinate to such instruments.

16.10 **Bind and Inure**. The terms, provisions, covenants and conditions contained in this Lease shall bind and inure to the benefit of Landlord and Tenant, and, except as otherwise provided herein, their respective heirs, legal representatives, successors and assigns. If two or more individuals, corporations, partnerships or other business associations (or any combination of two or more thereof) shall sign this Lease as Tenant, the liability of each such individual, corporation, partnership or other business association to pay Rent and perform all other obligations hereunder shall be deemed to be joint and several. All agreements, covenants and indemnifications contained herein or made in writing pursuant to the terms of this Lease by or on behalf of Tenant shall be deemed material and shall survive expiration or sooner termination of this Lease.

16.11 **Remedies Cumulative; No Waiver**. No remedy or election hereunder shall be deemed exclusive, but shall wherever possible, be cumulative with all other remedies at law or in equity. No waiver of any provision hereof shall be deemed a waiver of any other provision

hereof or of any subsequent breach of the same or any other provision. No waiver of any breach shall affect or alter this Lease, but each and every term, covenant and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof. No reference to any specific right or remedy shall preclude the exercise of any other right or remedy permitted hereunder or that may be available at law or in equity. No failure by Landlord to insist upon the strict performance of any agreement, term, covenant or condition hereof, or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent during the continuance of any such breach, shall constitute a waiver of any such breach, agreement, term, covenant or condition.

16.12 **Tenant's Financial Statements**. Tenant shall furnish Landlord annually, within ninety (90) days after the end of each fiscal year of Tenant, copies of the balance sheets of Tenant, as at the close of such fiscal year, and statements of income and retained earnings of Tenant for such year, prepared in accordance with generally accepted accounting principles and reviewed by Tenant's independent certified public accountants. Tenant also agrees to furnish to Landlord within ten (10) days following Landlord's written request therefor, copies of such financial statements identified above as are then available and financial statements for the then current fiscal year prepared in accordance with generally accepted accounting principles on an unaudited basis certified as true and correct by such company's chief financial officer.

16.13 **Attorney's Fees**. If on account of any default by either party in each of their obligations under the terms of this Lease, it becomes necessary or appropriate for either party to employ attorneys or other persons to enforce any of their rights or remedies hereunder, the non-prevailing party shall pay upon demand all reasonable fees of such attorneys and other persons and all other costs of any kind so incurred.

16.14 **Landlord Approvals**. Whenever Tenant is required to obtain Landlord's consent hereunder, Tenant agrees to reimburse Landlord all reasonable and documented out-of-pocket expenses incurred by Landlord, including reasonable attorney's fees in order to review documentation or otherwise determine whether to give its consent. Tenant shall pay Landlord's invoice for any such amounts within fifteen (15) days following Landlord's delivery of its invoice therefor. Any provision of this Lease which requires the Tenant to obtain Landlord's consent to any proposed action by Tenant shall not be the basis for an award of damages or give rise to a right of setoff on Tenant's behalf, but may be the basis for a declaratory judgment or injunction with respect to the matter in question.

16.15 **Landlord's Liability**. Tenant shall look only to Landlord's estate in the Property (or the proceeds thereof) for the satisfaction of Tenant's remedies with respect to any liability, default or obligation of Landlord under this Lease or otherwise regarding Tenant's leasing, use and occupancy of the Premises pursuant hereto, including without limitation for the collection of any monetary obligation, judgment or other judicial process requiring the payment of money by Landlord. Neither Landlord nor any of its members, stockholders, officers, directors, partners, trustees, beneficiaries or employees shall be personally liable hereunder, nor shall any of its or their property, other than the Property, be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's said remedies. Landlord shall not under any circumstances be liable for any special, indirect or consequential damages of Tenant, including

lost profits or revenues. No owner of the Property shall be liable under this Lease except for breaches of Landlord's obligations occurring while such party owns the Property.

16.16 **Time of Essence**. **TIME IS OF THE ESSENCE** with respect to the due performance of the terms, covenants and conditions herein contained; provided, however, that no delay or failure to enforce any of the provisions herein contained and no conduct or statement shall waive or affect any of Landlord's rights hereunder.

16.17 **Confidentiality**. Tenant agrees: (a) to treat the terms of the Lease, and the terms of any existing and future amendments and modifications to the Lease (the "**Confidential Information**") as confidential during the term of this Lease (the "**Non-Disclosure Period**"), (b) not to disclose, directly or indirectly, to any third party nor permit any third party to have access to any or all of such Confidential Information during the Non-Disclosure Period, including, without limitation, any Building tenants and any brokers, and (c) to indemnify, defend and hold harmless Landlord from any loss, cost, expense, damage and liability, including Landlord's legal fees and expenses, resulting from Tenant's breach of the foregoing confidentiality agreements. Landlord acknowledges that Tenant shall have the right to disclose such Confidential Information only to the extent that such disclosure is required by law or court order or by discovery rules in any legal proceeding. Tenant's agreements and indemnity with respect to the Confidential Information shall survive the expiration or earlier termination of the Lease.

16.18 **Submission**. Submission of this instrument for examination does not constitute a reservation of or option for lease of the Premises, and it is not effective as a lease or otherwise until this Lease has been executed by both Landlord and Tenant and a fully executed copy has been delivered to each.

16.19 **Governing Law**. This Lease and the rights and obligations of the parties hereunder shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

16.20 **OFAC List**. Tenant represents and warrants that it is not listed, nor is it owned or controlled by, or acting for or on behalf of any person or entity, on the list of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Assets Control of the United States Department of the Treasury, or any other list of persons or entities with whom Landlord is restricted from doing business with ("OFAC List"). Notwithstanding anything to the contrary herein contained, Tenant shall not permit the Premises or any portion thereof to be used, occupied or operated by or for the benefit of any person or entity that is on the OFAC List. Tenant shall provide documentary and other evidence of Tenant's identity and ownership as may be reasonably requested by Landlord at any time to enable Landlord to verify Tenant's identity or to comply with any legal requirement or applicable laws. Tenant acknowledges and agrees that as a condition to the requirement or effectiveness of any consent to any Transfer by Landlord pursuant to Section 12.1, Tenant shall cause the Transferee, for the benefit of Landlord, to reaffirm, on behalf of such Transferee, the representations of, and to otherwise comply with the obligations set forth in, this Section 16.20, and it shall be reasonable for Landlord to refuse to consent to a Transfer in the absence of such reaffirmation and compliance. Tenant agrees that breach of the representations and warranties set forth in this

Section 16.20 shall at Landlord's election be a default under this Lease for which there shall be no cure. This Section 16.20 shall survive the termination or earlier expiration of the Lease.

16.21 **Rent Not Based On Income**. No rent or other payment in respect of the Premises shall be based in any way upon net income or profits from the Premises. Tenant may not enter into or permit any sublease or license or other agreement in connection with the Premises which provides for a rental or other payment based on net income or profit.

## ARTICLE 17 OPTION TO LEASE ADDITIONAL SPACE

17.1 Landlord hereby grants Tenant an option (the "**Expansion Option**") to lease all, but not less than all, of the space adjacent to the Premises comprising, approximately 52,480 rentable square feet and identified more particularly on Exhibit F attached hereto (the "**Additional Space**") prior to September 1, 2021, with time being of the essence, on the same terms and conditions as set forth in this Lease with respect to the Premises, except that, if Tenant exercises the Expansion Option, the initial Annual Base Rent for the Additional Space shall be [redacted] per square foot, which rate shall escalate by 3% on September 1 each year thereafter, the term for Tenant's leasing of the Additional Space shall commence no sooner than September 18, 2021 but no later than November 1, 2021 and shall be for a term of sixty (60) months. If at any time prior to September 1, 2021, with time being of the essence, Tenant notifies Landlord in writing that it desires to lease the Additional Space on the terms set forth herein, Landlord and Tenant shall execute an amendment to the Lease incorporating the Additional Space into the Premises and extending the term of the Lease for the Premises to be coterminous with the term of the Lease with respect to the Additional Space and including Landlord's obligation to install three (3) new dock doors and to paint and carpet the office area of the Additional Space and replace the HVAC units serving such office space. If Landlord does not receive notice of Tenant's desire to lease the Additional Space on or before September 1, 2021, with time being of the essence, Tenant's Expansion Option shall be void. Tenant's rights hereunder shall be conditioned upon the following terms and conditions being satisfied at the time that the Tenant's rights hereunder are exercised and upon Tenant's taking occupancy of the Additional Space: (i) no Event of Default shall have occurred under the Lease and no event shall have occurred and be continuing or state of facts exist which, if continued uncured, will with the lapse of time or the delivery of notice, or both, would constitute an event of default, and (ii) no Transfer shall have occurred.

## ARTICLE 18 RIGHT OF FIRST OFFER.

18.1 Landlord hereby grants Tenant a one-time right of first offer to lease the Additional Space. If at any time after the date hereof Landlord delivers or receives a bona fide initial proposal to lease the Additional Space to a third party (a "**Third Party Proposal**"), Landlord shall extend to Tenant a right of first offer to lease to Tenant all, but not less than all, of the Additional Space (the "**Offer Notice**") on the same terms and conditions as set forth in this Lease with respect to the Premises, except that the minimum term for Tenant's leasing of the Additional Space shall be sixty (60) months and the initial Annual Base Rent for the Additional Space shall be the greater of: (a) the Annual Base Rent rate payable for the Premises as of the commencement date of Tenant's leasing of the Additional Space (with the same escalations as provided herein with respect to the Premises), and (b) the annual base rent set forth in the

applicable Third Party Proposal. Tenant shall within five (5) business days after receipt of the Offer Notice notify Landlord in writing as to whether it desires to lease the applicable Additional Space on the terms set forth herein, in which event Landlord and Tenant shall execute an amendment to the Lease incorporating the Additional Space into the Premises and extending the term of the Lease for the Premises to be coterminous with the term of the Lease with respect to the Additional Space. If Landlord does not receive notice of Tenant's desire to lease the Additional Space within five (5) business days after the Offer Notice is delivered to Tenant, Tenant's Right of First Offer shall be void and Landlord may thereafter lease the Additional Space to third parties without first offering it to Tenant. Tenant's rights hereunder shall be conditioned upon the following terms and conditions being satisfied at the time that the Tenant's rights hereunder are exercised and upon Tenant's taking occupancy of the Additional Space: (i) no Event of Default shall have occurred under the Lease and no event shall have occurred and be continuing or state of facts exist which, if continued uncured, will with the lapse of time or the delivery of notice, or both, would constitute an event of default, and (ii) no Transfer shall have occurred.

## ARTICLE 19 RELOCATION OPTION

19.1 Provided that (a) no Transfer of the Lease shall have occurred (other than pursuant to a Permitted Transfer), (b) no Event of Default shall have occurred under the Lease, and (c) Tenant shall not have previously exercised the Expansion Option or Tenant's Right of First Offer, Tenant shall have a one (1) time option (the "**Relocation Option**") to relocate the Premises to the Additional Space. To exercise the Relocation Option, Tenant shall deliver to Landlord written notice (the "**Relocation Notice**") on or before September 1, 2021, with time being of the essence, and Landlord and Tenant shall execute an amendment to this Lease identifying the Relocation Space as the "Premises" hereunder and confirming the Annual Base Rent and other terms of Tenant's leasing of thereof. If Landlord does not receive notice of Tenant's desire to relocate the Premises to the Additional Space on or before September 1, 2021, with time being of the essence, Tenant's Relocation Option shall be void.

19.2 Tenant's leasing of the Relocation Space shall commence no sooner than September 18, 2021 but no later than November 1, 2021, and shall be upon all of the same terms and conditions of the Lease. In particular, the length of the term of Tenant's leasing of the Relocation Space shall be coterminous with the Term of the Lease and the Annual Base Rent rate payable on a per rentable square foot basis for the Relocation Space shall be the same as the Annual Base Rent rate payable for the Premises, and same shall escalate in the same amounts or percentages and at the same times as the Annual Base Rent rate for the Premises then thereafter increases as provided in the Lease.

[remainder of page left intentionally blank - signatures on following page]

IN WITNESS WHEREOF, intending to be legally bound, Landlord and Tenant have executed this Lease the day and year first above written.

**LANDLORD:**

**MH II PENNSBURG LLC**

By: ______________________

Name: Anthony J. Hayden
Title: President

**TENANT:**

**CAN MAN LLC**

By: ______________________

Name:
Title: RYAN USZENSK

EXHIBIT A

PLAN OF PREMISES

2512 Quakertown Road



EXHIBIT B

## Comprehensive Roof Repair Proposal

We include dumpsters and the removal of trash and debris generated from our roofing.

**Excluded:**(unless specifically outlined as included in the base bid scope of work)

- Electrical, HVAC and/or plumbing disconnect/re-connect and curbs replacement/removal.
- Satellite re-alignment
- Corrective repairs to substrate under existing roofing, flashing, etc.
- Interior protection
- Removal of existing insulation
- Painting, coating or repairs of walls and exterior surfaces
- Replacement of gutters and downspouts
- Repair or replacement if needed of walls and components.
- Testing for and abatement of asbestos containing roofing material (ACRM)

Roof deck repair and replacement in the base bid scope, but is added per the unit cost schedule outlined.
Daily approval will be documented and a weekly accounting of repair and replacement will be reported

20 Conchester Road • Glen Mills, PA 19345 • (610) 361-9337 • www.ddproofing.com

DDP

# Comprehensive Roof Repair Proposal

## SCOPE OF WORK

Roof Area approximately:

## Roof System:

**Included: Roof Repairs**
DDP Roofing Services will set up safety as required to make repairs.
DDP Roofing Services will load materials needed for repairs.
Clean and remove any loose dirt and debris from roof seams, base of curb flashing, and any pipe projections.
Install a 6" wide 1/16"-1/8" thick of Pro Grade 923 Butter Grade Silicone to the roof seams, base of curbs, and pipe projections.
Install 6" Henry 195 Polyster Fabric into the Butter Grade Silicone.
Install a second layer of 6" wide 1/16"-1/8" thick of Pro Grade 923 Butter Grade Silicone over the new fabric.
Remove and dispose of all job related debris from roof area.

Taxes, materials, labor, hoisting of materials, insurance, freight and permit.

**UNIT PRICES**

- Replacement of rotten steel deck, if any, will be performed at a unit price of $6.75 per sf.,
- Replacement of rotten wood deck, if any, will be performed at a unit price of $3.75 per sf.,
- Replacement of wet or damaged insulation, if any, will be performed at a unit price of $3.50 per sf.,
- Replacement of drain assemblies, if any will be performed at a unit price of $1,450.00
- Installation of retrofit drain assemblies, if any, will be performed at a unit price of $750.00

**BASE BID CLARIFCATIONS**
It is the responsibility of the owner/designer to verify that the roof system meets FM approvals if required and warranty requirements of the manufacturer.

20 Conchester Road • Glen Mills, PA 19345 • (610) 361-9337 • www.ddproofing.com

## EXHIBIT C

**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSITS (ACH DEBITS)**

Tenant Name Can Han LLC (TENANT) Tenant ID Number ____________

Landlord Name HHII Pennsburg LLC (LANDLORD)

TENANT hereby authorizes LANDLORD, to initiate a recurring monthly debit from TENANT'S (select one) ☐ Checking Account or ☐ Savings Account indicated below, at the depository Financial Institution named below. LANDLORD and TENANT acknowledge that the authority will remain in effect until either party cancels in writing and that the origination of ACH transactions from TENANT'S account must comply with the provisions of U.S. law.

Financial Institution: [redacted] Branch Name: ____________

Branch Contact: [redacted] Branch Phone: [redacted]

City: [redacted] State: [redacted] Zip: [redacted]

Routing Number: [redacted] Account Number: [redacted]

Recurring Monthly Amount: *(Please check one)*

Base Rent ✓ Base Rent & OPEX Charges ____ All Outstanding Charges ____

Day of the Month: First business day of each calendar month

TENANT: Can Han LLC

By: [signature] Date: 7·13·2021
Authorized Signature

Printed Name: Ryan Uszenski

Title: Member

# EXHIBIT D

## CONFIRMATION OF COMMENCEMENT DATE

(NOTE: THIS ADDENDUM IS TO BE COMPLETED AND SIGNED ON THE COMMENCEMENT DATE WHEN SUITE IS TURNED OVER TO LESSEE.)

CONFIRMATION OF COMMENCEMENT DATE AND EXPIRATION DATE OF TERM
Lessor and Lessee hereby further agree as follows:

The Commencement Date is: July 1, 2021

The projected Expiration Date of the Term of the Lease is: June 30, 2026

**LANDLORD:**

**MH II PENNSBURG LLC**

By: ______________________
Name: Anthony J. Hayden
Title: President

**TENANT:**

**CAN MAN LLC**

By: ______________________
Name:
Title: Member

EXHIBIT E

RULES AND REGULATIONS

1. Use of Common Areas. Tenant's use of the Common Areas shall be limited to access and parking purposes. Under no circumstances shall Tenant be permitted to store any goods or equipment, conduct any operations or construct or place any improvements, barriers or obstructions in the Common Areas, or otherwise adversely affect the appearance thereof. Tenant shall not obstruct any sidewalks, halls, passages, exits, entrances, elevators, lobbies and stairways of the Building, and tenants shall not use any of the same for any purpose other than for ingress to and egress from their respective Premises. Tenant shall not store any property outside the Premises.

2. Parking Vehicles. Tenant shall comply with such rules and regulations governing parking as may be promulgated from time to time by Landlord, including, without limitation, rules and regulations requiring the parking of vehicles in designated spaces or areas or regarding the exclusion of other spaces or areas. Tenant shall not store vehicles for extended periods of time in either the parking garage or lot.

3. Building Security. All persons entering and/or leaving the Building may be required to sign a register. Landlord will notify each tenant if Landlord elects to institute a pass system outside of Normal Business Hours. Landlord may furnish passes to Tenant so that Tenant may validate and issue same. Tenant shall safeguard said passes and shall be responsible for all acts of persons in or about the Property who possess a pass issued to Tenant. Landlord reserves the right to exclude from the Property all persons who do not present a pass to the Property issued by Landlord.

4. Building Personnel. The requirements of Tenant will be attended to only upon application at or call to the management office of the Property. Property personnel shall not perform any work or do anything outside of their regular duties, unless under special instructions from the office of the Landlord.

5. Building Deliveries. During the moving or delivery of receipt of safes, freight, furniture, packages, boxes, crates, paper, office material, or any other item, Tenant shall use and shall cause its employees and contractors and any others making deliveries to the Premises or dispatch from the Premises to use hand trucks equipped with rubber tires, side guards and such other safeguards as Landlord shall reasonably require. Hand trucks shall not be used in passenger elevators, and passenger elevators shall not be used for moving, delivery or receipt of the aforementioned articles.

6. Moving Restrictions. All freight, furniture, trade fixtures and personal property must be received and delivered through entrances to the Building designated for such purpose unless otherwise authorized by the Landlord, and only during such hours and in such elevators as Landlord may reasonably determine from time to time. Movement in and out of the Building of furniture or office equipment, or dispatch or receipt by Tenant of any merchandise or material which requires the use of elevators or stairways, or movement through the building entrances or

lobby, shall be restricted to the hours designated by Landlord from time to time. All such movement shall be as approved by Landlord in a pre-arranged manner to be agreed upon between Tenant and Landlord. Such pre-arrangement shall include the time, method, and routing of movement. Tenant expressly assumes all risk or damage to any and all articles moved, as well as injury to any person or persons and equipment, property and personnel of Landlord.

7. Right to Inspect. The Landlord, its agents and employees shall have access at reasonable times to perform their duties in the maintenance and operation of the Premises. Landlord reserves the right to inspect all objects and matter to be brought into the Building and to exclude from the Building all objects and matter which violate any of these Rules and Regulations or the Lease. Landlord may require any person leaving the Building with any package or other object or matter to submit a pass, listing such package or object or matter, from the tenant from whose premises the package or object or matter is being removed; however, the establishment and enforcement of such requirement shall not impose any responsibility on Landlord for the protection of any tenant against the removal of property from the premises of such tenant. Landlord shall not be liable to Tenant for damages or loss arising from the admission, exclusion or ejection of any person to or from the Premises or the Building under the provisions of this Rule or the following Rule.

8. Floor Load. Tenant shall not place a load upon any floor in the Premises exceeding the floor load per square foot of area which such floor was designed to carry and which is allowed by law. Landlord reserves the right to reasonably impose the weight and position of all business machines and mechanical equipment, including safes, which shall be placed so as to distribute the weight. Business machines and mechanical equipment shall be placed and maintained by Tenant at Tenant's expense in settings sufficient, in Landlord's reasonable judgment, to absorb and prevent vibration, noise and annoyance. Tenant shall not move any safe, heavy machinery, heavy equipment, freight, bulky matter or fixtures into or out of the Building without Landlord's prior consent. If such safe, machinery, equipment, freight, bulky matter or fixtures requires special handling, Tenant agrees to employ only persons holding a Master Rigger's License to do said work, and that all work in connection therewith shall comply with applicable laws and regulations.

9. Signage. No sign or signs shall be allowed in any form on the exterior of the Building or on any window or windows inside or outside of the Building. No sign or signs, except in uniform location and uniform style, fixed by Landlord, will be permitted in the public corridors or on corridor doors or entrance to Tenant's space. All signs shall be constructed by Landlord at the rate fixed by Landlord from time to time. Tenant will be billed and pay for such service upon demand. Prior written consent from Landlord for any such Tenant sign or signs is required.

10. Advertising. No sign, advertisement, notice or other lettering shall be exhibited, inscribed, painted or affixed by Tenant on any part of the outside or inside of the Premises or of the Building without the prior written consent of Landlord. The Landlord shall have the right to prohibit any advertising by any Tenant, which, in its opinion, tends to impair the reputation of the Building or its desirability, and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising. Tenant shall not use the name of the Property for any purpose other than as the address of the business to be conducted by Tenant in the Premises, nor shall

Tenant use any picture of the Property in its advertising, stationery or in any other manner without the prior written permission of Landlord. Landlord expressly reserves the right at any time to change said name without being liable to Tenant therefor.

11. No Interference with Building Services. Tenant shall not take or permit any action which would impair or interfere with any of the Building services or the proper and economic heating, cleaning, air conditioning or other servicing of the Building or the Premises, or impair or interfere with or tend to impair or interfere with the use of any of the other areas of the Building by occasion or discomfort, annoyance or inconvenience to, Landlord or any other tenants or occupants of the Building. Tenant shall cooperate with Landlord in obtaining maximum effectiveness of the cooling system and if requested by Landlord shall lower and close drapes and curtains when the sun's rays fall directly on the windows of the Premises. The Landlord or his agent should be notified at once of any trouble with heating, lighting or plumbing fixtures.

12. Tenant's Contractors. Tenant will refer all contractors, contractor's representatives and installation technicians rendering any service for Tenant to Landlord for Landlord's approval before performance of any such contractual services. This shall apply to all work performed in the Building including the installation of telephones, telegraph equipment, electrical services and attachments, and the installations of any and every nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment or any other physical portion of the Building. None of this work will be done by Tenant without Landlord's prior written approval.

13. Tenant Locks and Premises Security. No additional locks, bolts or mail slots of any kind shall be placed upon any of the doors or windows by Tenant, nor shall any change be made in existing locks or the mechanism thereof. Tenant, at its sole expense, may install a card key system, which must be in full compliance with all other provisions of the Lease, and Tenant will provide Landlord with all access cards necessary to fully exercise all of its entry rights under the Lease with respect to the Premises. Tenant must lock all of its doors to the Premises at the end of its business hours. Tenant must, upon the termination of the tenancy, restore to Landlord all keys of stores, offices and rest rooms either furnished to or otherwise procured by Tenant and, in the event of the loss of any keys so furnished, Tenant shall pay to Landlord the cost thereof.

14. No Obstructions. The sashes, sash doors, skylights, windows, and doors that reflect or admit light or air into the halls, passageways or other public places in the Property shall not be covered or obstructed by Tenant, nor shall any bottles, parcels, or other articles be placed on the window sills, or in the public portions of the Property. No curtains, blinds, shades, drapes or screens shall be attached to or hung in, or used in connection with any window or door of the Premises. All electrical fixtures hung in offices or spaces along the perimeter of the Premises must be fluorescent, of a quality, type, design, bulb color, size and general appearance approved by Landlord.

15. No Alterations. Tenant shall not change (whether by alteration, replacement, rebuilding or otherwise) the exterior color and/or architectural treatment of the Premises or of the Building in which the same are located, or any part thereof. Tenant shall not install any awnings or curtains, blinds, shades or screens in, on or outside the Premises which are visible to public view outside the Premises.

16. Fire Hazards. Neither Tenant nor any of Tenant Parties shall at any time bring or keep upon the Premises or in the Building or the Property any flammable, combustible or explosive fluid, chemical or substance. Except as specifically permitted by Landlord, Tenant shall not place or use in or about the Premises any explosives, gasoline, kerosene, oil, acids, caustics, or any other flammable, explosive or hazardous material. Tenant may use microwave ovens, coffee makers and refrigerators within the Premises.

17. Waste Handling and Disposal. Tenant agrees to handle and dispose of all rubbish, garbage, and waste from Tenant's operations in accordance with regulations established by Landlord, and Tenant shall comply with Landlord's recycling programs. Tenant shall not permit the accumulation or burning of any rubbish or garbage in or about any part of the Building. Any permitted corrosive, flammable or other special wastes shall be handled for disposal as directed by Landlord and strictly in accordance with all applicable law.

18. Wiring and Cabling. Landlord will direct Tenant as to where and how telephone, video, telecommunications, internet and data wiring and cabling are to be placed in the Building and Premises. Tenant shall not paint, mark, drill into or in any way deface the walls, ceilings, partitions, floors, woodwork, stonework or ironwork or any part of the Premises, the Building or the Property. No boring or cutting shall be permitted, except with the prior written consent of Landlord, and as Landlord may direct.

19. Roof Access. Neither Tenant nor the employees or invitees of Tenant shall access the roof of the Building or any of the mechanical, telephone, telecommunication or equipment rooms in the Building.

20. Vending Machines. Tenant agrees not to install food or drink, vending machines or any other food service equipment except for servicing Tenant's employees only and not for sale or use by or to the general public.

21. Permits. If any governmental license or permit shall be required for the proper and lawful conduct of Tenant's business in the Premises, or any part thereof, and if failure to secure such license or permit would in any way affect Landlord, then Tenant, at its expense, shall duly procure and thereafter maintain such license or permit and submit the same inspection by Landlord. Tenant shall at all times comply with the terms and conditions of each such license or permit, and failure to procure and maintain same by Tenant shall not affect Tenant's obligations hereunder.

22. Plumbing System. The water and wash closets and other plumbing fixtures shall not be used for any purposes other than those for which they were constructed, and no sweepings, rubbish, rags, garbage or other substances shall be thrown therein. All damages resulting from any misuse of the fixtures by Tenant shall be borne by Tenant to the extent that Tenant or Tenant's agents, servants, employees, contractors, visitors, or licensees shall have caused the same.

23. Electrical Systems. Tenant shall not install, operate or maintain in the Premises any electrical equipment which will overload the electrical system therein, or any part thereof, beyond its reasonable capacity for proper and safe operation as determined by Landlord in light

of the overall system and requirements therefor in the Building, or which does not bear underwriters' approval. No air-conditioning unit or system, generator or other apparatus shall be installed or used without Landlord's prior written consent.

24. Cleaning Services. Tenant shall not permit window-cleaning or other exterior maintenance and janitorial services in and for the Premises to be performed except by such person(s) as shall be approved by Landlord and except during reasonable hours designated for such purposes by Landlord.

25. Pest Extermination Expenses. If the Premises is or becomes infested with vermin as a result of the use or any misuse or neglect of the Premises by Tenant, its agents, servants, employees, contractors, visitors, or licensees, Tenant shall forthwith, at Tenant's expense, cause the same to be exterminated from time to time to the satisfaction of Landlord and shall employ such licensed exterminators as shall be approved in writing in advance by Landlord.

26. Third Party Services. Tenant shall not purchase spring water, towels, janitorial, maintenance or other like services from any company or persons not reasonably approved by Landlord. Landlord shall approve a sufficient number of sources of such service to provide Tenant with a reasonable selection, but only in such instances and to such extent as Landlord in its judgment shall consider consistent with security and proper operation of the Property.

27. Union Labor. Tenant shall not contract for any work or service which might involve the employment of labor incompatible with the Building employees or employees of contractors doing work or performing services by or on behalf of Landlord or with the terms and conditions of any collective bargaining agreement to which Landlord or Landlord's agents or contractors may be a party.

28. Animals. Tenant shall not bring in, keep or permit to be brought in or kept, any animals, fish or birds at the Premises or the Building, nor shall Tenant install any aquarium or similar water-containing device at the Premises.

29. Intentionally Omitted.

30. Lost Property. Landlord will not be responsible for any lost or stolen property, equipment, money or jewelry from the Premises or public rooms regardless of whether such loss occurs when the item is locked against entry.

31. Noise. Tenant shall not make, or permit to be made, any unseemly or disturbing noises or interfere with occupants of the Property or neighboring buildings or premises or those having business with them. Tenant shall not throw anything out of the doors, windows or skylights or down the passageways.

32. No Soliciting. Tenant shall not disturb, solicit, or canvass any occupant of the Building and shall cooperate to prevent same.

33. Prohibited Uses. Tenant shall not occupy or permit any portion of the Premises to be occupied in a manner that is inconsistent with the Lease. Tenant shall not permit any portion of the Premises to be used (a) as an office for a public stenographer or public typist, or (b) for

sale to the general public of beer, wine, liquor, or drugs; (c) for rendition of medical, dental or other diagnostic or therapeutic services; (d) as a barber, beauty or manicure shop; (e) as an employment agency or labor office; (f) as a dance or music studio or as a school; (g) as a radio or television or recording studio, theater or exhibition hall; (h) as a restaurant or bar; (i) for lodging, sleeping or any immoral purpose; (j) for the consumption of food and beverages; (k) intentionally omitted; or (l) for sale at retail or auction of merchandise, goods or property of any kind, except for promotional purposes.

34. Additional Rules. Landlord reserves the right to make such other and further reasonable rules and regulations as in Landlord's judgment may from time to time be necessary for the safety, care and cleanliness of the Premises or the Building, or the Property, and for the preservation of good order therein. Any such other or further rules and regulations shall be binding upon Tenant with the same force and effect as if they had been inserted herein at the time of the execution hereof.

# EXHIBIT F

Additional Space

2512 Quakertown Road



# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "Amendment") is made and entered into as of the 13th day of September, 2021 by and between **MH II PENNSBURG LLC** ("**Landlord**") and **Can Man, LLC** ("**Tenant**").

RECITALS

A. Pursuant to that certain Lease dated July 13, 2021 (the "**Lease**"), Landlord leases to Tenant certain real property (the "**Existing Premises**"), comprising approximately 50,000 rentable square feet ("**RSF**") of space, commonly known as 2512 Quakertown Road, Pennsburg, PA.

B. Pursuant to Article 17 of the Lease, Tenant has an option (the "**Expansion Option**") to expand the Premises by the addition of the approximately 52,480 square feet of space adjacent to the Existing Premises.

C. Tenant has exercised the Expansion Option. Therefore, in accordance with Article 17 of the Lease, the parties wish to amend the Lease to, among other things, expand the Premises to include the Additional Space (as defined in Article 17 of the Lease) and extend the Term thereof and otherwise revise the Lease to reflect the terms of Article 17, as set forth below.

A G R E E M E N T

NOW, THEREFORE, in consideration of the foregoing recitals and the agreements hereinafter set forth, the parties agree as follows:

1. **Definitions**. All terms not otherwise defined herein shall have the meanings given to them in the Lease.

2. **Tenant Improvements**. Landlord, at its sole cost and expense, shall install three (3) new dock doors, paint and carpet the office area of the Additional Space and replace the HVAC units serving such office space.

3. **Expansion of Premises**. From and after October 1, 2021 (the "**Expansion Commencement Date**") the rentable area of the Premises shall be amended to include: (i) the Existing Premises, and (ii) the Additional Space, thus increasing the Premises to One Hundred Two Thousand Four Hundred Eighty (102,480) square feet and the term "Premises" as used in the Lease shall include, mean and refer to both (a) the Existing Premises and (b) the Additional Space.

4. **Redefinition of Common Areas**. Section 1.2.1 of the Lease is hereby deleted and replaced in its entirety with the following:

> The "**Common Areas**" shall consist of elements located outside of the Building at the Property, including, but not limited to, the pedestrian sidewalks, landscaped areas, roadways, parking areas, rights of way, and walking and jogging paths, if any.

The last sentence of Section 1.2.2 is hereby deleted and all references in the Lease to "Building Common Areas" are hereby replaced with references to "Common Areas."

5. **Extension of Term**. The term of the Lease with respect to the Premises (including the Existing Premises and the Additional Space) is hereby extended such that it shall expire, if not sooner terminated, on September 30, 2026 (the "**Expiration Date**"). The period of time commencing on October 1, 2021 and continuing through and including the Expiration Date is

hereinafter referred to as the "**Extended Term.**" The Term of the Lease with respect to the Additional Space shall commence on the Expansion Commencement Date and shall expire, unless sooner terminated in accordance with the provisions of the Lease, on the Expiration Date.

6. **Tenant's Share**. Effective as of Expansion Commencement Date, Section 5.1 of the Lease shall be modified such that the term "Tenant's Share" shall mean 100%.

7. **Base Rent**. From and after the Expansion Commencement Date, Tenant shall pay Base Rent for the Premises (including both the Existing Premises and the Additional Space) in accordance with the terms of the Lease, in advance, on the first day of each calendar month, without notice, setoff or demand, in the amount as shown on the immediately following chart:

| Time Period | Annual Base Rent/SF | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| 10/1/2021 – 9/30/2022 | [redacted] | | |
| 10/1/2022 – 9/30/2023 | [redacted] | | |
| 10/1/2023 – 9/30/2024 | [redacted] | | |
| 10/1/2024 – 9/30/2025 | [redacted] | | |
| 10/1/2025 – 9/30/2026 | [redacted] | | |

8. **Options**. Except for such rights and options, if any, as are specifically provided for herein, any and all options or other rights of Tenant to expand the Premises, to lease any other space within the Building (including any rights of refusal or rights of first offer), to purchase all or any portion of the Building or to renew or terminate the Lease with respect to all or any portion of the Premises, if any, are hereby terminated and henceforth shall be null and void and of no further force or effect.

9. **Tenant's Confirmation**. Tenant hereby agrees and confirms that:

i. **No Default**. To Tenant's knowledge, (i) all conditions and covenants under the Lease to be performed by Landlord prior hereto have been satisfied and (ii) Landlord is not in default in the performance of any covenant, agreement or condition contained in the Lease and Tenant shall have no right to set-off, counterclaim or defenses with respect to any obligations of Landlord under the Lease.

ii. **No Rent Credit**. The parties hereto agree and confirm that there are no outstanding rent credits that Tenant has not received.

iii. **No Improvements or Allowances**. The parties hereto agree and confirm that Landlord is not obligated to perform or construct any improvements to the Premises or the Building in connection with this Amendment and that Tenant is not entitled to receive any additional sums under the Lease for redecorating or improvements other than those specifically described in this Amendment, if any.

10. **Representation of Parties**. Each party represents that it has not made any assignment, sublease, transfer, conveyance, or other disposition of the Lease, or interest in the Lease, or any claim, demand, obligation, liability, action, or cause of action arising from the Lease. Each party represents and warrants that it has the full right, power and authority to enter into, execute and deliver this Amendment and to perform its obligations under the Lease as amended

hereby; and that the person executing this Amendment on behalf of such party is duly authorized to execute and deliver this instrument on behalf of the party for whom such person is acting.

11. **Attorney's Fees**. If either party commences an action against the other party arising out of or in connection with this Amendment, the prevailing party shall be entitled to recover from the non-prevailing party reasonable attorney's fees and costs of suit.

12. **Further Assurances**. Each party agrees to cooperate with the other and to execute and deliver all such further instruments and documents and do all such further acts and things as such party may be reasonably requested to do from time to time by the other party in order to carry out the provisions and objectives of this Amendment.

13. **Successors**. This Amendment shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

14. **Landlord not Bound**. Submission of this Amendment to Tenant shall not be deemed an offer. Landlord shall not be bound by this Amendment, and the Lease shall remain in full force and effect without reference to this Amendment, until it has received a copy hereof duly executed by Tenant and has delivered to Tenant a copy hereof duly executed by Landlord, and until such delivery Landlord reserves the right to nullify this Amendment.

15. **Counterparts and Amendments**. This Amendment may be executed in multiple counterparts, each of which shall be an original and, when taken together, shall constitute one original instrument. Neither this Amendment nor any term or provision hereof may be changed, waived, discharged or terminated orally, nor shall any breach thereof be waived, altered or modified, except by a written instrument signed by both parties hereto. This Amendment represents the entire agreement between the parties concerning the subject matter hereof and supersedes all prior discussions, negotiations and agreements between them regarding the subject matter of this Amendment.

16. **Ratification of Lease**. This Amendment and all of the terms and provisions hereof shall be considered for all purposes to be incorporated into and made part of the Lease. Except as specifically modified herein, the Lease and each provision, covenant, condition, obligation, right and power contained therein is hereby ratified and confirmed, and shall continue in full force and effect until terminated in accordance with the terms of the Lease, subject to the terms and conditions hereof. **Without limiting the generality of the foregoing, Tenant confirms, ratifies and approves all of the remedies set forth in Article 13 of the Lease and specifically acknowledges that the same apply to the Lease and are incorporated herein by this reference.** In the event of any inconsistencies or conflicts between other provisions of the Lease and the provisions of this instrument, the provisions hereof shall govern and control.

17. **Governing Law**. This Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to any otherwise applicable conflicts of laws principles.

18. **Brokers**. Tenant hereby represents and warrants to Landlord that it has not discussed this Amendment or the subject matter hereof with any broker, agent, finder or salesperson, other than representatives of Landlord, so as to create any legal right in any such person to claim a real estate commission or similar fee in connection with this Amendment. Tenant agrees that it shall indemnify, defend and save Landlord harmless from and against any cost, expense, claim, loss, liability or damages, including attorneys' fees and court costs, resulting from a breach of the foregoing representation and warranty.

19. **Time of Essence**. Time is of the essence with respect to the due performance of the terms, covenants and conditions contained in this Amendment; provided, however, that no delay on the part of Landlord to exercise any of its rights under the Lease or this Amendment shall be construed as any waiver thereof.

20. **Notices**. All notices and other communications given hereunder shall be in writing and shall be sent in the same manner and shall be deemed effective as provided for in the Lease.

21. **USA Patriot Act**. Landlord and Tenant shall each take any actions that may be required to comply with the terms of the USA Patriot Act of 2001, as amended, any regulations promulgated under the foregoing law, Executive Order No. 13224 on Terrorist Financing, any sanctions program administrated by the U.S. Department of Treasury's Office of Foreign Asset Control or Financial Crimes Enforcement Network, or any other laws, regulations, executive orders or government programs designed to combat terrorism or money laundering, or the effect of any of the foregoing laws, regulations, orders or programs, if applicable, on the Lease. Landlord and Tenant each represent and warrant to each other that it is not an entity named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Department of Treasury as last updated prior to the date of this Amendment.

*Signature page to First Amendment to Lease Follows*

IN WITNESS WHEREOF, Landlord and Tenant have caused this First Amendment to Lease to be executed as of the day and year first above written.

**LANDLORD:**

**MH II PENNSBURG LLC**, a Pennsylvania limited liability company,

By: ______________________
Name: Anthony J. Hayden
Title: President

**TENANT:**

**CAN MAN, LLC**, a Pennsylvania limited liability company,

By: ______________________
Name: Ryan Uszenski
Title: Managing Member