UNITED STATES DISCTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HAPPY HOUR DRINKS COMPANY, INC.,

Plaintiff,

vs.

Case No. 3:24-cv-00047 (ECC/ML)

CAN MAN, LLC, d/b/a Best Bev Co.,
BEST BEV LLC and
JOHN DOES 1 through 100,

Defendants.

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 1

III. ARGUMENT ..... 4

A. Legal Standard ..... 4

B. Pennsylvania Law Applies to Happy Hour's Claims Against Can Man ..... 5

1. Pennsylvania Law and New York Law Conflict ..... 5

2. The Interest Analysis Test Mandates Application of Pennsylvania Law ..... 7

C. Happy Hour is Not Entitled to Judgment as a Matter of Law on Its Negligence Claim ..... 8

1. There is No Independent Source of Tort Duties ..... 9

2. The Nature of Happy Hour's Alleged Injury Does Not Support Finding an Independent Duty ..... 9

3. Happy Hour's Negligence Claims Are Based Solely on Economic Loss ..... 10

D. Dr. Iezzi's Opinion ..... 11

1. Happy Hour Misrepresents Dr. Iezzi's Opinion and Its Implications ..... 12

a) Standard of Care versus Root Cause ..... 12

b) Pre-Production Validation Testing ..... 13

c) Copper and Chloride Levels ..... 14

2. Dr. Iezzi's Opinions are Unreliable and Should be Ignored ..... 15

E. Defendants' Alternative Theory of Causation ..... 18

F. Happy Hour Is Not Entitled to Judgment as a Matter of Law on the Concealment Element of Its Fraudulent Concealment Claim ..... 19

1. Happy Hour's Argument on the Fraudulent Concealment Element is Incoherent ..... 20

2. The Court Should Not Entertain Happy Hour's Argument Because It Is Based on an Untimely Theory of Liability ........................................ 21

3. Material Issues of Fact Remain as to Each Element of Happy Hour's Fraudulent Concealment Claim .................................................. 23

IV. CONCLUSION ........................................................................................ 26

## TABLE OF AUTHORITIES

### Cases

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280 (2001) ....... 8, 9, 10

*Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325 (1981)........................................................... 8

*Allstate Ins. Co. v. Stolarz*, 81 N.Y.2d 219 (1993) ............................................................... 5

*Amorgianos v. Amtrak*, 303 F.3d 256 (2d Cir. 2002) ......................................................11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 5

*Ansam Assoc., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442 (2d Cir. 1985)................................... 22

*Bissonette v. Nat'l Biscuit Co.*, 100 F.2d 1003 (2d Cir. 1939) ....................................................... 9

*Brass v. Am. Film Tech., Inc.*, 987 F.2d 142 (2d Cir. 1993) ......................................................... 19

*Brickman Grp., Ltd. v. CGU Ins. Co.*, 865 A.2d 918 (Pa. Super. 2004) ........................................ 6

*Bridgestone/Firestone v. RecoveryCredit Servs., Inc.*, 98 F.3d 13 (2d Cir. 1996) ........................ 19

*Bull Int'l, Inc. v. MTD Consumer Grp, Inc.*, 654 F. App'x 80 (3d Cir. 2016) ............................... 6

*Bustamante v. KIND, Ltd. Liab. Co.*, 100 F.4th 419 (2d Cir. 2024)...............................................11

*Cayuga Nation v. Parker*, 2025 U.S. Dist. LEXIS 225184 (N.D.N.Y. 2025).............................. 18

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382 (1987) .................................... 6, 8

*Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66 (1993) .................................................................. 7

*Curley v. AMR Corp.*, 153 F.3d 5 (2d Cir. 1998) ......................................................................... 5

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775 (2d Cir. 2003).......................................... 5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ........................................ 12

*Dittman v. UPMC*, 649 Pa. 496 (2018)........................................................................................ 6

*Dooley v. United States*, 83 F.4th 156 (2d Cir. 2023) ................................................................. 8

*Enders v. Boone*, 2024 U.S. App. LEXIS 18187 (2d Cir. 2024)..................................................... 5

*eToll, Inc. v. Alias/Savion Adver., Inc.*, 811 A.2d 10 (Pa. Super. Ct. 2002).................................... 6

*Greenidge v. Allstate Ins. Co.*, 446 F.3d 356 (2d Cir. 2006) ................................................. 21, 22

*Hollman v. Taser Int'l, Inc.*, 928 F. Supp.2d 657 (E.D.N.Y. 2013) ....... 11

*Houlihan v. Morrison Knudsen Corp.*, 2 A.D.3d 493 (2d Dept. 2003) ....... 9

*Krul v. DeJoy*, 705 F. Supp. 3d 5 (N.D.N.Y. 2023) ....... 5

*LaFlair v. Johnson & Johnson*, 2019 U.S. Dist. LEXIS 127481 (N.D.N.Y. 2019) ....... 9

*Licci v. Lebanese Canadian Bank,* 739 F.3d 45 (2d Cir. 2013) ....... 7

*Lightfoot v. Union Carbide Corp.*, 1999 U.S. App. LEXIS 3329 (2d Cir. 1999) ....... 18

*Mandarin Trading Ltd. v. Wildstein*, 16 N.Y.3d 173 (2011) ....... 19

*McElroy v. Albany Mem. Hosp.*, 332 F.Supp.2d 502 (N.D.N.Y. 2004) ....... 12

*Moltner v. Starbucks Coffee Co*., 2009 U.S. Dist. LEXIS 101413 (S.D.N.Y. 2009) ....... 13

*MVP Health Plan, Inc. v. OptumInsight, Inc.*, 765 F. App'x 615 (2d Cir. 2019) ....... 6, 8, 9

*Nora Bevs., Inc. v. Perrier Group of Am., Inc*., 164 F.3d 736 (2d Cir. 1998) ....... 13

*Phoenix Light SF Ltd. v. Wells Fargo Bank, N.A.*, 574 F. Supp. 3d 197 (S.D.N.Y. 2021) ....... 12

*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997) ....... 12

*Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189 (1985) ....... 7

*Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540 (1993) ....... 6, 9, 10

*TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82 (2d Cir. 2005) ....... 19, 25

*United States v Apple, Inc.* 791 F.3d 290 (2d Cir. 2015) ....... 11

*Waleski v. Montgomery*, 2022 U.S. App. LEXIS 30905 (2d Cir. 2022) ....... 6

**Rules**

Fed. R. Civ. P. 56 ....... passim

Fed. R. Civ. P. 8 ....... 21

Fed. R. Evid. 702 ....... 11

## I. INTRODUCTION

Defendants Can Man, LLC ("Can Man") and Best Bev, LLC ("Best Bev") respectfully submit this memorandum of law in opposition to the motion for partial summary judgment filed by plaintiff Happy Hour Drinks Company, Inc. ("Happy Hour").

In its complaint, Happy Hour asserts four claims against Can Man. (Dkt. No. 1, Compl.) Happy Hour now seeks summary judgment on liability on its negligence claim (first cause of action) and, purportedly, with regard to one element of its fraudulent concealment claim (fourth cause of action). (Dkt. No. 133, Pl.'s Mot. at 2.) Happy Hour applies New York law throughout its argument. However, Pennsylvania law applies to Happy Hour's claims against Can Man. Nevertheless, whether under Pennsylvania or New York law, Happy Hour's motion must be denied because (a) its claims should have been brought as claims for breach of contract; and (b) there are significant material facts in dispute regarding plaintiff's responsibility for the damages claimed.

As the Court is aware, defendants have also moved for partial summary judgment in their favor. (Dkt. No. 130.) In the interest of economy, defendants incorporate and reference the motion papers filed and legal arguments asserted in support of that motion in connection with their opposition to plaintiff's motion.

## II. STATEMENT OF FACTS

Defendants reference and incorporate the Statement of Facts, including the Procedural History, from their Memorandum of Law in Support of their May 1, 2026 motion for summary judgment. (Dkt. No. 130-18, at pp. 2-11). In addition, defendants note the following facts.

Can Man has never operated a co-packing facility in a state other than Pennsylvania. (Uszenski Decl. ¶ 4.) Best Bev has never operated a co-packing facility in a state other than New York. (Sheehan Decl. ¶ 5.)

Happy Hour and Can Man entered into an unwritten, non-exclusive contract for Can Man to produce its ready to drink ("RTD") tequila- and seltzer-based cocktails ("Cocktails") beginning in July 2021. (*See* Dkt. No. 1, ¶ 55; Dkt. No. 130-7, Novian Dep. 18:21-19:8.) For its production runs, Happy Hour supplied the ingredients (or specified the ingredients for Can Man to procure on its behalf), except for the tequila. (*See* Novian Dep. 15:4-24, 62:8-63:12.) Happy Hour also supplied the aluminum cans to Can Man. (Dkt. No. 130-13, Pitts Decl. ¶¶ 4-5.)

Happy Hour's formulator, Andre Reodica ("Reodica") identified certain parameters that Can Man was required to test for during the production runs including pH, Brix, and carbonation. (Pitts 5/20/26 Decl. ¶ 4.) Neither Happy Hour nor Reodica requested that Can Man test for, or adhere to, a particular level of copper, chloride, or dissolved oxygen ("DO") when producing Happy Hour's Cocktails. (Dkt. No. 130-13, Pitts Decl. ¶¶ 6, 9-10; Zimmerman Decl. ¶¶ 4-5.) Nevertheless, Can Man did test for DO during production runs. (Dkt. No. 130-13, Pitts Decl. ¶ 8.)

Originally, Can Man used Casa Maestri tequila in Happy Hour's Cocktails. (*See* Dkt. No. 130-13 Pitts Decl. ¶ 19.) In July 2022, John Pitts ("Pitts"), Can Man's Processing and Compliance Manager, advised Happy Hour that Can Man would begin sourcing tequila from a new supplier. (Dkt. No. 130-13, Pitts Decl. ¶¶ 17, 19; Dkt. No. 130-3, Novian Dep. 50:24-51:4.) Can Man sent three liters of the new tequila to Reodica, who prepared samples for Happy Hour to test. (Dkt. No. 130-3, Novian Dep. 48:2-11, 51:10-24; Dkt. No. 130-13, Pitts Decl. ¶ 18.)

Happy Hour approved using tequila from the new supplier. (Dkt. No. 130-13, Pitts Decl. ¶ 19.) However, Can Man would have continued to use tequila from Can Man's original supplier

had Happy Hour so requested. (Dkt. No. 130-13, Pitts Decl. ¶ 19.) Before giving its approval, Happy Hour never requested that Can Man conduct, or arrange for, compatibility testing of the new tequila or that Can Man obtain a certificate of analysis from the distillery showing the levels of copper and/or chloride in the new tequila. (Dkt. No. 130-13, Pitts Decl. ¶ 20.)

Can Man did not receive the first shipment of the new tequila until sometime after July 20, 2022. (Dkt. No. 130-13, Pitts Decl. ¶ 21.) As such, Can Man used tequila from its original supplier in its June 2022 production run for Happy Hour. (Dkt. No. 130-13, Pitts Decl. ¶ 21.)

Following the June 2022 Happy Hour production run—in which Casa Maestri tequila was used—some of the cans developed "pinhole" leaks. (Dkt. No. 130-13, Pitts Decl. ¶ 13.) Thereafter, following the switch to the new tequila, cans from the productions runs that took place in August,[1] September and October 2022 also developed "pinhole" leaks.

The "pinhole" leak issue was unique to Happy Hour's Cocktails. (Dkt. No. 130-13, Pitts Decl. ¶ 13; Zimmerman Decl. ¶ 8.) While some of Can Man's other customers experienced leaking issues, none of these other customers' cans developed "pinhole leaks." (Dkt. No. 130-13, Pitts Decl. ¶ 14; Zimmerman Decl. ¶¶ 9-10.)

On February 10, 2023, Ciocci advised Novian that Can Man's "ultimate goal is to work with Happy Hour to resolve the issue of pin-hole leaks and corrosion prior to producing additional finished products." (Dkt. No. 130-8, Novian Dep. Ex. D.) On February 17, 2023, Zimmerman stated that Can Man needed Happy Hour's can manufacturer to sign off on the interaction between the liquid and the can ***before*** the next production run. (*Id.*) Novian responded the same day and agreed "***on all points***." (*Id.*) Then on March 21, 2023, Novian asked if Happy Hour could run

[1] The August 2022 production run pre-dated the discovery of "pinhole" leaks in Happy Hour's cans.

product in April even though Ardagh had not yet reported back on the interaction between Happy Hour's formula and the can. *(Id.*)

To be clear, defendants deny that they withheld any information from Happy Hour regarding the cause of the "pinhole" leaks, deny that they fraudulently induced Happy Hour to continue business with Can Man, and deny responsibility for affirmatively causing the leaks.

In April 2023, Can Man completed its final production run for Happy Hour. (Dkt. No. 130-3, Pitts Decl. ¶ 34.) During this production run, Can Man controlled for Ardagh's DO specification, but that run also developed "pinhole" leaks in the cans. (Dkt. No. 130-13, Pitts Decl. ¶¶ 34-35.)

In July 2023, Best Bev completed one production run for Happy Hour. (Pitts 5/20/26 Decl. ¶ 5.) This production run was completed at Best Bev's production facility in Waverly New York. (*Id.*) Unfortunately, Happy Hour also experienced leaking cans from this production run. (*Id.*) The leaking cans from this production run resulted from a seaming tool that needed to be recalibrated/retooled. (Dkt. No. 130-10, Defs.' Response to Pl.'s Interrogatory Set 1 No. 15; Pitts 5/20/26 Decl. ¶ 5.) This production run did not result in "pinhole" leaks. (Pitts 5/20/26 Decl. ¶ 5.)

## III. ARGUMENT

### A. Legal Standard

Summary judgment is governed by FRCP 56, which authorizes a party to move for summary judgment on "each claim or … **part** of each claim … on which summary judgment is sought." FRCP 56(a) (emphasis added). The Court should only grant the motion where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "An issue of fact is material for purposes of this inquiry if it 'might affect the outcome of the suit under the governing law.' And a dispute of material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party.'" *Krul v. DeJoy*, 705 F. Supp. 3d 5, 31 (N.D.N.Y. 2023), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A non-moving party may demonstrate that there is a genuine issue of material fact using a variety of evidentiary types besides affidavits and declarations such as "depositions, documents … admissions, interrogatory answers, or other materials." FRCP 56(c)(1)(A). A district court must construe the facts, resolve all ambiguities, and draw all reasonable inferences in favor of the non-moving party. *Enders v. Boone*, 2024 U.S. App. LEXIS 18187, at *3 (2d Cir. 2024), *quoting Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

### B. Pennsylvania Law Applies to Happy Hour's Claims Against Can Man

A federal court presiding over a case based on diversity jurisdiction will apply "the choice of law rules of the forum state." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). Here, the Court sits in New York and must apply New York's choice of law rules.

"In New York, … the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Id.* "Where the applicable law from each jurisdiction provides ***different substantive rules***, a conflict of laws analysis is required." *Id.* (emphasis added). Once a conflict in the substantive rules is shown, New York applies the "interest analysis" test to tort claims and the "center of gravity" (aka "grouping of contacts") test to contract claims. *Allstate Ins. Co. v. Stolarz*, 81 N.Y.2d 219, 225-26 (1993). Here, the interest analysis test applies because the claims asserted by Happy Hour are torts: negligence and fraudulent concealment.

#### 1. Pennsylvania Law and New York Law Conflict

In both New York and Pennsylvania, a plaintiff may not "re-cast[] ordinary breach of contract claims into tort claims." *Brickman Grp., Ltd. v. CGU Ins. Co.*, 865 A.2d 918, 927 (Pa.

Super. 2004), *quoting eToll, Inc. v. Alias/Savion Adver., Inc.*, 811 A.2d 10, 14-15 (Pa. Super. Ct. 2002); *MVP Health Plan, Inc. v. OptumInsight, Inc.*, 765 F. App'x 615, 617 (2d Cir. 2019) (applying New York law). However, the rules in Pennsylvania and New York work differently.

Pennsylvania's "gist of the action doctrine," precludes tort claims if:

> (1) [they] "aris[e] solely from a contract between the parties"; (2) … "the duties allegedly breached were created and grounded in the contract itself"; (3) … "the liability stems from a contract"; or (4) … the tort claim "essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract."

*Bull Int'l, Inc. v. MTD Consumer Grp, Inc.*, 654 F. App'x 80, 102 (3d Cir. 2016), *quoting eToll, Inc.*, 811 A.2d at 19. Nevertheless, tort claims may proceed where the source of the duty is extraneous to the contract. *Dittman v. UPMC*, 649 Pa. 496, 525 (2018). In Pennsylvania, courts determine whether a duty arises from within or without the contract by examining the allegations in the complaint. *Waleski v. Montgomery*, 2022 U.S. App. LEXIS 30905, at *5 (2d Cir. 2022).

New York also allows tort claims to proceed if the allegedly violated duty originates from outside the contract. *MVP Health Plan, Inc.*, at 617, *citing Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987). That is where the similarities end. New York's focus, instead, is on the "nature of the injury, manner in which it occurred and the resulting harm." *MVP Health Plan, Inc.*, at 617, *quoting Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551-52 (1993). Unlike Pennsylvania, New York need not constrain its analysis to the allegations in the complaint. Because the analytical framework in Pennsylvania and New York differs, there is a substantive conflict.[2]

---

[2] There is also a substantive conflict in the rules governing comparative negligence and apportionment of damages among defendants. Can Man does not address the ramifications of those differences here because they are loss-allocating and come into play only after liability has been determined. *See Licci v. Lebanese Canadian Bank*, 739 F.3d 45, 49 (2d Cir. 2013). However, Can Man reserves the right to raise these conflicts in the future.

### 2. The Interest Analysis Test Mandates Application of Pennsylvania Law

Under the "interest analysis" test, "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied." *Licci v. Lebanese Canadian Bank,* 739 F.3d 45, 48 (2d Cir. 2013), *quoting Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 197 (1985). The rules differ "depending on whether the rules in question are conduct-regulating rules that 'people use as a guide to governing their primary conduct,' or loss-allocating rules that 'prohibit, assign, or limit liability after the tort occurs.'" *Licci*, at 49. When the conflict of laws concerns "conduct-regulating rules, 'the law of the jurisdiction where the alleged tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.'" *Licci*, at 50, *quoting Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993)). Here, the applicable rules are conduct-regulating because they control whether contract or tort rules govern Can Man's conduct. *See Licci*, at 49.

Can Man is a Pennsylvania limited liability company. (Uszenski Decl. ¶ 2.) In July 2021, Can Man began to mix and package Happy Hour's Cocktails pursuant to an unwritten, non-exclusive contract. (Dkt. No. 1, Compl. ¶ 55; Dkt. No. 130-3, Novian Dep. 18:21-19:8, 22:15-23:25; Dkt. No. 130-13, Pitts Decl. ¶ 3.) The June 2022, August/September/October 2022 and April 2023 production runs at issue were all completed at Can Man's co-packing facility in Pennsburg, Pennsylvania.[3] (Dkt. No. 130-12, Uszenski Decl. ¶¶ 3, 5.) Thus, Pennsylvania law applies because all of Can Man's actions allegedly giving rise to Happy Hour's tort claims occurred

[3] Happy Hour's brief states that Can Man completed the July 2023 production run. (Dkt. No. 133-1, Pl.'s Mem. at 7.) That assertion is incorrect; Best Bev completed the July 2023 production run for Happy Hour. (Pitts 5/20/26 Decl. ¶ 5.) Happy Hour's brief further states that Can Man operated a co-packing facility in Waverly, New York. (Dkt. No. 133-1, Pl.'s Mem. at 3.) That assertion is likewise incorrect; Can Man's only co-packing facility was in Pennsburg, Pennsylvania. (Dkt. No. 126-6, Uszenski Decl. ¶¶ 5, 14.b.)

in Pennsylvania. Therefore, Happy Hour's motion should be denied because it improperly applied New York law to each of its claims against Can Man.

Nevertheless, for the remainder of this brief, Can Man will assume, without conceding, that New York law applies.

### C. Happy Hour is Not Entitled to Judgment as a Matter of Law on Its Negligence Claim

Happy Hour requests an order finding Can Man and Best Bev liable for negligence as a matter of law. (Dkt. No. 133-1, Pl.'s Mem. at 14.) Happy Hour's argument assumes that Can Man and Best Bev each owe Happy Hour a duty of care independent of their respective contracts. They do not.

Under New York law, to establish a claim for negligence a plaintiff must prove: "(1) the existence of a duty; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Dooley v. United States*, 83 F.4th 156, 162 (2d Cir. 2023), *quoting Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981). The court determines as a matter of law both the existence and scope of a defendant's duty to a plaintiff. *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 288 (2001). A defendant is not liable in negligence unless the alleged duty runs to the plaintiff. *Id.*, at 289.

Where the parties' relationship is contractual, a plaintiff generally may not convert a simple breach of contract into a tort claim unless the defendant violated a legal duty ***independent of the contract***. *MVP Health Plan, Inc.*, at 617, *citing Clark-Fitzpatrick, Inc.*, at 389. An independent duty must arise from circumstances ***extraneous to the contract*** rather than from the contract's own terms, even if the duty is connected to the contractual relationship. *Id*. Such a duty may be imposed by law as an incident of the parties' relationship or may be assessed in light of the nature of the

injury, how it occurred, and the resulting harm. *Id.*, *quoting Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551-52 (1993).

Negligence claims seeking purely economic loss generally fall outside the scope of any duty owed absent a recognized basis for imposing a duty in tort. *532 Madison Ave. Gourmet Foods, Inc.*, at 292.

**1. There is No Independent Source of Tort Duties**

In its brief, Happy Hour completely ignores the body of law governing the availability of tort claims between parties to a contract. Assuming that body of law does not exist, Happy Hour cites ***products liability*** cases that arose from personal injuries. (*See* Dkt. No. 133-1, Pl.'s Mem. at 12.) *See, e.g.*, *Bissonette v. Nat'l Biscuit Co.*, 100 F.2d 1003, 1004 (2d Cir. 1939) (plaintiff consumed bread produced by defendant that contained shards of broken glass that injured plaintiff). Those cases are inapposite and do not support extending negligence duties to parties to a commercial contract.[4] Accordingly, Happy Hour has failed to identify any legal duty owed by Can Man and Best Bev independent of their respective contracts.

**2. The Nature of Happy Hour's Alleged Injury Does Not Support Finding an Independent Duty**

As noted above, a court may find an independent duty after considering the nature of the injury, how it occurred, and the resulting harm. *See MVP Health Plan, Inc.*, at 617. Here, Happy Hour alleges that it received leaking cans from production runs completed in June 2022,

[4] In addition, even if this were a products liability case, Can Man would be entitled to assert the "contract-specification defense," which insulates manufacturers from liability for products "manufactured in accordance with the plans and specifications provided by the purchaser." *LaFlair v. Johnson & Johnson*, 2019 U.S. Dist. LEXIS 127481, *11 (N.D.N.Y. 2019), *quoting Houlihan v. Morrison Knudsen Corp.*, 2 A.D.3d 493, 494 (2d Dept. 2003).

August/September/October 2022, April 2023, and July 2023.[5] (Dkt. No. 133-1, Pl.'s Mem. at 7.) Happy Hour does not allege that it suffered any personal injury or injury to other property. (*See generally* Dkt. No. 1, Compl.)

Happy Hour alleges that its harm resulted from: (1) Can Man's failure to perform pre-production testing; (2) Can Man's failure to test for copper content and chloride content; (3) Can Man's failure to maintain DO content at levels that were within the specifications of Happy Hour's can manufacturer; and (4) that Can Man did not have the laboratory equipment or personnel who were trained to perform those tests.[6] (Dkt. No. 133-1, Pl.'s Mem. at 13-14.) This certainly is no "abrupt, cataclysmic occurrence." *See Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 552 (1992). Rather, this harm is for the lost product and consequential damages stemming therefrom. (*See* Dkt. No. 1, Compl. at 14.) As in *Sommer*, Happy Hour seeks only to enforce its bargain and should have proceeded under a contract theory. It chose not to.

For the foregoing reasons, the "nature of the injury, the manner in which it occurred, and the resulting harm" are insufficient as a matter of law to establish an independent legal duty owed by either Can Man or Best Bev.

**3. Happy Hour's Negligence Claims Are Based Solely on Economic Loss**

As noted above, where "negligence claims [are] based on economic loss alone[, they] fall beyond the scope of the duty" owed by a defendant. *532 Madison Ave. Gourmet Foods, Inc.*, at 292. Happy Hour does not allege anyone suffered personal injury. (*See* Dkt. No. 1, Compl. ¶ 30.)

---

[5] The July 2023 production run was completed by Best Bev, but Happy Hour improperly attributes it to Can Man. *See* footnote 3, *supra*.

[6] Happy Hour acknowledges that the July 2023 production issues were the result of a tooling issue with Best Bev's production line rather than leaks from pinholes. (Dkt. No. 133-1 at 7). Can Man is not liable for the July 2023 production run because it was not involved in any capacity. (*See* Dkt. No. 126-9 ¶ 30.)

Nor does Happy Hour allege that anyone suffered damage to "other" property. (*Id.*) The only damage alleged is to the cans that Can Man and Best Bev produced for Happy Hour under their respective contracts and the consequential damages flowing therefrom. (*Id.* ¶¶ 14, 30.) Because Happy Hour's claims are purely for economic damages, they fall beyond the scope of any duty owed by Can Man or Best Bev. The foregoing analysis shows that Happy Hour's negligence claim must fail as a matter of law.

**D. Dr. Iezzi's Opinion**

Happy Hour contends that Can Man and Best Bev cannot contest Dr. Iezzi's opinion regarding the standard of care, breach, and causation because they have not retained a rebuttal expert to present an alternative theory of causation. (Dkt. No. 133-1 at 14.) That is not the law.

When supporting or opposing a motion for summary judgment, an affidavit must set out facts that would be admissible and show that the affiant is competent to testify on the matters stated. FRCP 56(c)(4). In order for an expert's opinion to be admissible, it must be based on sufficient facts or data, employ reliable principles and methods, and reliably apply those principles and methods to the facts of the case. Fed. R. Evid. 702. The proponent bears the burden of establishing by a preponderance of the evidence that the expert's opinion meets these requirements. *United States v Apple, Inc.* 791 F.3d 290, 335 n.24 (2d Cir. 2015). The district court acts as a "gatekeeper" to exclude expert testimony that is unreliable and irrelevant. *Bustamante v. KIND, LLC*, 100 F.4th 419 (2d Cir. 2024); *Hollman v. Taser Int'l, Inc.*, 928 F. Supp.2d 657, 666-67 (E.D.N.Y. 2013). Expert opinions that are "based on data, a methodology, or studies that are inadequate to support the conclusions reached" must be excluded as unreliable. *Amorgianos v. Amtrak*, 303 F.3d 256 (2d Cir. 2002). These rules apply at the summary judgment stage as well as

trial. *Phoenix Light SF Ltd. v. Wells Fargo Bank, N.A.*, 574 F. Supp. 3d 197, 201 (S.D.N.Y. 2021), *citing Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

Even if expert testimony is allowed, an opponent may challenge an expert's opinions through "vigorous cross-examination" and the "presentation of contrary evidence." *McElroy v. Albany Mem. Hosp.*, 332 F.Supp.2d 502, 505 (N.D.N.Y. 2004), *quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

### 1. Happy Hour Misrepresents Dr. Iezzi's Opinion and Its Implications

Happy Hour attempts to establish the standard of care, breach, and causation through Dr. Iezzi's affidavit and his report attached thereto. (*See* Dkt. No. 133-1, Pl.'s Mem. at 5-7, 13-14.) Happy Hour goes too far.

#### a) Standard of Care versus Root Cause

In its brief, Happy Hour writes "Dr. Iezzi opined, to a reasonable degree of engineering and scientific certainty, that the **standard of care** for a beverage co-packer requires…." (Dkt. No. 133-1, Pl.'s Mem at 5 [emphasis added]). However, Dr. Iezzi did not express an opinion as to the standard of care.

Dr. Iezzi explains that he was retained to offer an expert opinion on what ***caused*** Happy Hour's cans to leak. (Dkt. No. 133-5, Iezzi Aff. ¶ 8.) He does not claim to, nor does he, offer an opinion as to what the standard of care is. Indeed, Dr. Iezzi writes "[i]t is my opinion that the **root cause** of the corrosion and leaking of the aluminum beverage cans filled by Defendants Can Man and Best Bev." (Dkt. No. 133-5, Iezzi Aff. ¶ 12 [emphasis added]). When discussing the standard of care, Dr. Iezzi simply describes his understanding of the concept, or expresses an opinion that Can Man and Best Bev did not meet it without articulating what it is. (*See* Dkt. No. 133-5, Iezzi Aff. ¶ 12.a. & Ex. A at 7.)

In addition, defendants submit that Dr. Iezzi would not be qualified to opine on the standard of care in the RTD beverage industry. He is a metallurgist. Nothing in Dr. Iezzi's CV or expert report establishes any qualifications to testify regarding any alleged standard of care. *See, e.g., Nora Bevs., Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998); *Moltner v. Starbucks Coffee Co.*, 2009 U.S. Dist. LEXIS 101413, *23-24 (S.D.N.Y. 2009). In any event, it appears that Dr. Iezzi's commentary on this issue is completely unsubstantiated. There is no indication that he surveyed RTD beverage co-packers or relied on any such evidence.

At best, Happy Hour has inadvertently conflated causation with standard of care. At worst, Happy Hour has deliberately misrepresented the nature and significance of Dr. Iezzi's opinion. Consequently, the Court should find that Dr. Iezzi's opinion does not establish the standard of care for Happy Hour's negligence claim.

**b) Pre-Production Validation Testing**

Notwithstanding the foregoing, Happy Hour maintains that the "standard of care," as suggested by Dr. Iezzi, required Can Man and Best Bev to perform pre-production validation testing. (Dkt. No. 133-1, Pl.'s Mem. at 5, 13-14.) Dr. Iezzi offered no such opinion. In his report, Dr. Iezzi summarized Tyler Mondoc's deposition testimony regarding the inability to perform preproduction validation testing in-house as merely a "possible reason" for the quality issues that Can Man faced. (Dkt. No. 133-5, Iezzi Aff., Ex. A at 5-6). For Happy Hour to claim that Dr. Iezzi opined that the standard of care required a co-packer to perform pre-production validation testing in-house is a bridge too far.

In the beverage co-packing industry, a customer is responsible for specifying a bill of materials (ingredients, cans, suppliers, etc.) and the co-packer is responsible for producing finished goods consistent with the specifications. (Rittenburg Decl. ¶ 2.) Compatibility of the formulation

with the can/liner selected by the customer is typically validated by the customer, or the formulator for the customer. (Rittenburg Decl. ¶ 2.) Most co-packers cannot perform compatibility tests in-house, nor do they offer such service as a guarantee of product shelf-life. (Rittenburg Decl. ¶ 2.) This is because the average co-packer does not have the equipment to test for copper and chloride content. (Parzych Dep. 57:9-21.) Thus, it would be unreasonable for a customer to expect a co-packer to voluntarily validate a customer's product unless the co-packer offered it as a service and provided a contract with guarantees. (Rittenburg Decl. ¶ 3.) Moreover, Can Man could have, and would have, sent Happy Hour's Cocktails out for testing if Happy Hour had so requested. (Dkt. No. 130-13, Pitts Decl. ¶ 10). The Court should reject Happy Hour's formulation as to the standard of care.

**c) Copper and Chloride Levels**

Happy Hour contends that the standard of care, as articulated by Dr. Iezzi, required Can Man and Best Bev to test and maintain copper levels below 0.2 ppm and chloride levels below 50 ppm. (Dkt. No. 133-1, Pl.'s Mem. at 5.) Dr. Iezzi offered no such opinion. (*Id.*) Those specifications are for aluminum cans manufactured by Crown Packaging.[7] (Dkt. No. 133-5, Iezzi Aff., Ex. A at 6.) However, the aluminum cans that Happy Hour sourced and provided to Can Man were initially manufactured by Kian Joo, and then by Ardagh starting in June 2022. (Dkt. No. 130-3, Novian Dep. 44:24-45:6; Dkt. No. 130-13, Pitts Decl. ¶ 5.) As such, the specifications identified by Happy Hour are irrelevant and the Court should reject Happy Hour's formulation as to the standard of care.

[7] Happy Hour's attempt to attribute those specifications to Ardagh is misleading. Dr. Iezzi identifies Ardagh's specification for chloride and DO in his affidavit and in his report. (*See* Dkt. No. 133-5, Iezzi Aff. ¶¶ 12.c.,15, Ex. A at 10, 15.) However, he does **not** identify Ardagh's specification for copper. (*See generally* Dkt. No. 133-5.)

**2. Dr. Iezzi's Opinions are Unreliable and Should be Ignored**

Dr. Iezzi's analysis regarding copper and chloride levels is fundamentally flawed. Bdas tested the tequila that Can Man used in producing Happy Hour's Cocktails. (Dkt. No. 133-5, Iezzi Aff. Ex. A at 9, 11.) Eurofins tested the copper levels in retained samples of Happy Hour's Cocktails. (*Id*. at 11.) The unit of measure for those respective tests is different: (a) mg/L for Bdas; and (b) parts per million (ppm) for Eurofins. (*See id*.) Dr. Iezzi failed to translate the results of one of the tests to make an apples-to-apples comparison of the Bdas and Eurofins results. In addition, Dr. Iezzi failed to (1) discuss whether the copper levels in the old and new tequila alone were within Ardagh's specifications when mixed according to Happy Hour's recipe, (2) discuss what else may contribute to the higher copper levels observed in the Eurofins tests if the copper levels of the old and new tequila each conformed to Ardagh's specifications when so mixed, (3) discuss why Happy Hour's Cocktails began to leak in June 2022, prior to the change in tequila brands, and (4) discuss why Happy Hour's Cocktails produced in April 2023, following a production run in which DO levels were maintained below Ardagh's specifications, also developed "pinhole" leaks. Dr. Iezzi's analysis of the chloride levels is flawed for the same reasons. (*See id*. at 9-10.)

It is also notable that Dr. Iezzi's conclusion regarding the "industry standard" for DO is 1.2 ppm. (Dkt. No. 133-5, Iezzi Aff., Ex. A at 15.) Ardagh' cans, however, had a warranty limit on DO of 1.0 ppm. (*Id*.) Thus, even if Can Man complied with what Dr. Iezzi calls the "industry standard," they still would have exceeded the undisclosed specifications for the Ardagh cans that Happy Hour selected.

Dr. Iezzi failed to consider the following material facts when formulating his opinions:

- Happy Hour worked with Reodica to create the formula for its Cocktails. (Dkt. No. 130-2, Morton Dep. 30:8-31:19, 35:24-36:20.)

- Happy Hour supplied the ingredients (or specified which ingredients for Can Man to procure on its behalf) except for the tequila. (*See* Novian Dep. 15:4-24, 62:8-63:12.)
- Before Can Man changed the tequila supplier, Can Man informed Happy Hour of the change, provided samples of the new tequila to Reodica to test, obtained Happy Hour's approval before switching tequilas, and would have continued to use Casa Maestri had Happy Hour so chosen. (Dkt. No. 130-13, Pitts Decl. ¶¶ 17-20.)
- Prior to switching tequilas, Happy Hour did not request that Can Man test, or arrange for testing, to ensure compatibility between Happy Hour's formula and its selected and provided cans. (*Id.*, ¶ 20.)
- Prior to switching tequilas, Happy Hour did not request that Can Man request or secure a certificate of analysis showing copper or chloride in the tequila from the new tequila. (*Id.*)
- Happy Hour supplied the aluminum cans to Can Man. (*Id.* ¶¶ 4-5.)
- Reodica provided specifications for Can Man to test during production including pH, Brix, and carbonation, but **not** copper, chloride, or DO. (Pitts 5/20/26 Decl. ¶ 4.)
- Happy Hour did not provide the DO warranty limits for its chosen aluminum cans to Can Man until March 2023. (Dkt. No. 130-13, Pitts Decl. ¶¶ 6, 27; Dkt. No. 130-15, Pitts Decl. Ex. B.)
- Can Man controlled for Ardagh's DO specification in the April 2023 production run, but that run also experienced leaking cans. (Dkt. No. 130-13 Pitts Decl. ¶¶ 34-35.)

In addition, there are several glaring errors and omissions in Dr. Iezzi's report which call his conclusions and opinions into question:

- He states that "Can Man changed tequila suppliers in the summer of 2022 from Casa Maestri to Infinity tequila. Prior to the change in tequila, leakers did not occur." (Dkt. No. 133-5, Iezzi Aff., Ex. A at 9) This is a false statement. The June 2022 production run, which used Casa Maestri tequila, developed "pinhole" leaks. (Dkt. No. 130-13, Pitts Decl. ¶¶ 12-13).
- He highlights the assertion that Can Man experienced leaking cans with other customers (Dkt. No. 133-5, Iezzi Aff., Ex. A at 5, 7), but ignores the fact that none of these other customer's cans involved "pinhole" leaks. (Zimmerman Decl. ¶ 8.)
- He ignores the fact that cans from the April 2023 production run, which adhered to Ardagh' DO specifications, still developed "pinhole" leaks. (Dkt. No. 130-13, Pitts Decl. ¶¶ 34, 35.)

Perhaps Dr. Iezzi's most glaring omission, however, is his failure to take two obvious possible contributory factors into account: Happy Hour's other ingredients and, in particular, ***the cans***. Dr. Iezzi's report includes a colorful Venn diagram illustrating what he calls the "Perfect Storm of Corrosion." (Dkt. No. 133-5, Iezzi Aff., Ex. A at 7.) But missing from this diagram—and missing from his analysis is any consideration of problems inherent in the Ardagh cans that Happy Hour selected and supplied to the co-packer.[8] The trier of fact is entitled to consider these omissions, errors, and analytical shortcomings in deciding whether to credit his opinions. *See, e.g.,*

[8] Notably, Dr. Iezzi's main source for many of his opinions is an undisclosed, unattached report from Ardagh, identified only as "TR # T23046 & T23064, 4/15/2025." (Dkt. No. 133-5, Iezzi Aff., Ex. A at 4.) Obviously, Ardagh would be disinclined to blame its own cans for any of problems at issue in this case.

*Cayuga Nation v. Parker*, 2025 U.S. Dist. LEXIS 225184, *15 (N.D.N.Y. 2025)("[w]here the record indicates that the expert failed to consider necessary factors or that his analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value"), *quoting Lightfoot v. Union Carbide Corp*., 1999 U.S. App. LEXIS 3329, *7 (2d Cir. 1999).

The foregoing demonstrates that Dr. Iezzi did not apply reliable methods to the facts of this case. As such, Dr. Iezzi's opinion should be ignored for purposes of Happy Hour's motion.

**E. Defendants' Alternative Theory of Causation**

In its motion, Happy Hour asserts that, based on its submissions, the only conclusion the Court can reach is that Can Man is liable for negligence because, ostensibly, "Defendants have offered no alternative theory of causation." (Dkt. No. 133-1, Pl.'s Mem. at 14.) This is incorrect. Whatever caused the "pinhole" leaks in Happy Hour's Cocktails, the fact remains that Happy Hour provided those cans and then completely failed to tell Can Man that its selection of those cans required adherence to certain specifications. Happy Hour also: failed to properly vet its can provider; failed to provide the co-packer with specifications from the cans it selected prior to beverage production runs; failed to request pre-production testing of any sort; failed to perform, on its own, any pre-production testing of its beverage formulation in the cans it selected; failed to test the new tequila it agreed to use; and failed to request any particular DO level. To paraphrase Dr. Iezzi, a possible reason for these omissions was Happy Hour's "lack of experience." Happy Hour's refusal to acknowledge its own fault for the problems it experienced is astonishing. Happy Hour is not entitled to summary judgment.

### F. Happy Hour is Not Entitled to Judgment as a Matter of Law on the Concealment Element of Its Fraudulent Concealment Claim

To prevail on a claim of fraudulent concealment, a plaintiff must prove: "[(1)] a misrepresentation or a material omission of fact which was false and known to be false by the defendant, [(2)] made for the purpose of inducing the other party to rely on it, [(3)] justifiable reliance of the other party on the misrepresentation or material omission, … [(4)] injury[,] … [(5)] the defendant had a duty to disclose material information[,] and [(6)] that it failed to do so." *Mandarin Trading Ltd. v. Wildstein*, 16 N.Y.3d 173, 178-179 (2011).[9]

The duty to disclose may arise "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005), *quoting Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 152 (2d Cir. 1993). However, "the duty to disclose must exist separately from the duty to perform under the contract." *TVT Records*, at 91. When the litigants are parties to a contract, the plaintiff must also: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Id.*, *quoting Bridgestone/Firestone v. RecoveryCredit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)).

Happy Hour's motion should be denied because: its argument is incoherent and inconsistent with its motion; it raises a new and untimely theory of liability; and material issues of fact abound as to each element of its fraudulent concealment claim.

---

[9] The first four elements are those that must be established to prove a claim for common law fraud. *Id*. at 178.

### 1. Happy Hour's Argument on the Fraudulent Concealment Element is Incoherent

Happy Hour has failed to identify the part of its claim for which it seeks summary judgment. *See* FRCP 56(a). As a result, Can Man and Best Bev are left confused by Happy Hour's argument. First, in its notice of motion, Happy Hour states that it seeks summary judgment against both Can Man and Best Bev. (Dkt. No. 133, Pl.'s Mot. at 2.) Then, in its memorandum of law, Happy Hour does not mention Best Bev anywhere in the argument on this issue. (Dkt. No. 133-1, Pl.'s Mem. at 15-17.)

Second, Happy Hour purports to seek summary judgment as to only one element of its fraudulent concealment claim. (Dkt. No. 133 at 2; Dkt. No. 133-1 at 15.) Happy Hour describes that "one element" as follows: "Can Man knew of the systemic, company-wide leaking can problem and failed to disclose it to Happy Hour." (Dkt. No. 133-1 at 15.) Happy Hour's formulation suggests that it actually seeks to establish knowledge as to the omission of a material fact (first element) **and** failure to disclose it (sixth element).

Happy Hour then proceeds to raise arguments with the seeming intent to establish each of the other elements. In Argument Section C.1. Happy Hour argues that Can Man had a duty to disclose because it had superior knowledge (fifth element). (Dkt. No.133-1 at 15.) In Argument Section C.3., Happy Hour claims that Can Man blamed Happy Hour's suppliers. (Dkt. No. 133-1 at 16-17.) Presumably, Happy Hour's intent in including this section was to establish that Can Man intended to induce Happy Hour's reliance (second element) and that Happy Hour's reliance was justified (third element). Finally, in Argument Section C.4., Happy Hour describes Andrew Zimmerman as acknowledging that Happy Hour "'would not have proceeded' with the August/September/October 2022 run" had Can Man disclosed the extent of its customers that were experiencing leaking issues. (Dkt. No.133-1 at 17.) Ostensibly, this was to establish materiality

(first element), induced reliance (second element), and justified reliance (third element). If, indeed, Happy Hour seeks summary judgment only on the failure to disclose, then nearly all of its argument is superfluous and should be ignored.

Can Man, Best Bev, and ultimately, the Court, are left guessing as to what Happy Hour seeks and against whom. Consequently, Happy Hour has failed to meet its burden of identifying the claim or part of the claim for which it seeks summary judgment. *See* FRCP 56(a). The Court should, therefore, deny Happy Hour's motion as to Happy Hour's fraudulent concealment claim.

### 2. The Court Should Not Entertain Happy Hour's Argument Because It Is Based on an Untimely Theory of Liability

"[T]he central purpose of a complaint is to provide the defendant with notice of the claims asserted against it." *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006), *citing* FRCP 8(a). The proper means by which to raise a new theory of liability is to amend the complaint. *Id*. It is proper for a district court to refuse to entertain new theories of liability raised for the first time at the summary judgment stage. *Id*.

In its complaint, Happy Hour alleged that Can Man knew, but failed to inform Happy Hour, that the change in tequila caused its cans to develop pinholes and leak. (Dkt. No. 1, Compl. ¶¶ 52-53.) However, in its motion, Happy Hour argues **for the first time** that, instead, Can Man concealed the fact that "'nearly every customer' was experiencing leaking cans, that the problem was systemic and company-wide, and that Can Man lacked the capability to test for the parameters causing the leaking." (Dkt. No. 133-1, Pl.'s Mem. at 15.)

The principal evidence on which Happy Hour relies for its argument is an email from Andrew Zimmerman dated October 13, 2022 and Mr. Zimmerman's testimony related thereto. (Dkt. No. 133-1, Pl.'s Mem. at 15-16.) That email was first produced to Happy Hour on August

12, 2024. (Sheppard Aff., ¶10.) Happy Hour questioned Mr. Zimmerman about that email during his deposition on December 16, 2024 and again on February 5, 2025. (Sheppard Aff., ¶11.) On April 3, 2026, Happy Hour filed a motion to amend its complaint. (*See*, Dkt. No. 124.) However, Happy Hour did not seek to include this new theory in its proposed First Amended Complaint. (Dkt. No. 124-2, Proposed Am. Compl. ¶¶ 63-73; Dkt. No. 124-3, Proposed Am. Compl. ¶¶ 63-73 (redline version).) Thus, Happy Hour has known of this email for over 21 months, but never sought to amend its complaint to include this new theory of liability.

Happy Hour also asserted for the first time that Can Man was under a legal duty to disclose this information. Happy Hour's complaint is devoid of any allegations that Can Man owed any duty to disclose information. (*See* Dkt. No. 1, Compl. ¶¶ 48-58.) But, in Happy Hour's motion, it argues that Can Man had a duty to disclose based on superior knowledge. (*See* Dkt. No. 133-1, Pl.'s Mem. at 15.)

The argument that Happy Hour makes in its motion is incongruent with the allegations in its complaint. Happy Hour raises an entirely new theory of liability and for the first time argues that Can Man and Best Bev owed a duty to disclose. Entertaining Happy Hour's argument would be unfairly prejudicial to defendants because its "claims allege an entirely new set of operative facts of which it cannot be said that the original complaint provided fair notice." *See Ansam Assoc., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) (denying motion to amend after the close of discovery and the defendant filed a motion for summary judgment). The Court should, therefore, refuse to entertain Happy Hour's argument and deny Happy Hour's motion. *See Greenidge*, at 361.

### 3. Material Issues of Fact Remain as to Each Element of Happy Hour's Fraudulent Concealment Claim

In light of Happy Hour's incoherent argument (*see* Section III.D.1.1, *supra*), Can Man must now, in an exercise of caution, address each element of fraudulent concealment.

**Material Omission/Failure to Disclose**. The basis of Happy Hour's argument is Zimmerman's October 13, 2022 email. (Dkt. No. 133-1, Pl.'s Mem. at 15.) Can Man concedes that it did not disclose to Happy Hour that some other customers experienced leaking cans. However, the "pinhole" leak issues with Happy Hour's product were unique to Happy Hour. (Dkt. No. 130-13, Pitts. Decl. ¶ 13; Zimmerman ¶ 12.) As such, the fact that other customers were experiencing issues that were entirely different (production line damage and seaming issues) is entirely disconnected from the pinhole-leaking that Happy Hour experienced. (*See Id.* ¶ 14.) For the foregoing reasons, a material issue of fact remains regarding the materiality of the information that Can Man did not disclose to Happy Hour.

As for Best Bev, it did not omit material information. Best Bev was formed in June 2022. (Sheehan Decl. ¶ 2.) Best Bev completed its one and only production run for Happy Hour in July 2023, approximately nine months after Zimmerman's email. (*See* Pitts 5/20/26 Decl. ¶ 5.) This production run was completed in a different facility in a different state by different personnel using different equipment. (*Id.* ¶¶ 21-24, 26-27, 30.) In October 2022, Best Bev did not possess the information that Happy Hour now claims Best Bev was under a duty to disclose. For the foregoing reason, a material issue of fact remains regarding whether Best Bev concealed material information from Happy Hour.

**Purpose for Not Disclosing**. Can Man omitted the information because the issues that Happy Hour was experiencing were unique to it. (Dkt. No. 130-13, Pitts Decl. ¶ 13.) Moreover, it would have been improper for Can Man to disclose information about its other customers. Some

of those customers may have been competitors of Happy Hour, while others, as a matter of course, impose confidentiality restrictions on co-packers. (*Id*. ¶ 16.) For the foregoing reasons, a material issue of fact remains regarding the intent behind Can Man's non-disclosure.

**Reliance**. Under the circumstances, it was unreasonable for Happy Hour to rely on any statement or omission and, to a large extent, Happy Hour did not rely. Can Man was transparent in disclosing to Happy Hour when it discovered leaking cans of Happy Hour's product in its warehouse. (*See* Dkt. No. 130-3, Novian Dep. 41:13-42:19, 44:3-45:5; Dkt. No. 130-4, Ciocci Dep. 76:2-7; Dkt. No. 130-7, Novian Dep. Ex. C.) Can Man worked collaboratively with Happy Hour in trying to identify the cause and ultimately to resolve the production issues. It was clear throughout that Can Man did not know what caused Happy Hour's cans to leak.

Following the June 2022 production run, Can Man suspected that aged cans were the culprit. ((Dkt. No. 130-3, Novian Dep. 44:3-45:5; Dkt. No. 130-10, Defs.' Response to Pl.'s Interrogatory Set 1 No. 15; Dkt. No. 130-13, Pitts Decl. ¶ 15.) That proved incorrect because Happy Hour provided new cans that also experienced the same leaking issues. (*Id*. ¶¶ 22-23.) Happy Hour asked Can Man to investigate bacterial fermentation and seaming issues based on recommendations that Novian received from Matson. (Dkt. No. 130-3, Novian Dep. 57:13-58:3; Dkt. No. 130-7, Novian Dep. Ex. C.) Can Man did so and promptly reported to Happy Hour that neither were the cause. (Dkt. No. 130-7, Novian Dep. Ex. C; Dkt. No. 130-13, Pitts Decl. ¶ 26.)

Happy Hour knew that the cause eluded Can Man and so it was unreasonable for Happy Hour to rely on any representations or omissions that future production runs would have a different result. Happy Hour recognized this. Consequently, it engaged a new co-packer, Wildpack, in December 2022 and subsequently completed three or four production runs with them. (Dkt. No. 130-3, Novian Dep.18:21-19:21.) On February 10, 2023, Ciocci advised Novian that Can Man's

"ultimate goal is to work with Happy Hour to resolve the issue of pin-hole leaks and corrosion prior to producing additional finished products." (Dkt. No. 130-8, Novian Dep. Ex. D.) On February 17, 2023, Zimmerman stated that Can Man needed Happy Hour's can manufacturer to sign off on the interaction between the liquid and the can before the next production run. (*Id.*) Novian responded the same day and agreed "on all points." (*Id.*) Then on March 21, 2023 Novian asked if Happy Hour could run product in April even though Ardagh, Happy Hour's chosen can manufacturer, had not yet reported back on the interaction between Happy Hour's formula and the cans. (*Id.*)

The foregoing demonstrates that material issues of fact exist as to (1) whether Happy Hour relied on Can Man's alleged non-disclosure and, (2) to the extent Happy Hour did rely, whether that reliance was reasonable.

**Duty**. In its brief, Happy Hour argues that a duty applies because Can Man had superior knowledge. That is insufficient because Can Man and Happy Hour were in a contractual relationship. (*See* Dkt. No. 1, Compl. ¶ 54.) As such, Happy Hour was obligated to identify a duty separate from Can Man's duty to perform under the contract, a misrepresentation that was collateral to the contract, or identify damages that it seeks, but would be unable to recover under contract law. *See TVT Records*, at 91. It did not.

Can Man did not possess superior information which gave rise to a duty to disclose. The fact that other customers experienced leaking cans was irrelevant because the "pinhole" leaks that Happy Hour experienced were unique to it. (Dkt. No. 130-13, Pitts Decl. ¶¶ 13-14.) Disclosing that fact would have no bearing on Can Man's pre-existing contractual obligation to produce cans for Happy Hour.

Considering the foregoing, the Court should find that, as a matter of law, Can Man was under no duty to disclose. Alternatively, the Court should find that material issues of fact remain as to whether Can Man possessed superior information and, on that basis, deny Happy Hour's Motion.

## IV. CONCLUSION

For the foregoing reasons, Best Bev and Can Man each respectfully request that this Court deny plaintiff's motion for partial summary judgment.

Dated: May 22, 2026
Binghamton, New York

By: ***s/ Paul T. Sheppard***
Paul T. Sheppard, Esq.
NDNY Bar Roll No. 102596
Hinman, Howard & Kattell, LLP
*Attorneys for Defendants*
80 Exchange Street
PO Box 5250
Binghamton, New York 13902-5250
Telephone: (607) 723-5341
Facsimile: (607) 723-6605
Email: psheppard@hhk.com