# EXHIBIT "B"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

---------------------------------------------X

HAPPY HOUR DRINKS COMPANY, INC.,

Plaintiff,

-against-

Index No.: 3:24-cv-0047

CAN MAN, LLC d/b/a BEST BEV CO.,
BEST BEV, LLC and JOHN DOES 1 through 10,

Defendants.

---------------------------------------------X

Tuesday
February 4, 2025
4:49 p.m.

CONTINUED EXAMINATION BEFORE TRIAL of the Non-Party Witness, ANDREW ZIMMERMAN, taken pursuant to Subpoena, held via Zoom on the 4th day of February 2025, before a Notary Public of the State of New York.

ROCKLAND & ORANGE REPORTING

2 Congers Road, Suite 2

New City, New York 10956

(845) 634-4200

A P P E A R A N C E S:
(All parties via Zoom)

SAVAD, CHURGIN, P.C.
Attorneys for Plaintiff
55 Old Turnpike Road, Suite 209
Nanuet, New York 10954
BY: JOSEPH A. CHURGIN, ESQ.
j.churgin@savdchurgin.com
(845) 624-3820

NOVIAN & NOVIAN, LLP
Co-Counsel for Plaintiff
1801 Century Park East, Suite 1201
Los Angeles, California 90067
BY: ANDREW B. GOODMAN, ESQ.
agoodman@novianlaw.com
(310) 553-1222

COOK, KURTZ & MURPHY, P.C.
Attorneys for Defendants
85 Main Street, P.O. Box 3939
Kingston, New York 12402
BY: ERIC M. KURTZ, ESQ.
Ekurtz@cookfirm.com

ALSO PRESENT: Matthew Novian

Andrew Zimmerman

Q. Do you recall how the quality issues with Happy Hour's cans were discovered?

A. Um, I -- There was, definitely, some evidence of leaking. I believe Anthony and Matt do -- had - had conversations about product that was leaking, on-site, and as well as Matthew Novian letting us know that there was product leaking in market.

Q. What initial steps were taken to address the quality issues with the Happy Hour cans?

A. Um, we had tried to work, together, to investigate and get specification data for the cans and the liquid combinations to know where to look, why they would have been leaking in that manner. Um, I think that was, probably, the main point. And we were trying to break cans apart to see if we could identify where the leak was occurring or what it was looking like on the inside of the can. I think, at one point, we had shared some photos of those.

Q. Shared some photos of the leaking cans with whom?

A. I think Matthew. It may have been a Webex call or Zoom or whatever type of media it was.

Andrew Zimmerman

Q. How would you describe the investigation within Can Man and Best Bev of the leaking-can issues for Happy Hour?

MR. KURTZ: Objection, form.

THE WITNESS: Uh, like most - most like as frustrating.

Q. Why is that?

A. You know, unable to determine why they were leaking.

Q. What did Best Bev and Can Man do to determine or try to determine why the Happy Hour cans were leaking?

A. I'd say similar to my answer, a couple of questions ago, tried to obtain the specs and the requirements of the can liner verse liquid combination, um, to make sure that what we were doing was within them, um, if that could have been the root cause, and as well as, like I said, you know, look into what's causing them to leak, try to identify, you know, why would there become a pinhole leak in the can.

Q. At Best Bev and Can Man, who do you say led the investigation on the leaking-can issues for Happy Hour?

Andrew Zimmerman

MR. KURTZ: Objection, form.

THE WITNESS: I'd say it was a group effort, um, Tyler Mondoc, myself, Anthony, Angus.

Q. Were any outside consultants brought into the investigation of the leaking-can issue for Happy Hour?

MR. KURTZ: Objection, form.

THE WITNESS: Um, not to my recollection.

Q. What conclusions were reached regarding the leaking-can issues for Happy Hour within Best Bev and Can Man?

MR. KURTZ: Objection, form.

THE WITNESS: I'm not sure that I was ever part of a final conclusion. In re - in regards to what, specifically?

Q. Were there any recommendations made by Best Bev and Can Man to Happy Hour regarding the leaking-can issues?

A. Um, I believe, on the final production run, there was some knowledge gained on can liner, specific requirements for the cans. Um, I wasn't -- I think I was still pretty involved before that

production run, and there was testing done to some of the ingredients to ensure they would comply.

Q. Any other recommendations?

A. Um, not that I recall, specifically. I think there was a lot of back-and-forth on timing of a production run and not being confident in the ability to, successfully, run the product. Um, I don't know, don't quite remember timing of that or, you know, obviously, we bring in additional product, eventually.

Q. Was there an issue with copper that was identified with Happy Hour cans?

A. Um, it was copper was looked at as a possible reason for the leaking. Um, I don't know if it tested out that there wasn't -- it was an elevated level, uh, partly, because we didn't know what the can specification was. Most of the time during the testing and, again, I don't recall if we got the specific can's specifications, including copper levels for those cans or we had used, um, a different can-supplier spec. We could have. I don't recall.

Q. Do you recall sending out the Happy Hour Tequilas for any kind of testing?

A. Um, there were cans and tequila samples sent to I believe the company was Eurofins for testing.

Q. When was that?

A. I don't. Specifically, it's sometime in 2023, I believe.

Q. What kind of a test was conducted by Eurofins?

A. I don't recall the specific test name for the test, um, but I believe they were, specifically, targeting copper concentration, and there may have been one other or two other tests that were part of like the panel.

Q. Do you recall what the one or two other tests that were part of the panel were?

A. I don't recall what the other ones would have been.

Q. Do you recall the results of any of the tests from Eurofins?

A. Um, I'd say most of the sample sets were lower than we thought they would be for copper across many different brands and products, including products that were nonalcoholic. Um, I think I remember those were zero, which was something we

were glad to see. Um, that meant that it wasn't the piece of equipment that was creating copper, um, residuals and, again, not necessarily having the can-liner spec for everything, we didn't know which ones would have been too high or too low, or I shouldn't say too low. All right. Sorry. That was a misstatement.

I think there was, eventually, some spec obtained, like I said, for one specific canning company and their liner, um, and many of them were below that tolerance.

Q. Do you recall that a new tequila had a lower copper level than Casa Maestri Tequila?

A. Um, I do not recall if the new one had a lower copper level.

Q. How were the results of some of these tests from Eurofins documented?

A. They were given via a portal on the Eurofins' website.

Q. Was anyone at Happy Hour provided access to that portal or otherwise informed of the results?

A. Um, I don't recall if informed of the results. I don't recall ever being requested to give access to the portal. I think the portal

access was really internal. Um, I don't know. I don't remember who all results would have been shared with. External, I should say.

Q. In this portal, were any of the results downloaded, say, on a zip drive or - or was it just something that you would access through the portal and review and you had a certain amount of time that you could access the link?

A. Okay. Um, I believe it was just access through the portal.

Q. And that no one from Happy Hour or Best Bev or, excuse me, no one from Best Bev or Can Man downloaded the results of the Eurofin testing to your knowledge from the portal?

A. I don't believe so. I don't know if it was an option.

Q. What effect did copper levels have on the Happy Hour cans?

MR. KURTZ: Object to the form.

THE WITNESS: Um, I don't know, specifically. I think the belief is that an elevated level of copper would increase corrosivity, but I don't -- I'm not an expert on liquid-can reaction.

MR. GOODMAN: Go ahead. I didn't mean to stop you on -- stop your peers.

THE WITNESS: That's I didn't want to like make clarifying like what I was saying, earlier, like I think he's referring to negligence of producing product with elevated levels of copper, but I - I don't know what he's referencing and I wasn't there and involved when this e-mail chain occurred.

Q. Do you think any of your co-workers at Can Man or Best Bev were negligent?

MR. KURTZ: Objection, form.

THE WITNESS: Um, no. No, not really. I think a lot of people were doing the best they could to try to resolve the issues that had occurred, here, at the end of October, as they're referenced, here -- I'm sorry, the end of 2022, middle to end.

Q. Do you know if Can Man or Best Bev was monitoring dissolved oxygen levels in cans for the customers that are referenced in this e-mail chain at Exhibit I?

A. Yes. Dissolved oxygen was part of the

packaging inspection at the filler.

Q. Then there's a reference, just going back to the top e-mail from John Pitts, October 27th, 2023 at 10:50 a.m., to a Eurofins account and logging into it; do you see that?

A. Uh-huh.

Q. We were talking, earlier, about a Eurofins account and, um, I wanted to follow up on how that - that looks. Do -- Did you have a Eurofins account when you were at Can Man or Best Bev?

A. That would be the Eurofins account, but he's -- that we had just spoken about, earlier, with the on-line portal to review the results of the testing.

Q. Yes. Did you have such an account?

A. I believe my account was the only account and that password would have been shared, yeah. As he's referring to, he had my user name and password. Sorry. Didn't refer to the user -- He tried to log into the Eurofins account. Sorry.

But let me back up. There was one Eurofins account, I believe. I believe I set up the Eurofins account with Eurofins to send them cans for

testing and then we had a shared access.

Q. And then do you have any knowledge as to how long documents are maintained within a Eurofins account? For example --

A. I don't. Sorry.

Q. Oh, go ahead. That might have answered it.

A. Yeah. I don't know if there was a period of time that that information would have remained accessible on the portal or not or if the account was still, um, like what's the word? Like whole or if it, due to inactivity, the account was still valid or not.

Q. Got it. Thank you.

When running dissolved oxygen levels of 2,000 parts per billion, would you consider that negligent?

MR. KURTZ: Objection to form.

THE WITNESS: I think that's dependent on product and can spec, um, and customer spec. Um, I believe there were acceptable levels from 300 to over 2,000, depending on who the customer was, what their product was and what their can

manufacturer defined as the allowable limits for that product and I think Xampla -- I believe one customer had changed can manufacturers and, with that, they advised us of a change in dissolved oxygen level, which, quite frankly, was a challenge. I think it dropped it to 300 parts per billion with their liners. So, there was a lot of work that had to be done to achieve that.

Q. Which customer was that?

A. Um, I believe might have been Onda.

Q. All right. Let's - let's go to Exhibit J, Page 13 in the PDF. Do you recognize this exhibit?

A. Yup, one that I provided.

Q. Who's on this text thread?

A. Um, an A would be Angus, barely legible there, but, um, CP, I think is Casey Parzych; TM, Tyler Mondoc, and I think that's an NL, Nathan Longacre.

Q. Can you say Nate's last name and --

A. Oh, sorry. Longacre.

Q. Can you spell that, please?

A. L-O-N-G-A-C-R-E.

C E R T I F I C A T I O N

I, Kathryn Lebeau, a Stenotype Reporter and Notary Public within and for the State of New York, hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn or affirmed by a Notary Public and that the transcript of examination is a true record of the testimony given by the said witness; and

That I am not related to any of the parties to this action by blood or marriage and I am in no way interested in the outcome of this matter.

Kathryn Lebeau