**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

HAPPY HOUR DRINKS COMPANY, INC.,

Plaintiff,

-against-

CAN MAN, LLC d/b/a Best Bev Co.;
BEST BEV, LLC and
JOHN DOES 1 through 100,

Defendants.

**DECLARATION OF ANDREW ZIMMERMAN IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Case No. 3:24-cv-00047 (ECC/ML)

I, Andrew Zimmerman, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, the following:

1. I was employed by defendant Can Man, LLC ("Can Man") as Logistics Director, in Pennsburg, Pennsylvania, during the period of time that plaintiff Happy Hour Drinks Company, Inc. ("Happy Hour") was doing business with Can Man, through approximately April 2023. I subsequently worked, briefly, for defendant Best Bev, LLC ("Best Bev"), in Waverly, New York, in a similar capacity, until September 2023.

2. Happy Hour engaged Can Man as a beverage co-packer to batch and package its ready-to-drink ("RTD") tequila- and seltzer-based cocktails ("Cocktails"). Can Man's role in this process included batching or mixing the

ingredients comprising Happy Hour's Cocktails in accordance with the formula or recipe provided by Happy Hour, and packaging the mixed product, along with specific amounts of carbonation, into aluminum cans.

3. Happy Hour did not ask Can Man to secure cans for its products. Instead, like many of Can Man's customers, Happy Hour sourced its own cans and provided those cans to Can Man.

4. Prior to the relevant production runs, Happy Hour did not provide Can Man with specifications regarding the cans it provided. Specifically, Happy Hour did not request that Can Man adhere to a particular "dissolved oxygen" level for its production runs.

5. Likewise, Happy Hour never requested that Can Man conduct or arrange for any pre-production testing of its products or its cans for items such as copper levels or chloride levels.

6. I am not aware of any standard in the co-packing industry which places the responsibility for securing can-specific specifications on the co-packer. In my experience, a customer providing its own cans and beverage formula was the party responsible for requesting that such specifications as dissolved oxygen levels be adhered to.

7. Prior to June 2022, Can Man's production runs for Happy Hour were completed without any leaking issues.

8. The first production run to result in any leaking issues took place in June 2022. Following the June 2022 Happy Hour production run, some of the cans developed "pinhole leaks." This leaking issue was unique to Happy Hour's product.

9. I understand that Happy Hour has accused Can Man of engaging in fraudulent behavior by failing to advise Happy Hour that Can Man had experienced other, different leaking problems with other customers during this time frame. In particular, I understand that Happy Hour has relied on an internal email I drafted in October 2022 about these various leaking can issues.

10. While Can Man experienced leaking issues with some other customer's products, those problems were different in nature. They involved either production line damage (i.e., dents in cans which led to leaking) or seaming issues where cans developed leaks at the seams following the production runs.

11. Following the June 2022 Happy Hour production run, Can Man and Happy Hour spoke many times specific to Happy hours leaking issue. Can Man did not advise Happy Hour that, during the same time period, it had experienced leaking issues for other customers because, as noted above, those other leaking issues were entirely different from the "pinhole leaks" that developed in the Happy Hour cans.

12. Can Man's next production runs for Happy Hour took place in August 2022, late September 2022 and early October 2022. These production runs also resulted in some cans with "pinhole leaks."

13. Over the ensuing months, Can Man and Happy Hour communicated about the "root cause" of the leaking issues. Early on in this investigation, I received an email from Matthew Novian, one of Happy Hour's principals, in which he advised that Matson Logistics, a third-party assisting Happy Hour, "believe[d] the issue is related to two things: 1) a seeming issue on the production line and 2) the juice fermenting and causing pressure to build in the can because of excessive heat conditions."

14. Based on this email, Can Man looked into the fermentation and seaming issues identified by Matson and responded to Mr. Novian that neither of these issues appeared to be the cause of the pinhole leaks. A copy of this email chain is attached as Exhibit "A."

15. I am advised that, in its motion papers, Happy Hour asserts that "Can Man told Happy Hour that the leaking was caused by Happy Hour's tequila suppliers and ingredient changes." (Novian Declaration ¶ 9). Can Man did not know what was causing the leaks and was actively and diligently investigating the root cause of the issue. Therefore, we would not have made any such affirmative statement.

16. I am further advised that, in its complaint, Happy Hour alleged that, in February and March 2023, Anthony Ciocci and I "expressly disavowed any liability related to increased copper levels in Happy Hour's product due to changes in the tequila." (Complaint ¶ 39) I do not believe either of us ever made any such statement.

To the contrary, after being advised—for the first time—that copper levels in Happy Hour's product might be a root cause of the leaking issues, I directed Can Man's Processing and Compliance Manager, John Pitts, to send samples of the tequilas used in Happy Hour's products (before and after Septement 2022) out for testing. Those test results, which were received in April 2023, actually showed that the copper levels in the old tequila were higher than the copper levels in the new tequila.

17. I am further advised that Happy Hour's causation expert has relied on an internal email I drafted on March 28, 2023 to support his conclusion that the Ardagh cans Happy Hour provided to Can Man had a "50 ppm chloride warranty limit." (Iezzi Report p. 10) However, my email was not based on Ardagh's chloride warranty limit, it was based on information I received from Crown Packaging for its cans. Can Man was never provided with Ardagh's chloride specifications.

18. Likewise, I am advised that Happy Hour has asserted that Ardagh had 0.2 ppm specification for copper. (SMF ¶ 11). This also appears to be derived from my March 28, 2023 email regarding Crown Packaging specifications. Can Man was never provided with Ardagh's copper specifications.

19. Moreover, my March 28, 2023 internal email was designed to benefit Can Man by reducing its exposure to losses caused by leaking cans. When a customer fails to provide specifications for its cans, and leaks result, it is highly

likely that the customer will not pay for the damaged product, even if the damage is the result of the customer's error.

20. I am also advised that Happy Hour is relying on a portion of my deposition testimony to support its assertion that, if Happy Hour had been told that Can Man about leaking can issues involving other customers, it would never have proceeded with the production runs in September and October 2022. Happy Hour omits a portion of my answer where I state that, speculation aside, "I don't know if I could answer that question." (Zimmerman Tr. 119:10-11). I have no idea what Happy Hour would have done, but I do know that, even after there were pinhole leaks in the September and October 2022 production runs, Happy Hour asked Can Man to proceed with additional runs, but we repeatedly recommended against any additional runs until our root cause analysis was complete.

21. In June 2023, after Can Man began winding down its operations, Best Bev, LLC offered to do a free test run for Happy Hour at its Waverly, New York facility. Unfortunately, during that free test run, some cans were damaged as a result of a tooling error with Best Bev's production equipment. This damage did not result in the "pinhole" leaks that were present in Can Man's production runs.

Dated: May 21, 2026
Center Valley, Pennsylvania

Andrew Zimmerman