UNITED STATES DISCTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HAPPY HOUR DRINKS COMPANY, INC.,

Plaintiff,

vs.

CAN MAN, LLC, d/b/a Best Bev Co., BEST BEV LLC and JOHN DOES 1 through 100,

Defendants.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Case No. 3:24-cv-00047 (ECC/ML)

Defendants Can Man, LLC ("Can Man") and Best Bev LLC ("Best Bev"), by and through their attorneys submit this response to Statement of Material Facts ("SMF") filed herein by Plaintiff Happy Hour Drinks Company, Inc. ("Happy Hour") (Dkt. No. 133-2) as follows:

## RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

### The Parties and the Co-Packing Relationship

1. **Admitted** that Happy Hour is a company that produced ready-to-drink ("RTD") tequila seltzer cocktails made with real tequila, sparkling water, and juice, packaged in 12-ounce aluminum cans. **Denied** to the extent Happy Hour characterizes its product as "premium," as that term is a subjective marketing description, not a statement of material fact. **Denied** to the extent of Happy Hour's

use of the present tense "sells," which implies ongoing operations, as the record reflects that Happy Hour is no longer a going concern. (*See* Morton Dep. 71:22-72:2.)

2. **Admitted** that Can Man was a beverage co-packing company that operated a facility in Pennsburg, Pennsylvania. **Denied** that Can Man operated a co-packing facility in Waverly New York. The Waverly facility is operated by Best Bev, which is a separate legal entity. (*See* Sheehan Decl. ¶¶ 1-5.) Further **denied** to the extent Happy Hour's statement conflates Can Man with Best Bev or otherwise inaccurately attributes operations between distinct entities. (*See* Sheehan Decl. ¶¶ 2-5; Uszenski Decl. ¶¶ 1-4; Parzych Dep. 68:4-14, 80:5-11.)

3. **Admitted** that Happy Hour engaged Can Man as a co-packer to manufacture and package its product into aluminum cans. **Denied** to the extent Happy Hour's statement implies that Can Man was Happy Hour's sole or exclusive co-packer throughout the relevant period. The record reflects that Happy Hour also engaged Wild Pack beginning in or about December 2022, including a test run and subsequent production runs. (*See* Dkt. No. 130-3, Novian Dep. 18-21-19:8, 19:17-21.)

4. **Admitted** that Can Man acted as a co-packer and received ingredients supplied by or on behalf of Happy Hour, stored them, blended them, and packaged the product into cans. **Denied** to the extent Happy Hour's statement implies that

Can Man sold product to consumers. Rather, Can Man shipped finished product to Happy Hour's designated distributors. (*See* Novian Dep. 62:8-21.) **Denied** to the extent the cited materials (Dr. Iezzi's Report) are offered to establish these operational facts, as they are not based on personal knowledge or identified business records. *See Croons v. N.Y. State Office of Mental Health*, 304 F.R.D. 98, 102 (N.D.N.Y. 2015). **Denied** to the extent Happy Hour's characterization overstates or misrepresents the record.

5. **Admitted** that Can Man began operating in approximately summer of 2021. **Denied** to the extent Happy Hour characterizes the issues at hand as "defects," as the cause of the alleged can failures remains disputed and has not been established. (*See* Dkt. No. 130-13, Pitts Decl. ¶ 24.) **Denied** to the extent Happy Hour's characterization assumes a known cause or defect.

6. **Admitted** only that Can Man performed multiple production runs for Happy Hour during the relevant period. **Denied** that the cited materials establish that Can Man packed "over one million cans annually" or "over 240,000 cans per production run." Dr. Iezzi's report identifies no foundation or source for these figures, and his role as a corrosion scientist does not provide him with personal knowledge of Can Man's production volumes or business records. *See Croons v. N.Y. State Office of Mental Health*, 304 F.R.D. 98, 102 (N.D.N.Y. 2015). (*see also* Dkt. No. 133-5, Iezzi Aff., Ex. A at p. 2). **Denied** to the extent the asserted

quantities are unsupported by admissible evidence or testimony. Fed. R. Civ. P. 56(c)(2).

**[Purported] Failure #1: No Pre-Production Validation Process**

7. **Admitted** that Mr. Mondoc testified that Can Man and Best Bev did not have an in-house pre-production validation process for testing formula-can compatibility prior to production. **Denied** to the extent Happy Hour's statement implies that such validation must be performed in-house by a co-packer or that the absence of an in-house process establishes a breach of any applicable standard. The record reflects that the validation responsibilities and specifications are driven by the customer and the applicable can manufacturer, and testing may be performed by third-party laboratories where requested. (*See* Dkt. No. 130-13, Pitts Decl. ¶ 10; Rittenburg Decl. ¶¶ 2-3; Parzych Dep. 57:9-58:10; Zimmerman Dep. 62:14-63:5) **Denied** to the extent Happy Hour's characterization overstates Mr. Mondoc's testimony or presents it as establishing an industry-wide standard applicable to co-packers.

8. **Admitted** that Mr. Mondoc testified, in response to questioning about industry standards, that *in his view* certain testing (including copper, chloride, and fill volume) "would have been part of a … normalized and standardized validation activity" and "should … have been well-standardized" prior to Can Man's

operations. (*See* Goodman Aff., Ex. E., Mondoc Dep. 60:17-61:21.) **Denied** that such testimony constitutes a statement of material fact. The cited testimony reflets Mr. Mondoc's subjective beliefs and personal practices, expressly framed as "in my mind," and does not identify any objective, recognized industry standard regulation or authoritative source. Such testimony is precluded by Fed. R. Evid 701 and 702 as Mr. Mondoc has not been qualified to testify as to an expert or to give lay opinion on this topic. **Denied** to the extent Happy Hour's characterization improperly presents this opinion testimony as undisputed material fact establishing a standard of care or breach. (*See* Goodman Aff., Ex. E., Mondoc Dep. 60:17-61:21.)

**[Purported] Failure #2: Inability to Test for Copper and Chloride**

9. **Admitted** that Mr. Zimmerman sent the email dated March 28, 2023 identifying certain tests that Can Man was not performing in-house. **Denied** as to the relevance of the specifications because they were for Crown Packaging cans. (Zimmerman Decl. ¶¶ 17-19.) **Denied** to the extent Happy Hour's characterization omits that Happy Hour used cans from Kian Joo and, later, from Ardagh. (*See* Dkt. No. 130-3, Novian Dep. 44:24-45:6; Dkt. No. 130-13, Pitts Decl. ¶ 5.)

10. **Admitted** that Can Man did not perform in-house testing for copper or chloride and that Zimmerman testified that, to his knowledge, the company

lacked the in-house capability to do so. (*See* Goodman Aff., Ex. D, Zimmerman Dep. 171:14-172:21.) **Denied** that Can Man lacked the ability to provide or facilitate such testing. Had a customer or can manufacturer requested copper or chloride testing, Can Man would have utilized third-party laboratories to ensure compliance with requested specifications. (*See* Dkt. No. 130-13, Pitts Decl. ¶ 10.) **Denied** to the extent Happy Hour's characterization suggests that Can Man was unable to provide such testing upon request.

11. **Denied** that copper (less than 0.2 ppm) and chloride (less than 50 ppm) specifications are "standard parameters" uniformly required by aluminum can manufacturers. Dr. Iezzi's report and affidavit express that he was retained to "opine on the leaks" and that his analysis is directed to "what caused the leakers." (*See* Dkt. No. 133-5, Iezzi Aff. ¶¶ 8, 12; Ex. A at 2, 5.) As such, he does not articulate a defined or reliably supported industry standard of care for beverage co-packers, nor does he identify any regulatory authority or objective trade standard to support his assertions. Further **denied** to the extent the record reflects that such specifications are manufacturer-specific and governed by the applicable can manufacturer's warranty requirements, rather than a single horizontal industry standard. (*See* Zimmerman Dep. 62:14–63:5; 182:15–183:8.) Further **denied** as the cited materials misattribute Crown Packaging specifications to Ardagh Metal Packaging cans. (*See* Dkt. No. 133-3, Goodman Aff., Ex. D; Zimmerman Decl. ¶¶

17-19.) **Denied** to the extent Plaintiff's characterization overstates or misrepresents the cited materials.

12. **Denied**. This assertion relies on an unproduced third-party report purportedly prepared by Ardagh, a non-party, and therefore is not supported by evidence that can be presented in admissible form. *See* Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 802. Dr. Iezzi's reliance on such materials does not establish the underlying test results as undisputed, and Can Man and Best Bev lack a basis to admit the accuracy, methodology, or conclusions of the referenced testing. Further **denied** that the cited materials establish that any chloride levels "far exceed[ed]" an applicable warranty limit, as this is a characterization and disputed expert opinion rather than a statement of material fact. **Denied** to the extent Happy Hour's characterization overstates or misrepresents the cited materials.

13. **Denied**. The assertion relies on an unproduced third-party report purportedly prepared by Ardagh, a non-party, and therefore is not supported by evidence that can be presented in admissible form. *See* Fed. R. Civ. P. 56(c)(2). Dr. Iezzi's reliance on such materials does not establish the underlying facts as undisputed, and Can Man and Best Bev lack a basis to admit the accuracy, methodology, or conclusions of the referenced testing. Further **denied** that the cited materials establish that "clusters of copper particles [were] attacking the interior

can surfaces." This is a characterization and disputed expert opinion, not a statement of material fact.

**[Purported] Failure #3: Failed Dissolved Oxygen Control**

14. **Admitted** that, during relevant periods, Can Man's baseline upper allowable limit for dissolved oxygen was 2,000 ppb. Can Man used this specification where a customer did not provide a different requirement or applicable can manufacturer specifications. (Dkt. No. 133-13, Pitts Decl. ¶ 8; Zimmerman Dep. 183:9-184:14) Can Man would adhere to a different dissolved oxygen specifications when the customer provided the applicable specifications for a can manufacturer or requested based on the customer's own requirements. (Dkt. No. 130-13, Pitts Decl. ¶8; Zimmerman Dep. 156:16-157:10.)

15. **Denied** that the cited materials establish that Ardagh's warranty limit for dissolved oxygen was 1,000 ppb in admissible form. The referenced exhibit is not authenticated or otherwise supported by competent evidence sufficient to establish Ardagh's alleged specification. (*See* Dkt. No. 133-5, Iezzi Aff., Ex. A at 14-15.) **Denied** that the cited materials establish an "industry-wide standard" of approximately 1,200 ppb for dissolved oxygen. The referenced literature does not reflect a uniform industry standard and, instead, indicates that the dissolved oxygen limits vary by can manufacturer and application. (*Id*.) Further **denied** to the extent

Happy Hour's characterization is inconsistent with record evidence that dissolved oxygen specifications in the beverage co-packing context are governed by the can manufacturer's requirements, absent a customer-specified alternative. (*See* Dkt. No. 130-13, Pitts Decl. ¶ 8.) **Denied** to the extent the cited materials do not support the proposition asserted.

16. **Admitted**.

17. **Admitted** that Dr. Iezzi holds the opinion that dissolved oxygen is a dominant factor affecting aluminum can corrosion in beverages. **Denied** that his opinion constitutes an undisputed material fact or is supported as characterized by Happy Hour. **Objection** as to Happy Hour's assertion regarding the scientific literature, as that information cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). **Denied** that the cited materials establish that the scientific literature "uniformly" sets a maximum safe limit of approximately 1,200 ppb. The referenced excerpts reflect variation in dissolved oxygen specifications among can manufacturers and identify additional factors, including pH, product composition, and environmental conditions as significant contributors to corrosion. (*See* Dkt. No. 135-5, Iezzi Aff. ¶ 12.c, Ex. A at 14-18.) **Denied** to the extent Happy Hour's characterization overstates or misrepresents the conclusions of the cited literature.

**[Purported] Standard of Care, Breach, and Causation**

18. **Admitted** that Dr. Iezzi is a Ph.D. metallurgist and corrosion scientist and that his *curriculum vitae* reflects over 40 years of professional experience. **Denied** that the cited materials establish that he has "over 40 years of experience in aluminum can corrosion technology." Dr. Iezzi's *curriculum vitae* reflects that his work relating to food and beverage containers concluded during his tenure at Campbell Soup Company in or about 1989 and does not demonstrate continuous or specialized experience in aluminum beverage can corrosion thereafter. (See Dkt. No. 133-5, Iezzi Aff., Ex. A at 19–20.) Further **denied** to the extent Dr. Iezzi's *curriculum vitae* references work with "metal & plastic food packages" or "metal containers" generally, as such descriptions do not establish specific expertise in aluminum beverage can corrosion technology. (Id. at 20.)

19. **Admitted** that Dr. Iezzi reviewed various case documents and scientific literature, and purports to rely on his technical knowledge, skill, experience, training, and education. **Denied** further that Dr. Iezzi offers a competent or disclosed opinion regarding the applicable standard of care. Dr. Iezzi was retained to opine on causation, not industry standards, and neither his report nor affidavit articulates that he is qualified to or, in fact has, opined with regard to an established or recognized standard of care for beverage co-packers. (Dkt. No.

133-5, Iezzi Decl. ¶¶ 8, 12, Ex. A at 2, 5.) **Objection** on the grounds that Dr. Iezzi is not qualified to opine with regard to "standard of care" in the relevant industry. (Sheppard Aff. ¶ 14-15) **Denied** that the enumerated "standard of care" requirements are established facts, including: pre-production validation testing; specified copper and chloride thresholds; dissolved oxygen limits; and required laboratory capabilities. These are unsupported expert opinions and legal conclusions, not proper statements of material fact. **Denied** as to the statements regarding the alleged corrosion mechanisms, including that such mechanisms are "well-established," that copper caused galvanic corrosion, that chloride ions caused pitting corrosion, and that dissolved oxygen accelerated those processes. Those assertions constitute disputed expert opinion drawn from Dr. Iezzi's affirmation and are improperly presented as undisputed material facts. (*See* Dkt. No. 133-5, Iezzi Aff. ¶¶ 10-11, 14.) **Denied** to the extent the cited materials do not support the propositions asserted.

20. **Admitted** that Dr. Iezzi expressed opinions regarding the alleged cause of corrosion and the practices of Can Man and Best Bev. **Denied** that such opinions constitute statements of material fact, as they are disputed expert opinions and legal conclusions improperly presented as undisputed facts. Further **denied** to the extent Dr. Iezzi purports to opine on any "standard of care," as his report and affidavit do not identify any recognized industry standard, regulation, or

authoritative source establishing such requirements, and his analysis is directed to causation rather than defining co-packer obligations. (*See generally* Dkt. No. 133-5, Iezzi Aff.) **Objection** on the grounds that Dr. Iezzi is not qualified to opine with regard to "standard of care" in the relevant industry. (Sheppard Aff. ¶¶ 14-15) Further **denied** that the cited materials establish that Can Man or Best Bev lacked "technology, know-how, or capability," failed to appreciate the significance of dissolved oxygen, copper, or chloride, or failed to control dissolved oxygen levels, as these are conclusory assertions that are unsupported by admissible evidence and are disputed by the record. (*See, e.g.*, Dkt. No. 133-3, Goodman Aff., Ex. G, Pitts Dep. 44:7-11; Zimmerman Dep. 156:16-157:10; Dkt. No. 130-13, Pitts Decl. ¶ 7) **Denied** to the extent Happy Hour's characterization overstates or misrepresents Dr. Iezzi's opinions or the cited materials.

21. **Admitted** that Dr. Iezzi opined that certain alleged failures by Can Man and Best Bev caused or contributed to corrosion and characterized those opinions as a "Perfect Storm of Corrosion." (*See* Dkt. No. 133-5, Iezzi Aff. ¶ 13, Ex. A at 6-7, 18.) **Denied** that such statements constitute material facts, as they are disputed expert opinions and conclusions improperly presented as undisputed facts. Further **denied** that the cited materials establish causation, as Dr. Iezzi's opinions are conclusory and fail to account for other variables reflected in the record, including use of the original tequila during the June 2022 production run, the DO

controls in place during the April 2023 production run, Happy Hour failure to provide the specifications for its cans until approximately nine months after the issues first arose, product formulation and can manufacturing differences. (*See* Dkt. No. 130-13, Pitts Decl. ¶¶ 6, 12; Dkt. No. 133-5, Iezzi Aff., Ex. A at 15-16; Sheppard Aff. ¶¶ 18-14) **Denied** to the extent Happy Hour's characterization overstates or misrepresents Dr. Iezzi's opinions or the cited materials.

22. **Admitted** that the expert disclosure deadline has passed, that Can Man and Best Bev did not designate an expert to rebut Dr. Iezzi, and that Can Man and Best Bev did not depose Dr. Iezzi. **Denied** that this statement constitutes a material fact; rather it is a recitation of procedural history. **Denied** further to the extent the paragraph implies that Can Man and Best Bev are precluded from challenging the admissibility, foundation, or weight of Dr. Iezzi's testimony, or from rebutting such testimony using other admissible evidence in the record. **Denied** further that Defendants have not advanced any alternative theory of causation, i.e., Happy Hour's failure to provide Can Man with relevant specifications. (Sheppard Aff. at ¶¶ 23-24; A. Rittenburg Decl. ¶¶ 2-3).

23. **Admitted** that Mr. Mondoc used the phrases cited in his deposition. (*See* Goodman Aff. ¶ 7, Ex. E, Mondoc Dep. 39:20–40:9, 57:20–58:22.) **Denied** that such testimony constitutes a statement of material fact, as it reflects Mr. Mondoc's subjective lay opinion, including speculation regarding hiring practices

for which he admitted he lacked current knowledge. Further **denied** to the extent Happy Hour omits Mr. Mondoc's testimony that the in-house equipment provided was "suitable" for the scope of the operation and that his characterization of being "underequipped" related to the internal prioritization of testing rather than a lack of capability to ensure product quality. (Goodman Aff. ¶ 7, Ex. E, Mondoc Dep. 57:20-58:22.) **Denied** further because Can Man maintained the capability to facilitate any required testing through third-party laboratories upon request, a process used when in-house equipment was not utilized. (*See* Dkt. No. 130-13, Pitts Decl. ¶ 10.) **Denied** to the extent Happy Hour presents these excerpts out of context to suggest an undisputed deficiency in Can Man's or Best Bev's overall operational capabilities.

24. **Admitted** that Mr. Mondoc testified that, in his view, Can Man's and Best Bev's quality control testing "was not as robust as it needed [to] be to make them 100-percent successful in the quality space," in the context of the scope and speed of operations ramp-up. (*See* Goodman Aff. ¶ 7, Ex. E, Mondoc Dep. 60:17–61:5.) **Denied** that such testimony constitutes a statement of material fact, as it reflects a subjective and qualified lay opinion rather than an objective assessment of any defined industry standard, and does not identify any recognized standard, methodology, or benchmark. Further **denied** to the extent Happy Hour's characterization presents this testimony as establishing a standard of care,

undisputed deficiency, or breach. **Denied** further to the extent the record reflects that Can Man could facilitate required testing through third-party laboratories when requested. (*See* Dkt. No. 130-13, Pitts Decl. ¶ 10; Rittenburg Decl. ¶¶ 2-3.)

25. **Admitted** that Casey Parzych authored and sent an email dated November 1, 2023 containing the quoted language. (*See* Goodman Aff. ¶ 10, Ex. H; Parzych Dep. 46:21–47:10, 48:15–17, Ex. C.) **Denied** to the extent Happy Hour offers these statements for their truth or as establishing negligence, fault, or any "failure of leadership," as the quoted language reflects lay speculation and opinion in the context of an internal discussion regarding leaking-cans concerning a different customer, and does not constitute an undisputed material fact concerning Happy Hour's products or the cause of any alleged leaks at issue here. (See also, Zimmerman Dep. 154:12-20.) **Denied** further to the extent Happy Hour's statement or characterization conflates Can Man and Best Bev or otherwise attributes operations, personnel, or responsibilities between distinct entities. (*See* Dkt. No. 126-6, Uszenski Decl. ¶¶ 3, 5; Dkt. No. 126-9, Sheehan Decl. ¶¶ 12, 16, 19, 27.)

**The [Purportedly] Defective Production Runs**

26. **Admitted** that Happy Hour reported leaking cans associated with production runs in or about June 2022, September/October 2022, April 2023, and

July 2023. **Denied** to the extent Happy Hour characterizes those issues as "significant," as that is a subjective characterization rather than a statement of material fact. **Denied** further to the extent Happy Hour's statement conflates Can Man and Best Bev, which are separate legal entities operating different facilities; Best Bev performed only the July 2023 production run. (Dkt. No. 126-9, Sheehan Decl. ¶ 30; Dkt. No. 126-6, Uszenski Decl. ¶¶ 3, 5; Pitts 5/20/26 Decl. ¶ 5.) **Denied** further to the extent Happy Hour implies the same cause across all runs, as the record reflects that the June 2022, September/October 2022, and April 2023 runs involved "pinhole" leaks, whereas the July 2023 run involved a seam-related issue requiring recalibration/retooling. (Dkt. No. 130-13, Pitts Decl. ¶¶ 13, 22, 34–35; Dkt. No. 130-10, Defs.' Resp. to Pl.'s Interrogatory Set 1 No. 15; Pitts 5/20/26 Decl. ¶ 5; Parzych Dep. 55:3-56:8)

27. **Admitted** that Happy Hour placed an order for approximately 10,000 cases (approximately 240,000 cans) for the September/October 2022 production run. **Denied** that the statements in the Novian Affirmation—including that the production run was "particularly catastrophic," that roughly 192,000 cans "could not be repaired," and that nearly 8,000 cases "had to be destroyed"—constitute undisputed material facts, as they are based on subjective characterization, inadmissible lay opinion, and/or hearsay concerning communications with third-party distributors rather than competent evidence. **Denied** to the extent Happy

Hour seeks to establish the scope of loss or the necessity of destruction through self-serving testimony that lacks a proper evidentiary foundation or supporting documentation in the record.

28. **Admitted** that Best Bev has acknowledged that the July 2023 production run was affected by a seaming tool that required recalibration/retooling. (*See* Dkt. No. 130-10, Defs.' Resp. to Pl.'s Interrogatory Set 1 No. 15.) **Denied** to the extent Happy Hour characterizes this acknowledgment as an acceptance of "liability," as that is a legal conclusion rather than a statement of material fact. **Denied** further to the extent Happy Hour conflates Can Man and Best Bev, which are separate legal entities; Can Man had no involvement in the July 2023 production run and does not accept liability for it. (*See* Dkt. No. 126-9, Sheehan Decl. ¶¶ 12, 19, 22–24, 27; Dkt. No. 126-6, Uszenski Decl. ¶¶ 3, 5, 12, 14.a–d; *See* Pitts 5/20/26 Decl. ¶ 5.)

**Fraudulent Concealment — Knowledge and Non-Disclosure**

29. **Admitted** that Mr. Zimmerman sent the October 13, 2022 internal email titled “Leakers Sinking the Ship,” and that it contains the quoted sentence. **Denied** to the extent Happy Hour offers the quoted sentence as an undisputed material fact establishing that “nearly every customer” in the prior three months in fact had leaking cans “in market, or in their warehouses,” because Zimmerman

testified that he could not say exactly which customers were running during that period "without any records," and his assessment was based on his observations while "seeing them in the building and trying to work on resolution," not on identified documentation or quantified data. (Dkt. No. 133-3, Goodman Aff., Ex. B, Zimmerman Dep. 67:8–68:8.) **Denied** further to the extent Happy Hour uses the email to imply a single, uniform leak mechanism comparable to Happy Hour's "pinhole" leaks, because the email thread and Zimmerman's testimony describe multiple, different leak scenarios (including wrinkles/damaged cans and other issues) and reflect that leaking often developed over time while product sat in inventory/WIP. (Dkt. No. 133-3, Goodman Aff., Ex. B, Zimmerman Dep. 65:23–66:2, 69:5–70:10, Ex. A 5:27 p.m. Email; Zimmerman Decl. ¶¶ 8-12.) (*see also* Dkt. No. 130-13, Pitts Decl. ¶¶ 13-16).

30. **Admitted** that, in the October 13, 2022 email thread and in his deposition testimony about that thread, Zimmerman identified Happy Hour among the customers he was referencing when discussing leaking-can issues during that time frame. (Goodman Aff. ¶ 4, Ex. B, Zimmerman Dep. 67:2–22; Zimmerman Email Ex. A.) **Denied** to the extent Happy Hour implies that the leaking issues referenced for other customers were the same as, or materially similar to, the leaking issues Happy Hour experienced, as the record reflects that Happy Hour's leaks in the relevant period were "pinhole leaks" and that this issue was unique to

Happy Hour. (Dkt. No. 130-13, Pitts Decl. ¶¶ 12–13, 22–23; Zimmerman Decl. ¶ 10-11.)

31. **Admitted** that the October 13, 2022 internal email authored by Andrew Zimmerman was produced in discovery and was not disclosed to Happy Hour prior to this litigation. **Denied** that the leaking can issues were "systemic," as that is a subjective characterization and a legal conclusion rather than a statement of material fact. **Denied** to the extent Happy Hour asserts as an undisputed fact that the problem affected "nearly every customer," as that assessment was based on Zimmerman's observations while attempting resolution of various issues, not on quantified data or identified records. (Dkt. No. 133-3, Goodman Aff., Ex. B, Zimmerman Dep. 67:8–68:8.) Denied further that the leaking issues experienced by other customers were materially similar to Happy Hour's unique "pinhole leaks," or that Can Man or Best Bev were under any obligation to disclose internal communications regarding third-party customers. (Dkt. No. 130-13, Pitts Decl. ¶¶ 13-16; Zimmerman Decl. ¶¶ 10-11.) Denied further to the extent Happy Hour's statement conflates Can Man and Best Bev or improperly attributes knowledge or conduct between separate legal entities. (*See* Uszenski Decl. ¶¶ 2-4; Sheehan Decl. ¶¶ 2-5; Parzych Dep. 68:4-14, 80:5-11.)

32. **Denied** to the extent that Mr. Novian suggests that Can Man and Best Bev ***never*** communicated to Happy Hour that copper and chloride testing was not

performed in-house. (Novian Dep. 73:13-74:10.) **Denied** to the extent Happy Hour implies that Can Man lacked the capability to obtain such testing, as Can Man could and would have facilitated testing through third-party laboratories upon request. (*See* Dkt. No. 130-13, Pitts Decl. ¶ 10.) **Denied** further to the extent Happy Hour implies that it was unaware of Can Man's operational capabilities, as Happy Hour personnel, including its principals and formulator, were present at Can Man's facility for a multi-day trial run and multiple production runs and had the opportunity to observe the production process. (*See* Dkt. No. 130-2, Morton Dep. 33:10–34:23, 35:20–36:4, 40:16–42:10, 44:2–11; Dkt. No. 130-3, Novian Dep. 17:3–18:14, 20:25–21:3.) **Denied** further to the extent Happy Hour implies that Can Man was under an affirmative duty to make any such disclosures (Rittenburg Decl. ¶¶ 2-3), and ignores the fact that Happy Hour never requested any such testing. (Dkt. No. 130-13, Pitts Decl. ¶ 10; Zimmerman Decl. ¶ 5).

33. **Admitted** that Can Man does not have evidence that it specifically communicated to Happy Hour that it used a base level dissolved oxygen specification of less than 2,000 ppb. **Denied** to the extent Novian's affirmation asserts as undisputed fact that Can Man's dissolved oxygen specification "exceeded" any applicable warranty limit or industry standard, as those characterizations are disputed. Can Man's work order form identified a dissolved oxygen specification of less than 2,000 ppb, and Can Man was not provided with

Ardagh's warranty limit for dissolved oxygen until March 24, 2023. (*See* Dkt. No. 130-13, Pitts Decl. ¶ 27; *see also* Dkt. No. 133-3, Goodman Aff. Ex. G, Pitts Dep. 44:7-10.) **Denied** further that a 1,200 ppb figure constitutes an established industry standard, as that figure is derived solely from Dr. Iezzi's disputed expert opinion and is not supported by any identified regulation, authoritative source, or uniform industry requirement; the applicable dissolved oxygen specification is typically set by each can manufacturer's warranty, which varies by manufacturer. (*See* Goodman Aff., Ex. G, Pitts Dep. 44:7–18.) **Denied** further to the extent Happy Hour implies that it was unaware of Can Man's operational specifications, as Happy Hour's principals and formulator attended a multi-day trial run and multiple production runs at Can Man's facility. (*See* Dkt. No. 130-2, Morton Dep. 33:10–34:23, 35:20–36:4, 40:16–42:10, 44:2–11; Dkt. No. 130-3, Novian Dep. 17:3–18:14, 20:25–21:3.) **Denied** further to the extent Happy Hour implies that Can Man was under an affirmative duty to make any such disclosure (Rittenburg Decl. ¶¶ 2-3), and ignores the fact that Happy Hour never requested such information nor did it ever request that Can Man adhere to a particular dissolved oxygen level for its production runs. (Dkt. No. 130-13, Pitts Decl. ¶¶ 6-9; Zimmerman Decl. ¶ 4).

34. **Admitted** that Can Man encouraged Happy Hour to contact its ingredient vendors to inquire whether any ingredient changes had been made. **Denied** that Can Man affirmatively told Happy Hour that the leaking was caused

by Happy Hour's tequila suppliers or ingredient changes, as Can Man did not know the root cause of the leaking and was actively investigating it. To the extent Can Man suggested contacting vendors, it was as part of a good-faith root cause investigation conducted after testing revealed elevated copper content and after further testing showed that copper levels were actually higher in the old tequila than in the new tequila. (*See* Zimmerman Decl. ¶¶ 15-16; Dkt. No. 130-13, Pitts Decl. ¶¶ 27-31; Dkt. No. 130-15, Pitts Decl. Ex. B; Dkt. No. 130-16, Pitts Decl. Ex. C; Novian Dep. 58:24–59:7.) **Denied** further that the leaking issues Happy Hour experienced were "systemic" or shared by other customers, as that characterization is subjective and the record reflects that Happy Hour's pinhole leaks were unique to its product. (*See* Dkt. No. 130-13, Pitts Decl. ¶ 13; Zimmerman Decl. ¶¶ 10-11.) **Denied** further to the extent Novian's affirmation presents these assertions as undisputed facts rather than self-serving characterizations of disputed events.

35. **Admitted** that Can Man communicated to Happy Hour that it would investigate the source of the leakage and work toward resolution. **Denied** to the extent Happy Hour characterizes those communications as “representations” or “assurances” made to “encourage” Happy Hour to continue the business relationship, as those characterizations are subjective and constitute legal conclusions rather than statements of material fact. **Denied** further to the extent

Novian's affirmation presents this assertion as an undisputed fact, as the record reflects that Can Man's communications were made in good faith as part of an active root cause investigation, not as inducements to continue the relationship, and that Can Man discouraged Happy Hour from running additional product until the root cause was identified. (Zimmerman Decl. ¶¶ 13-16; Dkt. No. 130-8, Novian Dep. Ex. D.)

36. **Admitted** that Happy Hour placed an order with Can Man for approximately 5,000 cases for the April 2023 production run, and that Happy Hour placed an order with Best Bev for approximately 7,000 cases for the July 2023 production run. **Admitted** that some cans in each of those runs leaked. **Denied** to the extent Happy Hour asserts that those orders were placed "in reliance on" representations or assurances by Can Man, as that is a contested legal conclusion rather than a statement of material fact. The record reflects that Can Man advised Happy Hour as early as February 17, 2023 that it needed Ardagh's sign-off on the interaction between Happy Hour's formula and the can before proceeding with additional production runs, and that Novian agreed "on all points," yet on March 21, 2023 Novian requested that Can Man proceed with the April run even though Ardagh had not yet reported back. (*See* Dkt. No. 130-8, Novian Dep. Ex. D.) **Denied** further to the extent Happy Hour characterizes the cans produced in those runs as "defective," as the cause of any leaking during the April 2023 run remains

disputed (see Dkt. No. 130-13, Pitts Decl. ¶¶ 34-35), and the leaks in the Best Bev June 2023 production run were caused by tooling issues and did not result in the same kind of "pinhole" leaks. (Pitts 5/20/26 Decl. ¶ 5; Parzych Dep. 55:3-56:8) **Denied** further to the extent Happy Hour conflates Can Man and Best Bev, which are separate legal entities; the July 2023 production run was performed exclusively by Best Bev. (*See* Uszenski Decl. ¶¶ 2-4; Sheehan Decl. ¶¶ 2-5; Pitts 5/20/26 Decl. ¶ 5.)

37. **Admitted** that Andrew Zimmerman sent an internal email on March 28, 2023 that identified copper and chloride among parameters not then being tested in-house. **Denied** that Can Man did not communicate to Happy Hour that copper and chloride testing was not performed in-house prior to accepting the April 2023 order; Matthew Novian was aware that Can Man sent the tequila products used in Happy Hour's production runs "to a lab" for testing and provided those results to Novian. (Novian Dep. 73:18-74:10; Dkt. No. 130-13, Pitts Decl. ¶¶ 29-32). **Denied** to the extent Happy Hour implies that Can Man was incapable of obtaining such testing, as Can Man could and would have facilitated copper and chloride testing through third-party laboratories upon request. (*See* Dkt. No. 130-13, Pitts Decl. ¶ 10.) **Denied** further to the extent Happy Hour implies that the absence of in-house copper and chloride testing was causally related to the leaking

issues in the April 2023 production run, as causation remains disputed. (Dkt. No. 130-13, Pitts Decl. ¶ 34-35).

38. **Denied** to the extent Happy Hour characterizes Zimmerman's testimony as an unqualified admission. The cited testimony reflects speculation, as Zimmerman expressly qualified his answer by stating, "I don't know if I could answer that question," before offering his belief about what Happy Hour might have done. (*See* Goodman Aff. ¶ 5, Ex. C, Zimmerman Dep. 118:21–119:11; Zimmerman Decl. ¶ 20.) Further **denied** because Zimmerman has no personal knowledge of what Happy Hour would have done if told about other customers' leaking issues, and the record reflects that, even after Happy Hour experienced pinhole leaks in the September/October 2022 production runs, Happy Hour requested additional production runs, while Can Man recommended against additional runs until the root cause analysis was complete. *Croons v. N.Y. State Office of Mental Health*, 304 F.R.D. 98, 102 (N.D.N.Y. 2015); (Zimmerman Decl. ¶ 20; Dkt. No. 130-8, Novian Dep. Ex. D.) **Denied** further to the extent Happy Hour implies that the leaking issues experienced by other customers were materially similar to Happy Hour's "pinhole" leaks, as the record reflects that Happy Hour's "pinhole" leaks were unique to its product and distinct from the leaking issues experienced by other customers. (Dkt. No. 130-13, Pitts Decl. ¶ 13; Zimmerman Decl. ¶¶ 10-11.)

39. **Admitted** that Pitts testified that Can Man had no written protocol for validating that a new formula was compatible with aluminum cans. **Denied** that no pilot or trial run was performed for Happy Hour at Can Man, as Happy Hour's co-founders and formulator attended a three-day trial production run at Can Man's Pennsburg, Pennsylvania facility in March 2021. (Dkt. No. 130-2, Morton Dep. 33:10–34:23, 35:20–36:4; Dkt. No. 130-3, Novian Dep. 17:3–18:14, 20:25–21:3.) **Denied** further to the extent Happy Hour characterizes the absence of a written protocol or additional preproduction validation as a breach of any applicable standard of care, as that is a disputed expert/legal conclusion rather than a statement of material fact. (Rittenburg Decl. ¶¶ 2-3; Parzych Dep. 57:3-58-10) **Denied** further to the extent Happy Hour attributes Pitts's testimony regarding Can Man's practices to Best Bev or conflates Can Man and Best Bev. (*See* Uszenski Decl. ¶¶ 2-4; Sheehan Decl. ¶¶ 2-5; Parzych Dep. 68:4-14, 80:5-11.)

40. **Admitted** that Pitts testified that, as of March 28, 2023, Can Man did not have the in-house capability to test for copper or chloride levels. **Denied** to the extent Happy Hour implies that Can Man was incapable of obtaining such testing, as Can Man could and would have facilitated copper and chloride testing through third-party laboratories upon request, with costs passed to the customer. (*See* Dkt. No. 130-13, Pitts Decl. ¶ 10.) **Denied** further to the extent Happy Hour characterizes the absence of such in-house testing capabilities as a breach of any

applicable standard of care, as that is a disputed expert/legal conclusion rather than a statement of material fact. (Rittenburg Decl. ¶¶ 2-3; Parzych Dep. 57:3-58-10)

41. **Admitted** that Pitts testified that Can Man did not have the in-house means to test the copper content of the Jarabes Y Destilados tequila, and that Can Man did not independently test the new tequila for copper content prior to using it in Happy Hour's production runs. **Denied** to the extent Happy Hour implies that the switch to Jarabes Y Destilados was a unilateral decision by Can Man, as the record reflects that Pitts notified Happy Hour of the supplier change and offered to send samples of the new tequila, and that Happy Hour approved the switch. (Dkt. No. 130-13, Pitts Decl. ¶¶ 17–19; Dkt. No. 130-3, Novian Dep. 50:24–51:24.) **Denied** further to the extent Happy Hour implies that Can Man bore sole responsibility for testing the new tequila's copper content, as Happy Hour was provided samples of the new tequila, its formulator prepared samples for testing, and Happy Hour approved the use of the new supplier without requesting that Can Man conduct or arrange for any copper testing. (Dkt. No. 130-13, Pitts Decl. ¶¶ 18–19; Dkt. No. 130-3, Novian Dep. 48:2–11, 51:10–24.)(See also Rittenburg Decl. ¶¶ 2-3; Parzych Dep. 57:3-58-10)

42. **Admitted** that Can Man's work orders reflected a dissolved oxygen specification of less than 2,000 ppb as the upper allowable limit. **Denied** to the extent Happy Hour characterizes Can Man's dissolved oxygen specification as

having knowingly "exceeded" Ardagh's specification in connection with the June, August, September or October 2022 Happy Hour production runs, as Can Man was not provided with Ardagh's dissolved oxygen specifications until March 24, 2023. (*See* Dkt. No. 130-16, Pitts Decl. ¶ 27; Zimmerman Decl. ¶ 16.) Rather, during his deposition, Pitts merely acknowledged that 2,000 ppb is a higher number than 1,000 to 1,200 ppb. (Dkt. No. 133-3, Pitts Dep. 45:15-19). In addition, during the April 2023 Happy Hour production run, Can Man controlled for Ardagh's then-disclosed dissolved oxygen specification, but that run also had "pinhole" leaks in the cans. (Dkt. No. 130-13, Pitts Decl. ¶¶ 34-35.) **Denied** further to the extent Happy Hour implies that the 1,000 to 1,200 ppb figure constitutes a uniform industry standard, as the applicable dissolved oxygen specification is set by each can manufacturer's warranty and varies by manufacturer, and the 1,200 ppb figure is derived from Dr. Iezzi's disputed expert opinion rather than any identified regulation or authoritative industry source. (*See* Goodman Aff., Ex. G, Pitts Dep. 44:7–18; Zimmerman Dep. 62:14-63:5.)

43. **Admitted** that Pitts, when shown the October 13, 2022 "Leakers Sinking the Ship" email, confirmed that Zimmerman's statement that "nearly every customer" had experienced leaking cans was accurate, and that Pitts testified that the contents of that email were not disclosed to Happy Hour to his knowledge. **Denied** to the extent Happy Hour implies that the leaking issues experienced by

other customers were similar to Happy Hour's pinhole leaks, as the record reflects that the leaking issues affecting other customers were different in nature, involving production line damage or seaming issues, and that Happy Hour's pinhole leaks were unique to its product. (Dkt. No. 130-13, Pitts Decl. ¶¶ 13-14; Zimmerman Decl. ¶ 11.) **Denied** further to the extent Happy Hour implies that Can Man was under a legal obligation to disclose internal communications regarding third-party customers' distinct leaking issues, as that is a contested legal conclusion rather than a statement of material fact. **Denied** further that the characterization of the leaking issues as affecting "nearly every customer" constitutes an undisputed material fact, as Zimmerman testified that his assessment was based on personal observation rather than identified records or quantified data. (Dkt. No. 133-3, Goodman Aff., Ex. B, Zimmerman Dep. 67:8–68:8.)

44. **Admitted** that Pitts testified that Can Man's communications with Happy Hour regarding leaking cans were focused on the problems observed with Happy Hour's product specifically, and that Can Man did not disclose to Happy Hour that other customers had experienced different leaking can issues prior to the September/October 2022 production runs. **Denied** to the extent Happy Hour implies that Can Man was under a legal obligation to disclose other customers' distinct leaking issues to Happy Hour, as that is a contested legal conclusion rather than a statement of material fact. **Denied** further to the extent Happy Hour implies that the

leaking issues experienced by other customers were materially similar to Happy Hour's pinhole leaks, as the record reflects that other customers' leaking issues involved production line damage or seaming issues and were different in nature from the pinhole leaks unique to Happy Hour's product. (Zimmerman Decl. ¶¶ 11; Dkt. No. 130-13, Pitts Decl. ¶ 13-14.) **Denied** further to the extent Happy Hour uses Pitts's testimony to establish that Can Man's focus on Happy Hour-specific communications constituted a fraudulent omission, as Can Man communicated with Happy Hour regarding its specific leaking issue and was actively investigating the root cause. (Zimmerman Decl. ¶¶ 13-14; Zimmerman Dep. 107:10-21, 108:2-109:5; Mondoc Dep. 129:5-15; Ciocci Dep. 82:14-24)

45. **Denied**. This statement is lifted directly from Novian's self-serving affirmation and does not constitute a statement of undisputed material fact. The assertion is speculative, premised entirely on a hypothetical scenario about what Happy Hour "would have" done and is contradicted by the record, which reflects that Happy Hour continued to request additional production runs even after it was aware of pinhole leaks in the September/October 2022 runs, while Can Man recommended against additional runs until the root cause analysis was complete. (Zimmerman Decl. ¶ 20; Dkt. No. 130-8, Novian Dep. Ex. D.) **Denied** further because the record reflects that Happy Hour had already engaged Wild Pack as an alternative co-packer as early as December 2022, yet continued to place production

orders with Can Man thereafter, directly undermining Happy Hour's assertion that it would have "immediately sought an alternative co-packer" had it known of the alleged issues. (Dkt. No. 130-3, Novian Dep. 18-21-19:8, 19:17-21.) **Denied** further because the predicate characterizations embedded in this statement—that the leaking issues were "systemic and company-wide," that Can Man and Best Bev "lacked the capability" to test for copper and chloride, and that dissolved oxygen specifications "far exceeded" the can manufacturer's warranty limits—are each disputed, subjective, or constitute legal conclusions, as set forth in Can Man and Best Bev's responses to SMF ¶¶ 29-44. **Denied** further to the extent this statement improperly conflates Can Man and Best Bev as a single entity, as they are separate legal entities that operated distinct facilities. (*See* Uszenski Decl. ¶¶ 2-4; Sheehan Decl. ¶¶ 2-5; Parzych Dep. 64:4-14, 80:5-11.) The questions of reliance and causation are disputed issues of fact reserved for the finder of fact and are not properly resolved on summary judgment through a party's own affirmation.

## STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE

**The Parties**

1. Can Man and Best Bev are two different businesses. (Parzych Dep. 68:4-14.)

2. Can Man and Best Bev operate in different locations. (Parzych Dep. 68:4-14.)

3. Can Man has only ever operated a co-packing facility on Pennsburg, Pennsylvania. (Uszenski Decl. ¶ 4.)

4. Best Bev has only ever operated a co-packing facility in Waverly, New York. (Sheehan Decl. ¶ 5.)

5. Best Bev is not a successor to Can Man. (Parzych Dep. 68:4-14.)

6. Best Bev was formed to take advantage of a perceived need for additional aluminum can filling companies. (Parzych Dep. 82:22-83:7.)

**Standard of Care in the Industry**

7. In the beverage co-packing industry, as between a beverage company and co-packer, the beverage company is responsible for specifying a bill of materials (ingredients, cans, suppliers, etc.). (Rittenburg Decl. ¶ 2.)

8. The co-packer is responsible for producing finished goods consistent with the beverage company's specifications. (Rittenburg Decl. ¶ 2.)

9. Compatibility of the formulation with the can/liner selected by the beverage company is typically validated by the beverage company, or its formulator for the beverage company. (Rittenburg Decl. ¶ 2.)

10. Most co-packers cannot perform formulation-can/liner compatibility tests in-house. (Rittenburg Decl. ¶ 2.)

11. Most co-packers do not offer to perform formulation-can/liner compatibility tests in-house as a guarantee of product shelf-life. (Rittenburg Decl. ¶ 2.)

12. It is not common in the industry for the average co-packer to have the equipment necessary to test for copper and chloride. (Parzych Dep. 57:9-58:10.)

13. A customer should not expect a co-packer to validate that the customer's formula is compatible with its selected can unless the co-packer offers such service and provides a contract with guarantees for the service. (Rittenburg Decl. ¶ 3.)

**Can Man's Operations**

14. Can Man did not work directly with can manufacturers. (Zimmerman Dep. 62:14-63:5.)

15. Instead, the cans were sourced by the customer and the customer would work with the can manufacturers to secure specifications and provide them to Can Man. (Zimmerman Dep. 62:14-63:5.)

**Co-Packing Happy Hour's Product**

16. Happy Hour did not request that Can Man adhere to a particular dissolved oxygen ("DO") level for its production runs. (Pitts 5/20/26 Decl. ¶ 3)

17. Happy Hour never requested that Can Man conduct or arrange for any pre-production testing of its products or its cans for items such as copper levels or chloride levels. (*Id.*)

18. Andre Reodica, Happy Hour's formulator, did identify certain parameters that Can Man was required to test for during the Happy Hour production runs, including pH, Brix (a measure of the amount of dissolved solids in a liquid, which is used to measure dissolved sugar), and carbonation. (*Id.* ¶ 4.)

19. Can Man did test for these issues and complied with Mr. Reodica' specifications. (*Id.*)

20. Happy Hour never requested copies of test results. (Zimmerman Dep. 191:3-14.)

21. Had Happy Hour requested test results, they would have been provided. (Zimmerman Dep. 191:3-14.)

22. In response to counsel's questions, Andrew Zimmerman testified that defendants were not negligent and that, in particular, and depending on a customer's specifications, running dissolved oxygen levels of 2,000 ppm was not negligent. (Zimmerman Dep. 154:12-20, 156:16-157:10.)

**The July 2023 Production Run at Best Bev**

23. In July 2023, Best Bev completed one production run for Happy Hour at Best Bev's production facility in Waverly New York. (Pitts 5/20/26 Decl. ¶ 5; Parzych Dep. 55:3-56:8.)

24. Happy Hour also experienced leaking cans from this production run. (Pitts 5/20/26 Decl. ¶ 5; Parzych Dep. 55:3-56:8.)

25. The leaking cans from this production run resulted from a seaming tool that needed to be recalibrated/retooled. (Pitts 5/20/26 Decl. ¶ 5; Parzych Dep. 55:3-56:8.)

26. This production run did not result in "pinhole" leaks. (Pitts 5/20/26 Decl. ¶ 5; Parzych Dep. 55:3-56:8.)

**Happy Hour's New Theory of Fraud**

27. A copy of the October 13, 2022 email from Andrew Zimmerman, titled "Leakers Sinking the Ship," referenced throughout plaintiff's motion papers, and on which plaintiff is asserting a new theory of liability, was produced in discovery to the plaintiff's counsel on August 12, 2024. (Sheppard Aff. ¶ 10)

28. Thereafter, counsel for plaintiff deposed Mr. Zimmerman over three days (December 16, 2024, February 4, 2025 and February 5, 2025), and questioned Mr. Zimmerman at length regarding this email. (Sheppard Aff. ¶ 11.)

**Issues with Dr. Iezzi's Opinion**

29. Dr. Robert Iezzi ("Dr. Iezzi") explains that he was retained to offer an expert opinion on what caused Happy Hour's cans to leak. (Dkt. No. 133-5, Iezzi Aff. ¶ 8.)

30. He does not claim to, nor does he actually, offer an opinion as to any applicable "standard of care" relevant to this motion. (Sheppard Aff. ¶ 13.)

31. There is nothing in Dr. Iezzi's curriculum vitae or his report establishing that he is qualified to opine on the standard of care in the "ready to drink" beverage or beverage co-packing industry. (Sheppard Aff. ¶ 14.)

32. Dr. Iezzi is a metallurgist and notes only that he is "qualified to offer opinions on aluminum can corrosion because of [his] more than 40 years' experience in corrosion technology." (Dkt. No. 133-5, Iezzi Decl. ¶¶ 5-7, and Ex. A, p. 3).

33. There is no indication, in his declaration or report, that Dr. Iezzi surveyed RTD beverage co-packers or relied on any such evidence in formulating or expressing any opinion regarding "standard of care." (Sheppard Aff. ¶ 15.)

34. Dr. Iezzi does not opine that any applicable "standard of care" required defendants—in the absence of a specific request from plaintiff—to perform pre-production validation testing, or to test for and maintain copper levels below 0.2 ppm and chloride levels below 50 ppm. (Sheppard Aff. ¶ 16.)

35. Dr. Iezzi asserts that that the "industry-wide standard" for dissolved oxygen (DO) levels is 1.2 ppm (Dkt. No. 133-5, Iezzi Decl. ¶ 12[c].)

36. Dr. Iezzi also notes that the Ardagh cans at issue in this litigation had a "warranty limit" of 1,000 ppm (*Id.*).

37. Ardagh's warranty limit is below the "industry-wide standard" that Dr. Iezzi asserts. (Sheppard Aff. ¶ 17.)

38. Dr. Iezzi offers no evidence that any applicable "standard of care" required defendants—in the absence of a specific request from plaintiff—to maintain DO levels below Ardagh's warranty limit, particularly in light of plaintiff's failure to provide Can Man with those can-specific specifications. (Sheppard Aff. ¶ 17.)

39. Dr. Iezzi states that "Can Man changed tequila suppliers in the summer of 2022 from Casa Maestri to Infinity tequila. Prior to the change in tequila, leakers did not occur." (Dkt. No. 133-5, Ex. A at p. 9.)

40. The June 2022 production run used Casa Maestri tequila (the old tequila) and developed "pinhole" leaks. (Dkt. No. 130-13, Pitts Decl. ¶¶ 12-13.)

41. Dr. Iezzi highlights the assertion that Can Man experienced leaking cans with other customers (Dkt. No. 133-5, Ex. A at pp. 5, 7)

42. However, Dr. Iezzi ignores the fact that none of these other customer's cans involved "pinhole" leaks. (Zimmerman Decl. ¶ 11; Dkt. No. 130-13, Pitts Decl. ¶¶ 14-16.)

43. Dr. Iezzi ignores the fact that cans from the April 2023 production run, which controlled for and adhered to Ardagh' DO specifications, still developed "pinhole" leaks. (Sheppard Aff. ¶ 18[c]; Dkt. No. 130-13, Pitts Decl. ¶¶ 34, 35.)

44. Since both tequilas were ingredients in production runs that resulted in pinhole leaks (i.e., the June 2022 production run for the old tequila and the August/September/October runs for the new tequila), the suggestion that the "switch" from one tequila to another triggered the leaks is unsupportable. (Sheppard Aff. ¶ 19.)

45. Since the same leaks developed following the April 2023 production run, in which DO levels were maintained below 700 ppm, the conclusion that DO levels caused the leaks is not reliable. (Sheppard Aff. ¶ 19.)

46. Dr. Iezzi did not take into account that Happy Hour's other (non-tequila) ingredients as a possible contributory factor. (Sheppard Aff. ¶ 10.)

47. Dr. Iezzi did not take into account Ardagh's cans, themselves, as a possible contributory factor. (Sheppard Aff. ¶ 10.)

48. Happy Hour sourced the non-tequila ingredients and the cans. (Dkt. No. 130-13, Pitts Decl. ¶ 4.; Zimmerman Decl. ¶ 3; Novian Dep. 15:4-24, 62:8-63:12.)

49. Dr. Iezzi references two sets of test results: one from Bdas and one from Eurofins. (Dkt. No. 133-5, Ex. A at pp. 9-12).

50. The unit of measure for those respective tests is different: (a) mg/L for Bdas; and (b) parts per million (ppm) for Eurofins. (*See id.*)

51. Dr. Iezzi failed to translate the results of one of the tests to make an apples-to-apples comparison of the BDAS and Eurofins results. (Sheppard Aff. ¶ 21.)

52. Dr. Iezzi relied heavily on an undisclosed, unattached report from Ardagh, identified only as "TR # T23046 & T23064, 4/15/2025." (Dkt. No. 133-5, Ex. A at pp. 4, 10-15.)

53. Dr. Iezzi's suggestion—and plaintiff's assertion—that Can Man is responsible for the leaking issues completely ignores plaintiff's fault for the resulting issues. (Sheppard Aff. ¶ 23.)

Dated: May 22, 2026
Binghamton, New York

By: ***/s/ Paul T. Sheppard***

Paul T. Sheppard, Esq.
NDNY Bar Roll No. 102596
Hinman, Howard & Kattell, LLP
*Attorneys for Defendants*
80 Exchange Street
PO Box 5250
Binghamton, New York 13902-5250
Telephone: (607) 723-5341
Facsimile: (607) 723-6605
Email: psheppard@hhk.com